ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit A

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF BERKELEY | C.A. No.: 2025-CP-08-_____ |
| Berkeley Charter Education Association, Inc.<br>　　　　Plaintiff, | |
| vs. | **SUMMONS** |
| Red Apple Development, LLC, Red Apple at Liberty, LLC, Red Apple at Berkeley, LLC | |
| 　　　　Defendants. | |

　　　　YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your Answer to the Complaint on the subscriber at his office, Haynsworth Sinkler Boyd, P.A., ONE North Main, 2nd Floor (29601), Post Office Box 2048, Greenville, South Carolina 29602 within thirty (30) days after the service hereof, exclusive of the day of such service.  Your Answer must be in writing and signed by you or your attorney and must state your address or the address of your attorney, if signed by your attorney.  If you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the Complaint.

HAYNSWORTH SINKLER BOYD, P.A.

By: _s/J.W. Matthews III_____
　　　J.W. Matthews, III (SC Bar No. 68581)
　　　Christopher B. Major (SC Bar No. 72872)
　　　William D. Smith (SC Bar No. 105860)
　　　ONE North Main Street, 2nd Floor (29601)
　　　P.O. Box 2048
　　　Greenville, SC 29602
　　　(864)240-3200 (p)
　　　jmatthews@hsblawfirm.com
　　　cmajor@hsblawfirm.com
　　　wsmith@hsblawfirm.com

　　　***Attorneys for Plaintiff***

February 11, 2025
Greenville, South Carolina

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

STATE OF SOUTH CAROLINA

COUNTY OF BERKELEY

Berkeley Charter Education
Association, Inc.
              Plaintiff,

vs.

Red Apple Development, LLC, Red
Apple at Liberty, LLC, Red Apple at
Berkeley, LLC

              Defendants.

IN THE COURT OF COMMON PLEAS

C.A. No.: 2025-CP-08-_____

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

Plaintiff, Berkeley Charter Education Association, Inc. ("BCEA"), complaining of Defendants, Red Apple Development, LLC ("Red Apple"), Red Apple at Liberty, LLC ("RAL"), and Red Apple at Berkeley, LLC ("RAB", collectively "Defendants") would respectfully allege and show unto the Court as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.     BCEA is a non-profit organization incorporated under the laws of the State of South Carolina with its principal place of business in Charleston, South Carolina and doing business in Berkeley County, South Carolina.

2.     Red Apple is a limited liability company incorporated under the laws of the State of Florida and doing business in Berkeley County, South Carolina.

3.     RAL is a limited liability company incorporated under the laws of the State of Florida and doing business in Berkeley County, South Carolina.

4.     RAB is a limited liability company incorporated under the laws of the State of Florida and doing business in Berkeley County, South Carolina.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

5.    Venue is proper in this Court pursuant to S.C. Code Ann. § 15-7-30.

6.    Jurisdiction is proper before this Court.

## **FACTUAL ALLEGATIONS**

7.    BCEA operates charter schools, Mevers School of Excellence ("Mevers") and Berkeley Preparatory Academy ("BPA" collectively with Mevers the "Schools"), in Berkeley County, South Carolina.

8.    Red Apple engages in the acquisition, design, development, and construction of charter school facilities throughout the United States. Red Apple also coordinates with charter school operators to engage them with management companies, typically entities that share common ownership with Red Apple Development, LLC, that oversee the management of charter schools.

9.    Upon information and belief, RAB and RAL are subsidiaries and alter egos of Red Apple. For each school that it develops, Red Apple typically forms a separate limited liability company that functions as a holding company for the real estate and/or improvements upon which the school sits.  Upon information and belief, Red Apple exercises total dominion and control over RAB and RAL, RAB and RAL have no separate corporate forms from Red Apple (such as a separate board of directors or personnel) and RAB and RAL have no separate corporate interests from Red Apple. Accordingly, to treat RAB and RAL as separate corporate entities from Red Apple would result in unfair and inequitable consequences.

10.    In 2016 and 2020, BCEA engaged one or more of each of the Defendants to develop, design, and finance facilities for the Schools to be located in Berkeley County, South Carolina. For both BPA and Mevers, BCEA and the Defendants executed two (2) separate agreements: a development agreement and an interim lease agreement, some of which contained

later-executed addendums.[1] These agreements contain slight differences, but result in the same relief for each of the Schools for the purposes of this Complaint.

## **DEVELOPMENT OF MEVERS FOR A GUARANTEED COST**

11.     Effective December 22nd, 2016, BCEA and Red Apple entered into the Development Agreement for the School that would come to be known as "Mevers School of Excellence" ("Mevers"), a true and accurate copy of which is attached to this Complaint as **Exhibit A**, and is hereinafter referred to as the "Mevers Development Agreement."  Red Apple would earn a fee of five percent (5%) of the development costs of the construction for Mevers, not to exceed $750,000.  Ex. A, § 4.

12.     Under this agreement, Red Apple promised to acquire the location for the Mevers facilities and construct the Mevers school facilities. Ex. A, §§ 3.1 & 3.2.  It was required to lease back the completed facilities to BCEA immediately pursuant to the terms of an Interim Lease that was itself an exhibit to the Mevers Development Agreement, an exhibit which was in fact executed by the parties upon completion of the Mevers school facilities.  A true and accurate copy of the Mevers lease is attached hereto as **Exhibit B**, and is hereinafter referred to as the "Mevers Interim Lease."

13.     Under the Mevers Development Agreement, Red Apple guaranteed BCEA that the cost (to BCEA) of the school would not exceed **$15,015,790**, and that Red Apple would then Lease the facility to BCEA on such terms that BCEA would not incur rent calculated on costs that exceeded this number.  The relevant provision of the Mevers Development Agreement states:

> Red Apple shall [construct] the Charter School facility…at a cost basis that is guaranteed not to exceed $15,015,790, Red Apple will indemnify and hold

---

[1] Each of the agreements are exhibited to this Complaint as Exhibits A-E, and are collectively referenced herein as the "Agreements."

4

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

harmless BCEA from paying costs or (incurring rent calculated on costs) that exceed $15,015,790[.]

Ex. A, § 3.4.

14.        Beyond its obligation to deliver a complete school facility at a cost basis of $15,015,790, Red Apple promised that upon the closing of any loan or financing of the cost of the improvements, it would recalculate the rent in a new "Replacement Lease," and charge BCEA rent that could not exceed the debt service on said loan.  The relevant provision of the Mevers Interim Lease provides:

> Notwithstanding anything herein to the contrary, upon the closing of a loan the proceeds of which are used to finance or refinance…the acquisition of and/or improvements at the Premises (the 'Financing'), the parties agree to terminate this Lease and execute and deliver a long-term Lease Agreement or long-term Ground Lease for the Premises (the 'Replacement Lease'), which Replacement Lease shall provide for… an annual Base Rent in an amount equal to the lesser of (i) the Base Rent [as defined in the Interim Lease] in effect at the time of termination, or (ii) the debt service for such Financing.

Ex. B, Art. 1 § 1 (emphasis added)

15.        The Mevers Development Agreement and the Mevers Interim Lease cross-reference each other as it relates to this obligation to charge rent based on the debt service for the cost of the improvements.  The Mevers Development Agreement refers directly to the preceding provision of the Mevers Interim Lease, stating:

> Red Apple warrants that the Base Rent set forth in the Exhibit B of the Lease will not increase, and that the modified rent as calculated in Article I, Section I(ii) [of the Mevers Interim Lease] will not exceed the debt service that would be calculated by amortizing the $15,015,790 at prevailing financial terms.

Ex. A, § 3.4 (emphasis added).

16.        In essence, the Mevers Development Agreement and Mevers Interim Lease obligate Red Apple do to two things: (1) to construct the Mevers Facilities for an amount

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

guaranteed not to exceed $15,015,790; and (2) to obtain financing of that $15,015,790 and ultimately rent the Mevers Facilities to BCEA at an amount not to exceed the debt service on $15,015,790.

## ADDENDUM TO THE MEVERS INTERIM LEASE

17.     BCEA continued to urge Red Apple to obtain debt financing for the Mevers Facilities and thereby lower the rents charged to BCEA. In early 2018, Red Apple approached BCEA and informed BCEA of its desire to obtain bank financing for Mevers without triggering Red Apple's obligations to execute a Replacement Lease that charged a rent that was equal to the debt service obligations for the financing. The parties contemplated a single tax-exempt bond issued after the anticipated construction of the second school, BPA.

18.     In exchange for BCEA allowing Red Apple to secure financing for Mevers with lowering the rent it was being charged, Red Apple promised to act in good faith to secure bond financing that would result in the execution of a "Replacement Lease" by 2020.

19.     The parties memorialized this agreement in an "Addendum to Interim Lease Agreement" executed on February 8, 2018 (hereinafter "Mevers Interim Lease Addendum"). A true and accurate copy of the Mevers Interim Lease Addendum is attached hereto as **Exhibit C**.

20.     Red Apple then subsequently failed to obtain such financing, nor did Red Apple act in good faith to attempt to do so.

## DEVELOPMENT OF BPA FOR A GUARANTEED COST

21.     The parties proceeded to work together to build the second school. Effective October 5th, 2020, BCEA and Red Apple entered into a second Development Agreement for the School that would come to be known as "Berkeley Preparatory Academy" ("BPA"), a true and accurate copy of which is attached to this Complaint as **Exhibit D,** and is hereinafter referred to

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

as the "BPA Development Agreement." Red Apple would earn a fee of five percent (5%) of the development costs of the construction of BPA, not to exceed $661,603. Ex. D, § 4.

22.    Similar to the Mevers Development Agreement, under the BPA Development Agreement, Red Apple promised to construct the BPA school facilities.[2] Ex. D, § 3.4. It was also required to lease the completed facilities to BCEA immediately pursuant to the terms of an Interim Lease that was itself an exhibit to the BPA Development Agreement, and which was in fact executed by the parties upon completion of the BPA school facilities. A true and accurate copy of the BPA lease is attached hereto as **Exhibit E,** and hereinafter referred to as the "BPA Interim Lease."

23.    Under the BPA Development Agreement, Red Apple guaranteed BCEA that the cost (to BCEA) of the school would not exceed **$13,453,231**, and that Red Apple would lease the facility to BCEA on such terms that BCEA would not incur rent calculated on costs that exceeded this number. The relevant provision of the BPA Development Agreement states "Red Apple shall [construct]… the Project… at a cost basis that is guaranteed not to exceed $13,453,231 ("Cost Basis"). Ex. D, § 3.4.

24.    Beyond its obligations to deliver a complete school facility at a cost basis of $13,453,231, and like its arrangement for Mevers, Red Apple promised that upon the closing of any loan or financing of the cost of the improvements, it would recalculate the rent in a new "Replacement Lease," and charge BCEA rent that could not exceed the debt service on said loan. The relevant provision of the BPA Interim Lease provides:

> Notwithstanding anything herein to the contrary, upon the closing of a loan the proceeds of which are used to finance or refinance…the acquisition of and/or improvements at the Premises (the 'Financing'), the parties agree to terminate this Lease and execute and deliver a long-term Lease Agreement for the Premises (the 'Replacement Lease'), which

---

[2] BCEA already owned the site for the BPA facility. Ex. D., § 3.1.

Replacement Lease shall provide for…an annual Base Rent in an amount equal to the lesser of (i) the Base Rent (as defined herein) in effect at the time of termination or (ii) the debt service for such Financing.

Ex. E, Art.1 § 2.

25.     Reinforcing the above-recited promise in the BPA Interim Lease, the BPA Development Agreement also promised BCEA that Red Apple would timely obtain "Permanent Financing", stating:

> Provided it is financially feasible, within eighteen (18) months, [Red Apple] and BCEA will use their best efforts to cooperate in obtaining Permanent Financing for the Project and Property. Such financing may include [the Mevers Facilities]. It is anticipated that the existing Interim Lease and Mevers lease obligations would be reduced with Permanent Financing.

Ex. D, § 3.6.

26.     In essence, the BPA Development Agreement and BPA Interim Lease obligate Red Apple to do two things: (1) to construct the BPA Facilities for an amount not to exceed $13,453,231; and (2) to obtain financing of that $13,453,231 and ultimately rent the BPA Facilities to BCEA at an amount not to exceed the debt service on $13,453,231.

## RED APPLE FAILS AND REFUSES TO PERFORM

27.     The BPA Facilities were completed and operational by August of 2021. Red Apple had promised to use "best efforts" to obtain "Permanent Financing" within eighteen (18) months, but did not diligently proceed on its promise. BCEA has repeatedly urged Defendants to honor their agreements, and bring about a transaction whereby the two Interim Leases are replaced by a financing transaction. Defendants have failed and refused, and have continued to charge Base Rent at the annually escalating rates in the Interim Leases.

28.     Defendants have proposed financial terms which ignore their obligations under the Agreements. BCEA, through its Board, has offered to purchase the Schools from Defendants

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

numerous times, but each attempt at a transaction has not resulted in a deal. Upon information and belief, Defendants have purposely delayed and obfuscated, receiving excessive rents in an attempt to outlast the Board, and in disregard of BCEA's contractual rights.

29. BCEA's good faith offers to carry out the Agreements have been met with evasive, convoluted, and unfair counteroffers from Defendants that are merely ploys to maintain control by Red Apple's affiliated management entity over the Schools and deprive BCEA of the benefit of its bargain under the Agreements. Rather than honoring their promise of "prevailing market terms," Defendants have refused to consider any avenue of financing other than their exclusive partner, Hamlin Capital Advisors, LLC. Hamlin and Defendants have insisted on oppressive, non-market terms designed to keep Red Apple's commonly-owned management company (Charter Schools USA) as the management company for the Schools for the duration of a 30-year tax-exempt bond issue.

30. For conduct during the relevant timeframe of BCEA's attempts in good faith to bring about a transaction with Defendants, the U.S. Securities and Exchange Commission has sanctioned Hamlin Capital Advisors for, among other things:

- Failing to timely disclose conflicts of interest based upon an affiliate of Hamlin Capital Advisors purchasing "either all or a substantial portion of the offered bonds."

- Failing to timely disclose conflicts of interest based upon an affiliate of Hamlin Capital Advisors acting as a "compensated bondholder representative."

- Failing to ultimately disclose the correct relationship between Hamlin Capital Advisors and its affiliate because "it only disclosed that the firms had certain common ownership and both firms could 'receive fees.'"

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Source:  Website of the U.S. Securities and Exchange Commission, Administrative Proceeding File No. 3-22274, found at  https://www.sec.gov/enforcement-litigation/administrative-proceedings/34-101424-s.

### DAMAGES TO BCEA

31.    Defendants' conduct has caused, and continues to cause, substantial and extraordinary damages to BCEA.  Through the wrongful continuation of both Interim Leases, Defendants have charged excessive rents, rents that would have been much lower but for the failure of Defendants to fulfill their obligations.   BCEA's damages are ongoing, and will be subject to calculation at trial.

32.    Based on upon the duration of the Mevers Interim Lease, BCEA is entitled to compensation in excess of **$26,000,000** in order to place BCEA in the same position it should have been, but for the failure of Red Apple and RAL.

33.    Based on upon the duration of the BPA Interim Lease, BCEA is entitled to compensation in excess of **$14,000,000** in order to place BCEA in the same position it should have been, but for the failure of Red Apple and RAB.

### FOR A FIRST CAUSE OF ACTION
**(Breach of Contract as to all Defendants)**

34.    BCEA incorporates all previous allegations as if restated verbatim herein.

35.    The Develop Agreements, the Addendums thereto, and the Interim Lease Agreements are valid, enforceable contracts between BCEA and Defendants.

36.    Defendants have breached the Development Agreements and Interim Lease Agreements by, including but not limited to:

      a.  Upon information and belief, securing financing for the Schools and failing to charge lower rents than the rents in the Interim Lease Agreements; and

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

b.  Failing to pursue permanent financing in a timely manner;

c.  Charging rent in excess of the agreed upon Base Rent and Cost Basis;

d.  Failing to deliver the Schools to BCEA and its Board on the favorable financial terms the Board bargained for; and

e.  In other particulars to be shown at trial.

37.     BCEA has suffered damages as a result of Defendants' breach, including but not limited to, the payment of excess rental charges, along with incidental and consequential damages to be proven at trial.

## FOR A SECOND CAUSE OF ACTION
### (Specific Performance as to all Defendants)

38.     BCEA incorporates all previous allegations as if restated verbatim herein.

39.     The Agreements obligated Defendants to either refinance and lower the rents charged to BCEA, or sell the buildings comprising the Schools' facilities to the BCEA Board.

40.     Defendants have done neither, and have thereby deprived BCEA of its interest in a valid contract for the sale of real property.

41.     The Agreements were binding and enforceable as to BCEA and Defendants.

42.     BCEA carried into execution its obligations under the Agreements.

43.     BCEA has performed, or has been and remains able and willing to perform, its obligations under the Agreements.

44.     The Agreements were fair and entered into openly by both BCEA and Defendants.

45.     Due to Defendants refusal to perform their obligations under the Agreements, BCEA has been deprived of its interest in a valid contract for the sale of real property, causing BCEA to suffer damages for which no adequate remedy at law exists.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

46.     As such, BCEA is entitled to specific performance of the Agreements, including an Order requiring Red Apple to fulfill its obligation(s) under the Agreements to refinance or in the alternative, an Order requiring the sale of the buildings comprising the Schools' facilities at the agreed upon Cost Basis, respectively.

<div align="center">

**<u>FOR A THIRD CAUSE OF ACTION</u>**
**(Violation of South Carolina Unfair Trade Practices Act as to Defendant Red Apple)**

</div>

47.     BCEA incorporates all previous allegations as if restated verbatim herein.

48.     Defendant Red Apple, by securing financing for the Schools and not renegotiating the Interim Lease Agreements, and failing to proceed in good faith upon its promises, engaging in deceptive negotiation tactics intended to deprive BCEA of its rights under the Agreements and bring about control of the Schools by Charter Schools USA, has engaged in unfair and deceptive conduct in trade or commerce.

49.     Red Apple's above-described deceptive acts affect the public interest, as Red Apple is the developer of multiple charter schools in South Carolina and is capable of repeating these acts, and is likely to repeat these acts.

50.     BCEA has suffered damages as a result of Red Apple's unfair and deceptive conduct, including but not limited to being overcharged Base Rent and deprived of its property interests in the Schools themselves.

51.     Red Apple's use of unfair and deceptive practices was willful, such that BCEA is entitled to award of three times its actual damages pursuant to S.C. Code 39-5-140(a).

52.     BCEA is entitled to an award of its attorneys' fees and costs pursuant to S.C. Code 39-5-140.

      WHEREFORE, having fully set forth the causes of action against Defendants, Plaintiff BCEA demands:

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

a)      judgment against the Defendants for an award of actual and consequential damages in an amount to be shown at trial;

b)      specific performance of the Agreements;

c)      treble damages in an amount to be determined by the trier of fact;

d)      attorneys' fees and costs associated with prosecuting this action;

e)      pre-judgment interest;

f)      and for such other and further relief this Court deems just and proper.

Respectfully submitted,

HAYNSWORTH SINKLER BOYD, P.A.

By: _s/J.W. Matthews III_
     J.W. Matthews, III (SC Bar No. 68581)
     Christopher B. Major (SC Bar No. 72872)
     William D. Smith (SC Bar No. 105860)
     ONE North Main Street, 2nd Floor (29601)
     P.O. Box 2048
     Greenville, SC 29602
     (864)240-3200 (p)
     jmatthews@hsblawfirm.com
     cmajor@hsblawfirm.com
     wsmith@hsblawfirm.com

     ***Attorneys for Plaintiff***

February 11, 2025
Greenville, South Carolina

Exhibit A

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

# DEVELOPMENT AGREEMENT

**THIS DEVELOPMENT AGREEMENT** (this "**Agreement**") is made and entered into effective as of this 22nd day of December, 2016, by **RED APPLE DEVELOPMENT, LLC**, a Florida limited liability company, or its authorized assigns ("**Red Apple**") and **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a South Carolina not-for-profit corporation ("**BCEA**").

## RECITALS

**WHEREAS,** BCEA has filed or anticipates filing a charter application(s) (the "**Charter Application**") for a grant of a charter for the operation of a public charter school located in South Carolina (the "**Charter School**");

**WHEREAS,** BCEA has determined that it is in its best interest to contract with Red Apple to assist in the development of the Charter School facility (the "**Project**");

**WHEREAS,** Red Apple has determined that it is in its best interest to contract with BCEA in connection with the Project; and

**WHEREAS,** BCEA wishes to contract with Red Apple and Red Apple wishes to contract with BCEA, upon the terms and conditions set forth herein.

**NOW, THEREFORE** in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration receipt and sufficiency which is hereby acknowledged and further consideration of the mutual covenants and promises hereinafter set forth, the parties agree as follows:

1.    **Recitals**.  The recitals set forth above are true and correct and are incorporated herein by reference.

2.    **Engagement**.  BCEA hereby engages Red Apple and Red Apple hereby accepts such engagement from BCEA to provide the Services (as defined herein) in accordance with the terms of this Agreement.

3.    **Services**.  In connection with the obligations of BCEA with respect to the Project, Red Apple shall provide certain services, which services include the following (collectively, the "**Services**"):

3.1    Red Apple shall assist in identifying suitable site locations for the Charter School facility and shall propose and recommend optimal locations for the Charter School facility.

3.2    Red Apple shall advise BCEA in the planning and development of the Charter School facility and in connection therewith shall obtain proposals and engage, or cause to be engaged, professionals (i.e. contractors, architects, consultants, engineers, surveyors, etc.) to perform due diligence, entitlement, planning and design work required in connection with the Project (collectively, the "**Pre-construction Expenses**").

3.3    Red Apple shall assist in obtaining financing for the redevelopment, development, renovation and construction, as applicable, of the Charter School facility and in connection therewith BCEA shall be required to serve as a borrower or co-borrower on such financing (the "**Financing**") in the event the debt service for such Financing is less than the aggregate of the Base Rent (as defined in that certain Interim Lease Agreement dated December ___, 2016 between Red Apple at Liberty, LLC, as landlord, and BCEA, as tenant, as may be amended and/or assigned (the "**Lease**")) payable by BCEA under the Lease.

3.4    Red Apple shall redevelop, develop, renovate and construct, as applicable or cause to be redeveloped, developed, renovated and constructed, as applicable, the Charter School facility. in a scope, configuration, and quality that is at least equivalent to the entire facility and infrastructure identified and described in the Lease, at a cost basis that is guaranteed not to exceed $15,015,790,Red Apple will indemnify and hold harmless BCEA from paying costs (or incurring rent calculated on costs) that exceed $15,015,790.  Red Apple warrants that the Base Rent set forth in Exhibit B of the Lease will not increase, and that the modified rent as calculated in Article I, Section 1(ii) will not exceed the debt service that would be calculated by amortizing the $15,015,790 at prevailing market financial terms.

4.    **Fee**.  As and for the performance of its responsibilities hereunder and Services provided, Red Apple shall be paid by BCEA the amount equal to Five Percent (5%) of the total development costs of the Project (the "**Fee**"), which shall be the sum of $900,000 in land cost, $12,805,514 in Construction and Development cost, $500,000 in interim financing cost, and $100,000 in soft costs.  Further, Red Apple shall also be reimbursed for Pre-construction Expenses incurred, and included in the $15 million cost.   The Fee and Pre-construction Expenses shall be paid by BCEA to Red Apple directly from the Financing or other legally available funds of BCEA, in lump sum, upon substantial completion of the Project.  The Fee shall not exceed $750,000.

5.    **Termination of Agreement**.  This Agreement shall terminate on the date on which all obligations hereunder have been fully performed and no further obligations can arise hereunder.

6.    **Notices**.  All notices, requests, consents, instructions, and other communications required or permitted under this Agreement shall be in writing and shall be (as elected by the person giving such notice) either hand-delivered by messenger or nationally recognized overnight courier service, sent by facsimile with copy by mail, or mailed (air mail if international) by certified mail (postage prepaid), return receipt requested, and addressed to the parties as follows unless the address or facsimile number is changed by the party by like notice given to the other parties:

|  |  |
|---|---|
| If to BCEA: | Berkeley Charter Education Association, Inc.<br>103B Howard Mary Drive<br>Charleston, SC 29412<br>Attention:  Stewart Weinberg, Ph.D.<br>stewartweinberg@me.com |
| Copy to: | Haynsworth Sinkler Boyd, P.A._<br>ONE North Main<br>Greenville, SC 29615<br>Attention:  J.W. Matthews III<br>Facsimile No.:  864-240-3300 |
| If to Red Apple: | Red Apple Development, LLC<br>800 Corporate Drive, Suite 124<br>Fort Lauderdale, Florida 33334<br>Attention:  Scott Woodrey<br>Facsimile No.:  954-202-2047 |
| Copy to: | Tripp Scott, P.A. |

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

110 Southeast 6th Street
Fifteenth Floor
Fort Lauderdale, Florida 33301
Attention: Edward J. Pozzuoli, Esq.
Facsimile No.: 954-761-8475

Each such notice, request, consent, instruction or other communication shall be considered given and shall be deemed delivered: (a) three (3) days after mailing when mailed certified mail, return receipt requested, postage prepaid, or upon hand delivery by messenger to the address indicated or (b) one (1) day after acceptance for delivery by Federal Express or other nationally recognized overnight courier service for delivery at the address indicated or (c) when received by telephone facsimile transmission at the number indicated (with confirmation of receipt). Notice sent by counsel for either of the parties shall be deemed to be notice sent by such party.

7.     **No Partnership or Agency**. The relationship between the parties hereto shall be solely as set forth herein and neither party shall be deemed to be an employee, agent, partner, or joint venturer of the other party.

8.     **Assignment**. No party shall assign its rights or obligations hereunder without the prior written consent of the other party to this Agreement, which consent shall not be unreasonably withheld; provided, however, Red Apple shall have the right to assign this Agreement to an affiliate or related entity. For purposes hereof, "affiliate" as applied to any party, means any other person who directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such party. For purposes hereof, "control" (including "controlling", "controlled by", or "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of management and policies of such party, whether through ownership of voting securities, by agreement or otherwise.

9.     **Outside Business**. Nothing contained in this Agreement shall be construed to restrict or prevent, in any matter, Red Apple, or its representatives or principals from providing services to any third-party similar to the services provided pursuant to this Agreement.

10.     **Survival**. All of the covenants, agreements, representations, warranties, terms and provisions of this Agreement or otherwise made in writing by any party pursuant hereto shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby for a period of one (1) year after the date thereof.

11.     **Waiver of Jury Trial**. EACH OF RED APPLE AND BCEA HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTERS IN ANY WAY ARISING OUT OF OR CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF RED APPLE AND BCEA, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ENFORCEMENT OF ANY REMEDY HEREUNDER. THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF THE STATE OR FEDERAL COURTS IN THE STATE OF SOUTH CAROLINA IN RESPECT OF ANY SUIT OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT.

12.     **Miscellaneous**.

1341353v1 980058.0196

Exhibit A

(a)      This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.  The provisions of this Agreement may not be amended, supplemented, or waived orally, but only by a writing executed by the parties hereto.

(b)      The failure or delay of any party hereto to enforce any provisions of this Agreement shall not be construed to be a waiver of such or any other provision, nor in any way to affect the validity of all or any part of this Agreement, or the right of such party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

(c)      In the event that any portion of this Agreement is determined to be unconstitutional, unenforceable or invalid, such portion of this Agreement shall be stricken from and construed for all purposes not to constitute a part of this Agreement, and the remaining portion of this Agreement shall remain in full force and effect and shall, for all purposes, constitute the entire agreement so long as the material provisions of the parties bargain can still be given effect.

(d)      This Agreement shall be governed by South Carolina law.  Venue for any legal proceedings shall be in the state and federal courts of the State of South Carolina.

(e)      In the event of any controversy arising under or relating to the interpretation of this Agreement or any breach thereof, the prevailing party shall be entitled to recover all court costs, expenses, and reasonable attorneys' fees (including, without limitation, all pre-trial, trial and appellate proceedings) incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

(f)      All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and permitted assigns.

(g)      Time is of the essence of this Agreement.

(h)      The headings contained in this Agreement are for convenience of reference only, and shall not limit or otherwise affect in any way the meaning or interpretation of this Agreement.

(i)      This Agreement may be executed in any number of counterparts, each of which shall be considered an original and a complete set of which taken together shall constitute one and the same agreement.  The parties agree and intend that a signature by facsimile machine or other electronic transmission shall bind the party so signing with the same effect as though the signature was an original.

(j)      Each of BCEA and Red Apple has the full right, power and authority to enter into this Agreement and to perform each and all of the terms and provisions hereof, and to execute and deliver this Agreement.  Each of BCEA's and Red Apple's signatory to this Agreement is authorized to sign this Agreement on behalf of such party.

[signature page to follow]

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1341353v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed effective as of the day and year first above written.

**Witnesses:**                                          **BCEA:**

                                                        **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.,**
                                                        a South Carolina not-for-profit corporation

Printed Name: Debbie Fickling

                                                        By: _____
Print Name: KATHY M. GULICK                             Name: Stewart Weinberg, Ph.D.
                                                        Title: President

**Witnesses:**                                          **RED APPLE:**

                                                        **RED APPLE DEVELOPMENT, LLC,**
_____                          a Florida limited liability company
Print Name: _____

                                                        By: _____
_____                          Name: Jonathan K. Hage
Print Name: _____                               Title:   President

1341353v1 980058.0196

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed effective as of the day and year first above written.

Witnesses:

BCEA:

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.,**
a South Carolina not-for-profit corporation

_____

Printed Name: _____

By: _____
Name:  Stewart Weinberg, Ph.D.

_____

Print Name: _____

Title:  President

Witnesses:

Print Name: _____

**RED APPLE**:

**RED APPLE DEVELOPMENT, LLC,**
a Florida limited liability company

By: _____
Name:  Jonathan K. Hage

Print Name: _____

Title:   President

1341353v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit B

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**INTERIM LEASE AGREEMENT**

**By and Between**

**RED APPLE AT LIBERTY, LLC**

**as LANDLORD**

**and**

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**

**as TENANT**

**School:**

**Property Address:**

1333276v4 980058.0196

**INTERIM LEASE AGREEMENT**

**THIS INTERIM LEASE AGREEMENT** ("**Lease**") is made and entered into this 22nd day of December, 2016 by and between **RED APPLE AT LIBERTY, LLC**, a Florida limited liability company ("**Landlord**"), whose mailing address is 800 Corporate Drive, Suite 124, Fort Lauderdale, Florida 33334 and **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a South Carolina not-for-profit corporation ("**Tenant**"), whose mailing address is 17 East Battery Street, Charleston, South Carolina 29401.

**WITNESSETH:**

Landlord is the fee owner of a certain parcel(s) of real property consisting of approximately ten (10) acres for a K-8 charter school building, outdoor play area, athletic fields and related improvements (the building(s) and improvements and surrounding land and all appurtenant easements and rights benefiting or appurtenant to the real property being hereinafter referred to as the "**Premises**"), which Premises is located in the City of Goose Creek, County of Berkeley, State of South Carolina as more particularly described in the attached Exhibit "A".

In consideration of the mutual covenants of the respective parties, as herein provided, Landlord does hereby let, lease and demise, and by these presents has let, leased and demised unto Tenant the Premises.

**ARTICLE I**
**TERM, SURRENDER**

1.      **Term.**   The term of this Lease ("**Term**") shall commence on August 1, 2017 (the "**Commencement Date**"), for a term of forty-five (45) years.   Notwithstanding anything herein to the contrary, upon the closing of a loan the proceeds of which are used to finance or refinance, among other things, the acquisition of and/or improvements at the Premises (the "**Financing**"), the parties agree to terminate this Lease and execute and deliver a long-term Lease Agreement or long-term Ground Lease Agreement for the Premises (the "**Replacement Lease**"), which Replacement Lease shall provide for, among other things, an annual Base Rent in an amount equal to the lesser of (i) the Base Rent (as defined herein) in effect at the time of termination, or (ii) the debt service for such Financing.  The term of the Replacement Lease shall commence as of the date of termination of this Lease.  Tenant shall be required to serve as a borrower or co-borrower on such Financing in the event the debt service for such Financing is less than the aggregate of the Base Rent payable by Tenant under this Lease.

2.      **Lease Year.**   For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive period of twelve (12) calendar months, commencing on the first day of the calendar month following the calendar month in which the Rent Commencement Date (as defined herein) occurs and each anniversary of such day, except that the first Lease Year shall also include the period from the Rent Commencement Date until the first day of the following month.

3.      **Holdover Tenant.**   If Tenant shall remain in possession of the Premises following the expiration or the earlier termination of the Term without an agreement in writing between Landlord and Tenant with respect thereto, Tenant shall be deemed to be a tenant at sufferance and the rents and other amounts payable under this Lease during such holdover shall be 150% of the Base Rent in effect immediately prior to the expiration or earlier termination of the Term.  In no event, however, shall such holding over be deemed or construed to be or constitute a renewal or extension of this Lease.

1

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## ARTICLE II
## RENT

**1.     Base Rent.**  Tenant shall pay a monthly rental ("**Base Rent**") to Landlord, without deduction or setoff commencing on the Rent Commencement Date and continuing each month thereafter for the remainder of the Term, in the amount(s) set forth in Exhibit "B" attached hereto, in the manner herein provided.

The Base Rent has been determined using the actual costs associated with the land acquisition, development, construction, soft costs and Development Fee(s) totaling $15,000,000.00.

As used herein, the term "**Rent Commencement Date**" shall mean August 1, 2017.

No security deposit shall be required for the Term of this Lease.

If the Rent Commencement Date is not the first day of a month, then the monthly Base Rent for the first and last month of the Term shall be prorated accordingly.  All payments shall be made at Landlord's address below and shall be due on the first day of every month and late on the fifth (5th) day of the month in which the payment is due.  If payment is not made before the fifth (5th) day of the month in which the payment is due, then a five percent (5%) late fee will be added to that month against the unpaid amount. In no event may any such late fee exceed the maximum permitted by law.  The annual Base Rent during each Lease Year shall be paid by Tenant in equal monthly payments.

All Rent (as defined below) payable by Tenant under this Lease shall be paid to Landlord without prior notice or demand at 800 Corporate Drive, Suite 124, Fort Lauderdale, Florida 33334.

**2.     Additional Rent.**  If Tenant shall become obligated to Landlord under this Lease for any sum other than Base Rent, the amount thereof shall be deemed to constitute additional rent ("**Additional Rent**"; and together with Base Rent, "**Rent**") and shall be due and payable by Tenant simultaneously with the next succeeding monthly installment of Base Rent or at such other time as may be expressly provided in this Lease for the payment of the same.

**3.     Taxes and Assessments.**  Commencing on the Rent Commencement Date and continuing throughout the remainder of the Term, Tenant covenants and agrees to pay and discharge, when due and payable, any taxes (ad valorem, sales, excise and otherwise, but excluding income taxes), assessments, and governmental charges now or hereafter levied or assessed upon or against Tenant's or Landlord's interest in the Base Rent and Additional Rent, including, without limitation, assessments imposed by any community development district, private association, or pursuant to any private agreement affecting the Premises.  Should the appropriate taxing authority require that any of the foregoing be collected by Landlord for or on behalf of such taxing authority, then the same shall be paid by Tenant to Landlord as Additional Rent in accordance with the terms of any written notice from Landlord to Tenant to such effect.  Tenant shall pay all such taxes as and when the same become due and shall provide evidence of timely payment upon request from Landlord.

**4.     Operating Charges**.  Commencing on the Rent Commencement Date, Tenant shall directly pay, on behalf of Tenant and Landlord, all charges, costs, expenses, taxes, fees, licenses and permits as may be incurred, required, desired or needed for the operation of the Premises by Tenant, including, without limitation, maintenance of any easements benefitting or appurtenant to the Premises. This Lease is a triple net lease and other than Landlord's debt service, Landlord shall not have any charge, cost, expense for which it is responsible in connection with the Premises during the term of this Lease, Tenant being solely responsible for all costs of operation, maintenance, repair, insurance and taxes, whether or not such costs are specifically described in the Lease or contemplated as of the date hereof.

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

    **5.      Possible Renegotiation Option.** After ten (10) years of performance under this Lease or the Replacement Lease, Landlord and Tenant will confer in good faith to renegotiate the Lease or the Replacement Lease, the ownership structure, and the financing arrangements.   The good-faith negotiations may include an option by the Tenant to purchase the Premises.

<div align="center">

**ARTICLE III**
**USE AND MAINTENANCE OF PREMISES**

</div>

    **1.      Use of Premises.**  The Premises are to be used and occupied solely for such purposes as may be permitted by law.  Tenant shall not use the Premises for any unlawful purpose.  Tenant shall not do or permit any act or thing at the Premises which would constitute a public or private nuisance or waste.

    **2.      Maintenance and Repair.**   Except as set forth in this Lease to the contrary, Landlord shall deliver the Premises to Tenant in full and complete compliance with all laws, orders and regulations of federal, state and municipal authorities and with any lawful direction of any public officer (including but not limited to laws, orders and regulations with respect to The Americans with Disabilities Act of 1990). Landlord hereby represents that the HVAC, electrical, mechanical and plumbing systems of the Premises shall be in new and in good working condition as of the Rent Commencement Date.  Except as set forth herein, Landlord shall deliver the Premises to Tenant in its new condition.  Landlord agrees to assign all warranties to the extent such warranties are assignable by Landlord.  Tenant shall maintain and repair the entire interior of the Premises, at Tenant's sole expense, in good repair and condition, including but not limited to the building, electrical, plumbing and HVAC systems, and to keep the Premises in a clean and sanitary condition.  Tenant, at its own expense, shall be responsible for maintaining and keeping the building structure, roof, foundation, exterior walls, sidewalks and all utility service pipes and lines outside the exterior of the Premises in good repair and condition, including, to the extent that Tenant has either sole or shared maintenance obligations, all appurtenant easements, but not including easements owned and maintained exclusively by one other than Tenant.  Any maintenance and repairs under this Section shall be made promptly as and when necessary and shall be of a quality and class at least equal to the original work. Tenant shall not cause any trash or other refuse to accumulate on the Premises, and shall store and remove the same from the Premises at regular intervals, no less often than weekly.

    **3.      Landlord's Right of Access.**   Landlord, its agents and representatives, and any mortgagee of Landlord may, at all reasonable times, but with at least one (1) business day advance notice to Tenant except in the case of emergency, enter the Premises to make a walk-through examination or upon notification of termination of this Lease.

    **4.      Compliance with Law.**  Tenant agrees, at its own expense, to comply with all Laws (as defined below) which shall impose any duty upon Tenant with respect to its use of the Premises.

    **5.      Operation of Business.**  Provided that Tenant is not in default without regard to notice and cure periods under the terms of this Lease, Tenant shall not be required to be open for business or operate at any time during the Term of this Lease.

<div align="center">

**ARTICLE IV**
**ALTERATIONS AND IMPROVEMENTS**

</div>

    **1.      Equipment and Furnishings.**  Landlord covenants that Tenant shall be permitted to install personal property such as trade fixtures and equipment on and in the Premises.  Such personal property and equipment shall remain the property of Tenant after expiration of this Lease.

    **2.      Improvements.**  Throughout the Term of this Lease and at Tenant's sole cost, Tenant shall be permitted to make alterations, additions or improvements (hereinafter, "**Alterations**") in or to portions of the Premises as Tenant may desire provided that Tenant first obtains the prior written consent of Landlord, which consent may not be unreasonably withheld, delayed or conditioned.

Exhibit B

Notwithstanding the foregoing, all alterations must be accomplished in a manner that complies with all applicable local, state and federal laws, ordinances, rules and regulations (collectively, "**Laws**").

**3.    Approvals.**  Tenant shall have the right, throughout the Term and at its sole cost, to file and obtain any license or governmental approval (collectively, the "**Approvals**") that Tenant requires in order to conduct its business at the Premises and in connection with any Alterations.  Landlord agrees to cooperate with Tenant in Tenant's efforts to obtain each of the Approvals, at no expense to Landlord. Landlord shall, if required, join in the execution of any applications or other written requests provided that Landlord shall incur no liability or expense when doing so.

**4.    Signs.**  Tenant, throughout the Term and at its sole cost, shall be permitted to affix any sign, advertisement or notice (collectively "**Signs**") on any and every part of the Premises, with the prior written consent of Landlord as to design and installation methods and location, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing all Signs must be accomplished in a manner that complies with all applicable Laws.

**5.    No Liens Created by Tenant.**  Tenant shall not allow the Premises to become subject to any security interest, lien, charge or encumbrance whatsoever except as expressly provided herein.  If any mechanic's lien, materialman's lien or other lien is placed against the Premises, Tenant shall have thirty (30) days after notice thereof to remove same or to cause same to be released and discharged of record by posting a bond with the appropriate court of law in the amount of the lien. Tenant shall indemnify and hold Landlord harmless in the event of any default by Tenant under this provision, which indemnification shall survive the expiration or sooner termination of this Lease.

**6.    Quiet Enjoyment.**  Landlord covenants and warrants that Landlord shall have good and marketable title and the lawful right and authority to make this Lease as of the Rent Commencement Date, and that Tenant, upon paying the Base Rent and Additional Rent and performing and observing the covenants and conditions herein contained on Tenant's part to be performed and observed, shall and will peacefully and quietly have, hold and enjoy the Premises for the full Term.

**7.    Destruction of Premises**.  In the event of damage or destruction of fifty percent (50%) or more of the Premises which is not caused by the gross negligence or willful misconduct of the Tenant, its employees, guests or agents which renders the Premises reasonably and economically unsuitable for Tenant's business, as reasonably determined by Tenant, Tenant shall have the option to (i) terminate this Lease whereupon the Base Rent and Additional Rent shall be apportioned as of the date of such destruction, any prepaid Rents or deposits shall be returned, and the parties shall be released of all further duties and obligations hereunder; or (ii) at its sole expense, rebuild, repair or restore the Premises to a condition substantially similar to their condition at the Rent Commencement Date within 180 days of such damage or destruction and the Base Rent and any Additional Rent shall be abated during such rebuilding, repair and restoration.  Tenant shall notify Landlord in writing within thirty (30) days of the date of such damage or destruction of its election hereunder.  Tenant shall be required, at its sole expense, to rebuild, repair or restore any damage or destruction of less than fifty percent (50%) of the Premises to a condition substantially similar to their condition at the Rent Commencement Date within 180 days of the assessment by the Tenant's insurance carrier of such damage or destruction. The 180 day period provided herein for rebuilding, repairing or restoration shall be subject to reasonable time allowance for the purpose of adjusting the insurance loss, obtaining the necessary building permit or unavoidable delay and shall be enlarged by delays caused, without fault or neglect on the part of Tenant, by acts of God, strikes, lock-outs or other conditions, including, without limitation, adjusting the insurance loss and not obtaining building permits, beyond the control of Tenant.  Tenant's obligation to pay rent shall abate on a pro rata, square foot basis during period that some portion of the Premises are not usable under this Section In the event Tenant elects to terminate this Lease as aforesaid, (a) the Base Rent and Additional Rent shall be apportioned as of such date, any prepaid Rents or deposits shall be returned, and Tenant shall be released of all further duties and obligations hereunder; and (b) the proceeds collected under any policy or policies of casualty insurance for damage to the Premises shall be paid to Landlord; provided, however, Tenant shall be entitled to all

4

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

insurance proceeds, if any, recovered as a result of such casualty for its trade fixtures, equipment, personalty and inventory, which shall be separately insured.

8.     **Eminent Domain.**  In the event of condemnation or other similar taking or transfer due to governmental order, of a material portion of the buildings or land, which renders the land or buildings reasonably and economically unsuitable for Tenant's business, as reasonably determined by Tenant, this Lease, at Tenant's sole discretion, shall (i) terminate, in which case the Base Rent and Additional Rent shall be apportioned as of the date of termination, but not later than the date that the condemning authority actually takes possession of the part so condemned or purchased, any prepaid Rents or deposits shall be returned, and Tenant shall be released of all further duties and obligations hereunder; (ii) continue in full force and effect except that the Base Rent and Additional Rent shall be reduced by a percentage which is equivalent to the percentage of the Premises so taken.

If there is a partial taking of the buildings or land, or access thereto, such that the governmental taking results in an incomplete architectural unit, and this Lease is not thereupon terminated under the provisions of this Article but remains in full force and effect with a reduced Base Rent and Additional Rent as described above, then the Landlord shall, within a reasonable time thereafter and at Landlord's sole cost and expense, repair or reconstruct the remaining portion of the Premises or access to it to the extent necessary to make the same a complete architectural unit; provided that in complying with its obligations, Landlord shall not be required to expend more than the net proceeds of the condemnation award, which are paid to Landlord, and provided further that there shall be an abatement of the Rent and all other charges reserved hereunder during any period in which the Premises shall be rendered untenantable as a result of such partial taking.

Landlord shall be entitled to the entire proceeds of any condemnation award.  Tenant shall have no claim against Landlord or against the condemning authority for the value of any leasehold estate or for the value of the unexpired Lease Term.  Nothing, however, shall be construed to preclude Tenant from prosecuting any claim directly against the condemning authority for loss of business, for damage to, and cost of removal of, trade fixtures, furniture and other personal property belonging to Tenant, and for the unamortized cost of leasehold improvements to the extent same were installed at Tenant's expense, provided, however, that no such claim shall diminish or adversely affect Landlord's award.

## ARTICLE V
## UTILITIES

Tenant shall place in its name and shall pay or cause to be paid all charges for gas, electricity, light, heat, power, water, sewer, telephone, cable, trash collection and all other utility services used, rendered or supplied to or in connection with the Premises during the Term of this Lease and any renewals thereof.  The cost of such utilities shall include the cost incurred in connection with any easements or declarations providing for the use of off-site drainage facilities, lift stations, and the like, including, without limitation, the maintenance thereof.

## ARTICLE VI
## INSURANCE

1.     **Liability Insurance.**  Throughout the Term, Tenant shall obtain and maintain, at Tenant's sole cost, commercial general liability insurance against claims for bodily injury, death and property damage occurring in or about the Premises with a combined single limit per occurrence of $3,000,000, and a $5,000,000 annual aggregate, plus excess liability coverage with a limit of $5,000,000.  Landlord and Landlord's lender shall be named as additional insureds.

2.     **All-Risk Property Insurance.**  Throughout the Term, Tenant shall obtain and maintain at Tenant's sole cost, all-risk property insurance in the amount equal to the full replacement value of all buildings and contents of the Premises, insuring Tenant, Landlord, and lender as their interests may appear.

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit B

**3.    Worker's Compensation Insurance.**    Throughout the Term, Tenant shall obtain worker's compensation insurance in minimum limits as required by law of the jurisdiction in which the Premises is located.

**4.    Requirements.**  All policies of insurance required of Tenant hereunder shall (1) contain a severability of interest clause, a cross-liability clause, shall be primary and shall not call into contribution any other insurance available to Landlord, (2) contain an endorsement prohibiting cancellation or reduction of coverage without first giving Landlord, and if applicable, Landlord's first mortgagee, thirty (30) days prior written notice of such proposed action (by certified mail if permitted by the insurance carrier), (3) be issued by a company or companies licensed to do business in the jurisdiction in which the Premises is located and that has a rating equal to or exceeding A:XI form Best's Insurance Guide, and (4) upon request by Landlord, cause Landlord's first mortgagee to be added as an additional insured to the same extent as the Landlord.  The limit of said insurance shall not, however, limit the liability of Tenant hereunder.  Tenant shall furnish to Landlord a certificate of all required insurance and receipts evidencing payment therefor to Landlord on or before the Commencement Date and thereafter prior to the expiration of the policy then in effect.  Tenant is obligated to pay for deductibles associated with a loss.

**5.    Waiver of Subrogation**.    Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action, against the other, and their affiliates and each of their partners, members, governors, directors, shareholders, officers and employees for any loss or damage that may occur to the Premises, or any improvements thereto, or any personal property of any such party therein, by reason of fire, the elements, or any other cause which could be insured against under the terms of the all risk property insurance policies referred to in Article VI hereof (whether or not actually insured), or which is actually insured against by the party in question, regardless of cause or origin, including negligence of the other party hereto or its affiliates or any of their partners, members, governors, directors, shareholders, officers or employees, and covenants that to the extent of such waiver no insurer shall hold any right of subrogation against the other party hereto.

<div align="center">

**ARTICLE VII**
**ATTORNMENT AND SUBORDINATION; TENANT ESTOPPEL CERTIFICATE**

</div>

**1.    Attornment.**  Tenant shall, if requested by a mortgagee of the Premises at any time, or in the event any proceedings are brought for the foreclosure of or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease.  Tenant shall, if requested by a mortgagee of the Premises, provide to such mortgagee Tenant's financial statement, as and when requested.  In all events, Tenant will provide internally generated quarterly financial statements within 45 days after quarter end, and will provide unqualified audited financial statements within 180 days after fiscal year end.  As and when requested by any mortgagee of the Premises, Tenant shall deliver a copy of the certified enrollment.

**2.    Subordination.**  This Lease is hereby agreed by Tenant to be and is hereby made junior, subordinate and subject in right, priority and all other respects to any mortgage now or hereafter in force and effect upon or encumbering the Premises, and to all future modifications, extensions, and replacements of any such mortgage, and upon recording any of such mortgage, the same shall be deemed to be prior in dignity, lien and encumbrance of this Lease irrespective of the dates of execution, delivery or recordation of any such mortgage or mortgages.  The foregoing subordination provisions of this Section shall be automatic and self-operative without the necessity of the execution of any further instrument or agreement of subordination on the part of Tenant; provided, however, that Tenant shall execute a subordination, non-disturbance and attornment agreement reasonably acceptable to Tenant within ten (10) days after request therefor from Landlord.  Notwithstanding the foregoing, so long as Tenant shall not be in default in the performance of its obligations under this Lease, neither this Lease nor any of Tenant's rights hereunder, including but not limited to Tenant's right to remain in exclusive

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit B

possession of the Premises, shall be affected or disturbed by reason of any default under such mortgage and if such mortgage shall be foreclosed or if such mortgagee shall exercise any of its remedies under such mortgage, this Lease and all of Tenant's rights and obligations hereunder shall survive such foreclosure and continue in full force and effect.

**3.     Tenant Estoppel Certificate.**  Tenant agrees at any time and from time to time, within ten (10) business days after receipt of a written request from Landlord, to execute, acknowledge and deliver to Landlord or a party designated by Landlord a statement in writing (i) certifying that this Lease is unmodified and in full force and effect, or if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications, (ii) stating the Commencement Date and the expiration date of the Term of this Lease, (iii) stating the dates to which the Rent and other charges hereunder have been paid by Tenant, (iv) stating whether or not Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if Landlord is in default, specifying each such default, (v) agreeing that Tenant and Landlord will not thereafter modify the Lease without the approval of any mortgagee identified by Landlord, (vi) agreeing that Tenant shall not prepay any Rent more than one month in advance (other than to the extent that any payment of an installment of Tenant's Additional Rent when due constitutes such prepayment), and (vii) including such other matters relating to this Lease as may be reasonably requested, all in form and substance reasonably acceptable to Tenant. Any such statement delivered pursuant hereto may be relied upon by any owner of the Premises, any prospective purchaser of the Premises, any present or prospective mortgagee of the Premises or of Landlord's interest, or any prospective assignee of any such mortgagee.

## ARTICLE VIII
## DEFAULT

**1.     Tenant Events of Default.**  The occurrence of any one or more of the following shall constitute an "**Event of Default**" hereunder:  (a) Tenant's failure to pay any amount required hereunder within five (5) days after the date when due; (b) Tenant's failure to perform any other covenant, condition, agreement or provision contained herein within thirty (30) days after receipt of written notice of such failure (unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature reasonably be performed, done, or removed, as the case may be, within such thirty (30) day period, in which case no default shall be deemed to exist so long as Tenant shall have commenced doing the same within such thirty (30) day or other such period required in this Lease and shall diligently and continuously prosecute the same to completion); or (c) commencement of bankruptcy, insolvency, assignment for the benefit of creditors or receivership proceedings in respect of Tenant and the same is not dismissed within ninety (90) days from the date of commencement.

**2.     Landlord Remedies.**  Upon the occurrence and continuance for more than thirty (30) days of an Event of Default, Landlord may, at its option and without any obligation to do so, elect any one or more of the following remedies:  terminate and cancel this Lease; cure such Event of Default and recover the costs thereof from Tenant, plus interest at the maximum legal rate permitted by applicable law; or pursue any other remedy now or hereafter available under the laws or judicial decisions of the state in which the Premises is situated, together with interest thereon, at the maximum legal rate permitted by applicable law. Additionally, Landlord may at its option exercise any one or more of the following remedies upon the occurrence and continuance of an Event of Default by Tenant: (a) Landlord may declare as immediately due and payable the whole Rent remaining unpaid for the entire Term and the same shall thereupon become immediately due and payable, anything to the contrary notwithstanding; (b) Landlord may terminate this Lease in which event Tenant shall immediately surrender the Premises to Landlord and if Tenant fails to do so, Landlord may without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof; (c) Landlord may re-enter and take possession of all property hereby leased and in good faith sublet the same for the account of Tenant, applying all rental received by Landlord as the result of such subletting to the credit of Tenant on all Rents accruing but such re-entry and subletting by Landlord shall not relieve Tenant of Tenant's obligation to pay the Rents herein provided for, but Tenant shall

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

remain liable therefore and shall pay to Landlord, as and when the installments of Rent herein provided for shall become due, the difference, if any, herein agreed to be paid by Tenant and the rent received by Landlord as a result of such subletting for each month of the period that otherwise would have constituted the balance of the Term hereunder; Tenant shall be liable for Landlord's reasonable expenses in restoring the Premises and all reasonable costs incident to such re-letting, including broker's commissions; and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such reasonable action, whether caused by negligence of Landlord or otherwise, unless caused by the gross negligence or willful wanton misconduct of Landlord; or (d) effect a cure of such Event of Default and offset the amount due or necessary to effect a cure against any amounts owing to Tenant by Landlord, whether pursuant to this Lease or pursuant to a separate agreement.  Notwithstanding the foregoing or anything in this Lease to the contrary, property of Tenant, including, without limitation, any of such property deemed by law to be the property of the sponsoring school district, that is purchased by or reimbursed to Tenant with federal or state grant funds shall not be subject to seizure or removal from the Premises by Landlord or become the property of Landlord in the event such property is not removed by Tenant prior to the expiration or termination of this Lease.

  **3.**   **Landlord Default.**  In the event Landlord fails to perform its obligations hereunder, or if any representation or warranty of Landlord contained herein proves to be false, and such breach of this Lease continues for thirty (30) days beyond notice from Tenant, then in addition to all rights, powers or remedies provided by law or in equity, Tenant may cure such default and charge the cost thereof plus interest at the rate of eighteen percent (18%) to Landlord, or sue for specific performance, or sue for damages.  In no event shall Tenant have the right to terminate this Lease or offset any amount against Rent.

  **4.**   **[RESERVED]**

  **5.**   **Indemnification.**  Tenant hereby agrees to indemnify and hold harmless Landlord, its officers, directors, agents and employees, against any and all liability, loss, cost, damage or expense (including all reasonable attorneys' fees at hourly rates customarily charged and other reasonable expenses incurred by the Landlord in defense of any claim) in connection with the Premises and involving damage or injury to Landlord or Landlord's successors or assigns, the Premises, or any other party or parties, person or persons, if due to the negligence or willful misconduct of the Tenant, or any of its officers, directors, employees, servants, agents or representatives, or otherwise occurring in connection with any default of the Tenant hereunder.  The provisions of this Article shall survive any termination of this Lease.  Landlord hereby agrees to indemnify and hold harmless Tenant, its officers, directors, agents and employees against any and all liability, loss, cost, damage or expense (including all reasonable attorneys' fees at hourly rates customarily charged and other reasonable expenses incurred by the Tenant in defense of any claim) in connection with the Premises and involving damage or injury to Tenant or Tenant's successors or assigns, the Premises, or any other party or parties, person or persons, if due to the negligence or willful misconduct of the Landlord, or any of its officers, directors, employees, servants, agents or representatives, or otherwise occurring in connection with any default of the Landlord hereunder.  The provisions of this Article shall survive any termination of this Lease.

  **6.**   **Waiver.**  The waiver by either party of any breach of any term, covenant or condition in this Lease shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained.  The subsequent acceptance of Base Rent or Additional Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent.  No covenant, term or condition of this Lease shall be deemed to have been waived by either unless such waiver be in writing by that party.

  **7.**   **Force Majeure.**  Except as expressly provided herein, in the event of restrictive governmental laws or regulations, strike, lockout, labor trouble, civil commotion, Act of God, riots, insurrection, war, or any other cause beyond a party's control (collectively "**force majeure**") resulting in

Landlord's inability to supply the services or perform the other obligations required of Landlord hereunder, this Lease shall not terminate and Tenant's obligation to pay Rent and all other charges and sums due and payable by Tenant shall not be affected or excused except as otherwise provided in this Lease and Landlord shall not be considered to be in default under this Lease.  If, as a result of force majeure, Tenant is delayed in performing any of its obligations under this Lease, other than Tenant's obligation to take possession of the Premises on or before Rent Commencement Date and to pay Rent and all other charges and sums payable by Tenant hereunder, Tenant's performance shall be excused for a period equal to such delay and Tenant shall not during such period be considered to be in default under this Lease with respect to the obligation, performance of which has thus been delayed.  In no event shall force majeure be deemed to excuse the timely payment of any sums due hereunder.

## ARTICLE IX
## ENVIRONMENTAL

**1.    Maintenance of Premises.**  Tenant, at Tenant's expense, shall maintain the Premises in compliance with, and shall not cause or permit the Premises, through the acts of Tenant, to be in violation of any federal, state, county and municipal laws, ordinances, or regulations including, without limitation, those relating to Hazardous Materials (as defined herein), air and water quality, waste disposal, zoning, building, occupational safety and health, industrial hygiene, or to the environmental conditions on, under, or about the Premises, including, but not limited to, soil and groundwater conditions ("**Environmental Laws**").

**2.    Use of Hazardous Materials.**  Tenant shall not, in violation of any Environmental Laws, use, generate, manufacture, store, or dispose of, on, under, or about the Premises or transport to or from the Premises any flammable explosives, radioactive materials, including, without limitation, any substances defined as, or included in the definition of, "hazardous substances", "hazardous wastes", or "hazardous materials" under any applicable Environmental Laws ("**Hazardous Materials**").

**3.    Environmental Liens.**  Tenant shall not create or suffer to exist with respect to the Premises, or permit any of its agents to create or suffer to exist any lien, security interest or other charge or encumbrance of any kind, including without limitation, any lien imposed pursuant to section 107(f) of the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. section 9607(l)) or any similar Environmental Law.

**4.    Responsibility.**  Tenant shall be solely responsible for, and shall indemnify and hold harmless Landlord, its partners, employees, agents, successors, and assigns from and against any loss, damage, cost, expense, or liability directly or indirectly arising out of or attributable to Tenant's use, generation, storage, release, threatened release, discharge, disposal of Hazardous Materials on, under, or about the Premises.  The foregoing indemnity shall survive the termination or expiration of this Lease.

## ARTICLE X
## MISCELLANEOUS

**1.    Brokers.**  Landlord represents and warrants that it has not dealt with any broker(s) in connection with the execution of this Lease and Tenant represents and warrants that it has not dealt with any broker(s) in connection with the execution of this Lease.  Each of the parties represents and warrants there are no claims for brokerage commissions or finders' fees in connection with the execution of this Lease.  Each of the parties agrees to indemnify and hold harmless the other from any and all liabilities, costs and expenses (including attorneys' fees) arising from a breach of the foregoing.

**2.    Assignment and Subletting.**  Tenant shall have the right to assign, transfer, sublease, mortgage or otherwise encumber this Lease or its interest in the Premises provided that Tenant first obtains the prior written consent of Landlord, not to be unreasonably withheld.  Any assignment or subletting shall not be construed either as waiving or releasing Tenant from any of its liabilities or obligations under this Lease.

3.    **Applicable Law.**  The laws of the State and County in which the Premises is located shall govern the validity, performance and enforcement of this Lease and jurisdiction shall be in same.

4.    **Captions.**  The captions and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles or this Lease, nor in any way affect this Lease.

5.    **Entire Agreement.**  This Lease and the exhibits and riders, if any, attached hereto and forming a part hereof, represent the entire understanding and agreement between the parties with respect to the subject matter hereof, and supersede all other negotiations, understandings and representations (if any) made by and between the parties.  Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

6.    **Interpretations.**  This Lease shall not be construed more strictly against one party than against the other merely because it may have been prepared by counsel for one of the parties, it being recognized that both parties have contributed substantially and materially to its preparation.

7.    **Notices.**  All notices, demands and communications hereunder and copies of notices, demands, and communications, to Tenant or Landlord shall be served or given by hand-delivery or certified United States Mail, return receipt requested, or reputable overnight courier to the addresses first above appearing or to such other addresses as are hereinafter designated by either party, or their successors in interest, by notice in writing, sent by certified United States Mail, return receipt requested, or reputable overnight courier to such designated addresses. Notice shall be deemed effective upon delivery or refusal to accept delivery.

8.    **Relationship of Parties.**  The relationship between the parties hereto shall be solely as set forth herein, and neither party shall be deemed the employee, agent, partner or joint venturer of the other and that the relationship of the parties hereto is strictly that of Tenant and Landlord.

9.    **Severability.**  Each and every covenant and agreement contained in this Lease shall for all purposes be construed to be a separate and independent covenant and agreement, and the breach of any covenant or agreement contained herein by either party shall in no way or manner discharge or relieve the other party from its obligation to perform each and every covenant and agreement herein.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

10.    **Costs and Attorneys' Fees.**  If either party shall bring an action to recover any sum due hereunder, or for any breach hereunder, the court may award to the prevailing party its reasonable costs and reasonable attorneys' fees, specifically including reasonable attorneys' fees incurred in connection with any appeals, whether or not taxable as such by law.

11.    **Reasonable Consent.**  Any consent or approval of either party required hereunder shall not and may not be unreasonably withheld unless this Lease provides that such consent or approval is within the sole discretion of such party.

12.    **Successors and Assigns.**  This Lease shall be binding upon and enure to the benefit of the successors and assigns of the parties hereto.

13.    **No Representations or Warranties by Landlord.**  Neither Landlord nor any agent or employee of Landlord has made any representations or promises with respect to the Premises except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant except as herein expressly set forth.  Tenant has no right to light or air over any premises adjoining the Premises.  This Lease constitutes the entire agreement of the parties with respect to the subject matter

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

hereof and Tenant's leasehold interest.  All prior and contemporaneous written and oral agreements are merged herein.

**14.**     This Lease shall be strictly construed against neither Landlord or Tenant; each provision hereof shall be deemed both a covenant and a condition running with the land; except as otherwise expressly provided in this Lease, the singular includes the plural and the plural includes the singular; "or" is not exclusive; a reference to an agreement or other contract includes supplements and amendments thereto to the extent permitted by this Lease; a reference to any laws includes any amendment or supplement to such laws; a reference to a person or entity includes its permitted successors and assigns; accounting provisions have the meanings assigned to them by generally accepted accounting principles applied on a consistent basis; the words "such as", "include", "includes" and "including" are not limiting; except as specifically agreed upon in this Lease, any right may be exercised at any time and from time to time, and all obligations are continuing obligations throughout the Term of this Lease, and in calculating any time period, the first day shall be excluded and the last day shall be included, and all days are calendar days unless otherwise specified.

**15.**     Time is of the essence with respect to this Lease and each and every provision hereof.

**16.**     The provisions of this Lease that relate to periods subsequent to the expiration of the Term shall survive the expiration of the Term.

[Signatures on following page]

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit B

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the date first above written.

Landlord:                                             Tenant:

**RED APPLE AT LIBERTY, LLC,**                       **BERKELEY CHARTER EDUCATION**
a Florida limited liability company                   **ASSOCIATION, INC.,**
                                                      a South Carolina not-for-profit corporation

By:_____                          By:_____
Name:  Jonathan K. Hage                               Name:  Stewert Weinberg
Title:    President                                   Title:    President

**Witness:**                                          **Witness:**

Print Name: _SCOTT WOODRAY_                            Print Name: _____

Print Name: _Sharon Gerrard_                          Print Name: _____

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the date first above written.

**Landlord:**                                    **Tenant:**

**RED APPLE AT LIBERTY, LLC,**              **BERKELEY CHARTER EDUCATION**
a Florida limited liability company          **ASSOCIATION, INC.,**
                                             a South Carolina not-for-profit corporation

By:_____              By:_____
Name:  Jonathan K. Hage                      Name:  Stewert Weinberg
Title:    President                          Title:    President

**Witness:**                                     **Witness:**

_____                    _____
Print Name: _____                  Print Name: Debbie Fickling

                                             _____
Print Name: _____                  Print Name: KATHY M. GULICK

1341322v1 980058.0196

**EXHIBIT "A"**

**DESCRIPTION OF PREMISES**

**[Append 2016-11-11 Site Plan – Liberty.pdf, Liberty SK Plans 2016 10 10.pdf, SCHOOL SPECS MASTER COPY WORD.doc, all attached to Woodrey email dated 11/23/2016]**

13

1341322v1 980058.0196

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## GENERAL SITE NOTES

1. ALL DIMENSIONS ARE TO THE FACE OF CURB UNLESS OTHERWISE NOTED.
2. ALL CURBING SHALL BE PER THE CITY OF GOOSE CREEK STANDARDS.
3. ALL WORK AND MATERIALS SHALL COMPLY WITH ALL LOCAL REGULATIONS AND O.S.H.A. STANDARDS.
4. CONTRACTOR SHALL REFER TO ARCHITECT PLANS FOR EXACT BUILDING LOCATION AND DIMENSIONS AND UTILITY ENTRANCE LOCATIONS.
5. CONTRACTOR SHALL REFER TO SPECIFICATIONS AND GEOTECHNICAL REPORT FOR PAVING DESIGN AND PROPER MATERIALS.
6. THE CONTRACTOR SHALL BE RESPONSIBLE FOR MAINTAINING THE SITE UNTIL WORK IS ACCEPTED BY THE OWNER.
7. ALL SIGNS SHALL BE PER THE MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES (MUTCD) AND SCDOT.
8. CONTRACTOR IS RESPONSIBLE FOR PROVIDING AND MAINTAINING ADEQUATE TRAFFIC CONTROL THROUGHOUT THE PROJECT, INCLUDING PROPER TRAFFIC CONTROL DEVICES AND/OR PERSONNEL AS REQUIRED. THIS INCLUDES BOTH VEHICULAR AND PEDESTRIAN TRAFFIC CONTROL. TRAFFIC CONTROL SHALL BE IN ACCORDANCE WITH M.U.T.C.D. AND THE SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION (SCDOT) STANDARDS.
9. PAVEMENT DESIGN BASED ON GEOTECHNICAL REPORT BY ECS CAROLINAS, LLP, DATED SEPTEMBER 23, 2016.

## ASPHALT (FLEXIBLE) PAVEMENT
SCALE: NONE

3" ASPHALTIC CONCRETE BINDER COURSE (9.5 MM)
3" ASPHALTIC CONCRETE BINDER COURSE (9.5 MM)
6" GRADED AGGREGATE BASE COURSE COMPACTED MIN. 98% MODIFIED PROCTOR MAXIMUM DRY DENSITY (ASTM D 1557)
6" GRADED AGGREGATE BASE COURSE COMPACTED MIN. 98% MODIFIED PROCTOR MAXIMUM DRY DENSITY (ASTM D 1557)
HEAVY DUTY
LIGHT DUTY
COMPACTED SUBGRADE
COMPACTED SUBGRADE

## SITE SUMMARY

| ZONING | PLANNED DEVELOPMENT |
|---|---|
| FUTURE LAND USE | COMMERCIAL |
| TYPE OF CONSTRUCTION | |

| ZONING REQUIREMENTS PROVIDED | |
|---|---|
| PROJECT AREA | 10.00 ACRES |

| TOTAL IMPERVIOUS AREA | 3.81 AC |
|---|---|
| PAVING / SIDEWALK AREA | 2.58 AC |
| BUILDING AREA / POND AREA | 0.80 AC |
| | 0.24 AC |

| TOTAL PERVIOUS AREA (GREEN SPACES) | 6.19 AC |
|---|---|

| BUILDING | |
|---|---|
| SIZE | 81,588 SF |
| HEIGHT | 36' |

| PARKING | |
|---|---|
| REQUIRED* | 325 |
| PROPOSED REG SPACES | 146 |
| HANDICAP SPACES | 7 |
| SPACES IN STACKING LANES** | 192 |
| TOTAL SPACES | 345 |
| STALL SIZE | 9' x 18' |

* ONE PARKING SPACE PER CLASSROOM PLUS ONE SPACE PER EMPLOYEE (49 classrooms & 80 employees)
** 3,592' OF STACKING IN FOUR LANES AROUND BUILDING. 18' SPACING ASSUMED FOR VEHICLE STACKING

## SITE KEY NOTES

A. MONUMENT SIGN
B. 24' X 12' DUMPSTER PAD
C. 6' BLACK VINYL COATED CHAIN LINK FENCE
D. 4' GATE WITH PANIC BAR
E. 12' GATE FOR MAINTENANCE ACCESS
F. 36" X 36" STOP SIGN PER SCDOT STANDARD INDEX AND MUTCD STANDARD R1.1
G. 24" CURB AND GUTTER, PER DETAIL SHEET C2.1
H. FIRE HYDRANT, SEE UTILITY PLAN SHEET C4.0
I. HEAVY DUTY ASPHALT PAVEMENT
J. STANDARD DUTY ASPHALT PAVEMENT
K. CONCRETE SIDEWALK SEE DETAIL SHEET C2.1
L. NOT USED
M. 24" WIDE WHITE THERMO PLASTIC STOP BAR, SEE LENGTH INDICATED AT SYMBOL
N. 4" WHITE PARKING LOT STRIPING
O. 4" SOLID WHITE LANE STRIPE
P. 12" WIDE WHITE PAINTED CROSS WALK
Q. DIRECTIONAL PAVEMENT MARKINGS
R. NO PARKING PAVEMENT MARKING
S. NO PARKING STRIPING, PER DETAIL SHEET C2.1
T. ADA SIGN, PER DETAIL SHEET C2.1
U. ADA RAMP, PER DETAIL SHEET C2.1
V. ELECTRICAL TRANSFORMER
W. BICYCLE RACK
X. ONE WAY SIGN PER SCDOT & MUTCD STANDARD R6-2
Y. DO NOT ENTER SIGN PER SCDOT & MUTCD STANDARD R5-1
Z. NO RIGHT TURN SIGN PER SCDOT & MUTCD STANDARD R3-1
AA. PEDESTRIAN CROSSING SIGN PER SCDOT & MUTCD STANDARD WA11-2
BB. SITE LIGHTING, REFERENCE SITE LIGHTING PLAN

## PROPOSED LEGEND

———————— PROPERTY LINE
———————— CURB AND GUTTER
———————— FENCE

## LEGEND — EXISTING

—350— INDEX CONTOUR
—353— INTERMEDIATE CONTOUR
EDGE OF PAVEMENT
CURB AND GUTTER
PROPERTY LINE
WATER LINE
SANITARY SEWER
STORM SEWER
OVERHEAD ELECTRIC
COMMUNICATION SERVICE
HANDICAP SYMBOL
TRAFFIC CONTROL BOX
TRAFFIC SIGNAL
BENCHMARK
UTILITY POLE
SIGN
CURB DRAIN INLET (CDI)/DRAIN INLET (DI)
STORM DRAIN MANHOLE (SDMH)
SANITARY SEWER MANHOLE (SMH)
WATER VALVE & BACK PREVENTER VALVE
FIRE HYDRANT (HYD.)
STREET LIGHT/LAMP
JUNCTION BOX
TREE TRUNK
CONCRETE

PROPOSED PROPERTY BOUNDARY
SEABOARD COASTLINE RAILROAD 100' R/W
50' STRUCTURE AND PARKING SETBACK
50' STRUCTURE AND PARKING SETBACK
PROPOSED PROPERTY BOUNDARY

TOT LOT 50' x 100'

PROPOSED TWO STORY BUILDING
81,588 TOTAL SF
F.F.E.: 29.00

3,592' OF STACKING (179 PARKING SPACES)

WETLAND BUFFER PER USACE PERMIT #SAC-2004-2914-2KG

50' STRUCTURE AND PARKING SETBACK

SEE SHEET C9.0 FOR ROADWAY PLANS

BENCHMARK #1
MAG NAIL SET W/WASHER
NORTHING = 410708.77
EASTING = 2389715.28
ELEV=23.66

## GRAPHIC SCALE
0   20   40   80
( IN FEET )
SCALE: 1" = 40'

SOUTH CAROLINA 811



Bowman Consulting Group, Ltd.
2090 Marcoris Drive
Suite 200
Alpharetta, GA 30005
Phone: (678) 374-6887
bowmanconsulting.com
© Bowman Consulting

Bowman CONSULTING

SITE PLAN
LIBERTY CHARTER SCHOOL
MONTAGUE PLANTATION ROAD
GOOSE CREEK, SC 29445
CITY OF GOOSE CREEK    BERKELEY COUNTY SC

KAI BURK
LICENSE NO. 33129

| PLAN STATUS | | |
|---|---|---|
| 10/06/16 | INITIAL SUBMITTAL | |
| 11/10/16 | CITY RESUBMITTAL | |

| DATE | DESCRIPTION | |
|---|---|---|
| PNL | PNL | KB |
| DESIGN | DRAWN | CHKD |

| SCALE | 1" = 40' |
|---|---|
| JOB No. | 010441-01-001 |
| DATE | 11/10/16 |
| FILE | C2.0 - SITE PLAN |

SHEET
C2.0

CAD file name: C:\Users\pnowler\Dropbox\Projects\Projects\010447 — Ryan Companies\201 — Goose Creek Charter School\Engineering Plans\C2.0 - Site Plan.dwg 11/10/2016

| Number | Description | Date |
|--------|-------------|------|
| | | |

LAI DESIGN ASSOCIATES, LLC

Civil Engineer

Mechanical/Electrical Engineers
Jenkins Wagg Associates, LLC
10600 Chevrolet Way, Suite 302
P: 239-281-2917

Structural Engineer
Select Structural
12573 New Brittany Blvd
Fort Myers, FL 33907
(239) 210-5090 Office



RYAN
BUILDING LASTING RELATIONSHIPS
RYAN COMPANIES US, INC.
101 East Kennedy Blvd, Suite 3450
Tampa, FL 33602

RED APPLE
DEVELOPMENT, LLC

CHARTER SCHOOL USA &
RED APPLE DEVELOPMENT

800 Corporate Drive, Suite 124
Ft. Lauderdale, Florida 33334
(954) 202-3500

Liberty Charter School (K-8)

South Carolina

Schematic
First Floor
Plan

SK101.1

---

**Floor plan labels:**

Gymnasium

Stair #5

Vestibule  Vestibule  Rest Rm - Girls    Corridor    Rest Rm - Boys    Storage

3 Class Rm     Office    Storage

3 Class Rm     Corridor     SPED    SPED     O (K) Class Rm    O (K) Class Rm    O (K) Class Rm    O (K) Class Rm    O (K) Class Rm    O (K) Class Rm     Class Rm

Corridor     Unisex TR     1 Class Rm

Pantry     Corridor     Unisex TR     Rest Rm - Boys     Elevator Machine     Art Lab     1 Class Rm

Warming Kitchen     Storage     Rest Rm Vest.     Electric     Corridor     Unisex TR     1 Class Rm

Storage     Jan. Clo.     Rest Rm - Girls     Rest Rm Vest.     Teacher Planning     Closet     1 Class Rm

Serving Lines     Unisex TR     Closet     Conf     Unisex TR

Music Lab     Closet     Conf     Office     Office     Office     Unisex TR     2 Class Rm

Lunch Room     Corridor     2 Class Rm

3 Class Rm     3 Class Rm     3 Class Rm     2 Class Rm     2 Class Rm     Admin     2 Class Rm

Huddle     Waiting

Storage     Stair #4     Stair #6     Corridor     2 Class Rm

1st Floor
3/32" = 1'-0"

Exhibit B

| Number | Description | Date |
|---|---|---|
| | | |

LAI DESIGN ASSOCIATES, LLC

Civil Engineer

Mechanical/Electrical Engineers

Jenkins Maag Associates, LLC.
10600 Chevrolet Way, Suite 302
P: 239-281-2917

Structural Engineer

Select Structural
12573 New Brittany Blvd.
Fort Myers, FL 33907
(239) 210-5090 Office

Developer/Builder

RYAN

BUILDING LASTING RELATIONSHIPS

RYAN COMPANIES US, INC.
101 East Kennedy Blvd , Suite 2450
Tampa, FL 33602

Operator

RED APPLE DEVELOPMENT, LLC

CHARTER SCHOOL USA & RED APPLE DEVELOPMENT

800 Corporate Drive, Suite 124
Ft. Lauderdale, Florida 33334
(954) 202-3500

SC PE –
RICHARD S. LOSEE, PE

Liberty Charter School (K-8)

South Carolina

# Schematic Second Floor Plan

| | |
|---|---|
| Scale: | 3/32" = 1'-0" |
| Project Number 145-16 | Drawn By SG |
| Sheet Issue Date 10.10.2016 | Checked By Checker |

SHEET NUMBER

SK101.2

Printed On 10/10/2016 7:57:21 AM

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

# CSUSA NEW SCHOOL SPECIFICATIONS

**Planning & Architectural**

All design standards shall comply with National, State, and local Building and Fire Prevention Codes.

RAD school building projects shall include a complete school "Turn Key" as defined in RAD (Red Apple Development) New School Specifications. Developer/Contractor shall commence work, proceed diligently, and complete scope of work in accordance with a schedule satisfactory to and as directed by RAD and the State/local municipalities for a new school opening.

School opening dates are fixed, defined by the State, and non-negotiable. Scheduling is critical, and planning and commitment are of the utmost importance to ensure timely project completion.

Developer/Contractor shall designate a representative to meet at a predetermined regular specified date and time with RAD, provide weekly written updates, reports and schedules, shall coordinate delivery and installation activities, and conduct Quality and Safety Inspections of work completed on regular intervals.

**Site Planning**

Site design shall optimize the use of the property to accommodate program requirements with a compact footprint and providing the largest possible open areas for use as green space and play areas. Red Apple Development will provide Developer with site criteria required for school operations based on the type, size, and capacity of the proposed facility. To include, but not be limited by, the following:

1. Bus loading zone requirements:
   1.1. Separation from parent drop-off. Design to accommodate four busses.
   1.2. Right side of bus will preferably face school when loading/unloading.
   1.3. Sidewalks to busses required, 6'w min. typ., covered accessibility to facility if possible.

2. Drop-off and Pick-up zone requirements
   2.1. Two separate drop-off and pick-up locations with covered aluminum walkway, one of which exiting out of the multipurpose room.
   2.2. Minimum of triple stacking. Quadruple stacking preferred, if site plan allows.
   2.3. Maximize site for optimum stacking, wrap around parking and/or building before loading.
   2.4. All stacking lanes to be individually marked with slash lines and arrows.
   2.5. Sidewalk to loading area required, covered accessibility to facility
   2.6. Covered loading area to span all lanes by a minimum of 60-foot length. Aluminum roof or equivalent.

3. Parking
   3.1. 1-parking space per every 10 students of capacity
   3.2. 1 parking space for every 50 students for Visitor Parking
   3.3. High Schools only – 2 additional spaces per every 3 students in 11th & 12th grades, to be separated from faculty parking.
   3.4. Handicap parking shall comply with ADA, Chapter 11.
   3.5. Provide Mailbox if required by local Post Office. Size and location to be approved by RAD.
   3.6. Note: Some local municipalities may have additional parking criteria, determined by location.
   3.7. If retro-build, existing parking bumpers to be in good shape and painted white.
   3.8. All parking areas to be lighted and placed on time clocks.
   3.9. If retro-build, all paved areas to be repaired and freshly seal-coated
   3.10. If retro-build, all existing site lights to be in good working order and freshly painted.

4. Service Zone
   4.1. Create a loading zone location with access to serving kitchen (no loading dock required) with 5-foot wide ramped access.
   4.2. Provide dumpster location for waste and recycle bins on concrete pad with hose bib and floor drain, minimum to accommodate two 8 cubic-yard dumpsters with gates.
   4.3. Provide fencing or visual screening as required.

Exhibit B

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

5. Play area (Tot lot) for K-3
   5.1. Minimum 40x75 fenced tot lot area.
   5.2. Completely fenced area with black chain link, 6' height, gate, top & bottom rail with steel ties
   5.3. Sidewalk to be provided from exterior doors to tot lot. Gate to be used as access.
   5.4. Accessible from or near kinder rooms.
   5.5. Recreation Equipment designed as modular play system, installed.
      5.5.1. Designed for age 5-12 and 45 student capacity
      5.5.2. Poured rubber padded surface under structure.
      5.5.3. Remaining surface within the fenced area to be artificial turf, no sod allowed.
      5.5.4. Equipment pieces and layout to be approved by RAD
   5.6. Canopy cover over equipment area.
   5.7. All awning cover poles to be wrapped with 6' high exterior padding for protection.
   5.8. Include adequate drinking fountains.

6. Athletic Area for 4-8
   6.1. Gymnasium preferred or…
   6.2. Combination of soccer field and basketball/volleyball court(s),
   6.3. Artificial turf to be installed at $250,000 allowance. RAD to provide manufacturer and model # of turf. If remaining area exist, irrigation and Bahia/ Bermuda to be used.
   6.4. Exterior play area must have black chain link perimeter fencing, 6' min height. Top & bottom rail, steel ties with 60" gates and a min 10' maintenance/lawn equipment gate at rear of property.
   6.5. Include adequate drinking fountains.

7. Athletic Area for 9-12
   7.1. Gymnasium and outdoor field suitable for football and soccer, or…
   7.2. Exterior bleachers and scoreboard.
   7.3. Include adequate drinking fountains.

8. Signage
   8.1. (2) School Names with logo on the building, (size and number to be maximized per code) 1 above building entrance and one on building side facing a main street, if feasible.
      8.1.1. Constructed of individually mounted letters and CSUSA logo.
   8.2. (1) 2-sided sign monument with school name and logo on each side mounted at main entrance to property. Sign must have minimum of 4 lines of changeable copy and be visible from roadway.
   8.3. All interior signage, with Braille, per code requirements, identifying stairwells, exits, room numbers, admin space, etc.

9. Bike Storage
   9.1. Permanently affixed bike racks to accommodate a minimum of 20 bikes.
   9.2. Bicycle parking area to be hard-surfaced (asphalt or concrete)

10. Flag Poles
   10.1. (3) Commercial-grade flag poles shall be provided in a triangular configuration in front of the school building or in a position approved by RAD. 1-30' height (center), 2-25' height, spaced at least 6' apart and designed to withstand wind velocity as required by ASCE. Flag poles to be displayed on concrete with access walk, not in grass area.

11. Landscaping
   11.1. Property to comply with landscaping requirements of the jurisdiction having authority.
   11.2. Include a complete irrigation and drainage system.
   11.3. All exterior surfaces assessable to students and staff shall contain sod or solid surfacing. No dirt, rocks, or sand can be allowed to track into the facility.
   11.4. Recreation fields to be Bahia sod or artificial turf.
   11.5. Where building is retrofit, clean-up of existing landscaping/trimming of trees, re-mulching of landscape beds to be part of scope.
   11.6. All shrubs, bushes, and trees shall be selected with child safety in mind.
   11.7. All landscaping to be placed around the perimeter of the athletic field.
   **11.8. No recreation fields should be designed as water storage or retention.**
   **11.9. Provide "Spirit Rock", natural boulder approx. 6' base by 4' height placed on school grounds (location by RAD). NC schools only.**

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

12. <u>Site Plan Approval Procedures & Permitting</u>
   12.1. Developer/Site Engineer to provide Red Apple Development with a preliminary site plan for review and discussion.
   12.2. Red Apple Development will make recommendations for any required modifications.
   12.3. Revised site plan will be provided to RAD for Final team approval & sign-off, approx. 1 week.
   12.4. Final site plan to be provided in electronic form and hard copy to Red Apple Development.
   12.5. School Building & Site Rendering required for marketing purposes.
   12.6. Permitting application, NTO, and all other submittals required for commencement of job (by January 1st of opening year).


**Building Design**

Building design shall optimize the use of the interior space to accommodate program requirements with a compact footprint, providing the maximum space utilization possible. Red Apple Development will provide Developer/Architect with building and space utilization criteria required for school operations based on the type, size, and capacity of the proposed facility. To include, but not limited to, the following:

1. <u>General</u>
   1.1. Address security through building footprint with built-in resistance to unauthorized intrusions.
   1.2. Quantity of rooms determined by School Worksheet provided by Red Apple Development based on total capacity.
   1.3. All classrooms and corridors to receive VCT (Armstrong) flooring with color-coordinated inlays, unless otherwise specified.
   1.4. Main lobby area (location approved by RAD) to have School name, corporate logo incorporated into VCT flooring.
   1.5. All ceiling tiles throughout school will be 2'x4', manufactured from Armstrong.
   1.6. All music rooms to be carpeted with durable, commercial-grade carpet tiles.
   1.7. All colors for paint, flooring, countertops, etc. to be determined and signed-off on by RAD.
   1.8. All water fountain /hand dryer locations to be outlined in 12"x 12" ceramic tile with floor border strip for water protection.
   1.9. All rooms to be identified by exterior signage with Braille.
   1.10. All rooms to include emergency evacuation signage (acrylic placard) on interior adjacent to door.
   1.11. All interior signage required by code (with Braille) identifying exits, stairwells, admin areas, room numbers, etc. (acrylic placard).
   1.12. All classrooms, specialty classrooms, administrative areas, teacher planning rooms, stairways, and storage rooms to have PVC vertical blinds with no pull strings on windows.
   1.13. Backing is required for all coat racks, cabinets, and all other wall-mounted features. All countertops to have post-form edge.
   1.14. Every classroom, multipurpose room, gymnasium, admin space, conference room, and teacher workroom shall have a programmable analog clock.
   1.15. Where required, contractor shall provide radon testing and certification for site.
   1.16. Where required, contractor shall provide asbestos inspection and certification.
   1.17. Contractor shall provide final survey with flood elevation certificate to Red Apple along with Certificate of Occupancy.

2. <u>K-1 Classrooms</u>
   2.1. All grade K students shall be located on the first floor only, not to be permitted above the first floor per NFPA.
   2.2. Each kindergarten classroom should have direct access to a bathroom within the classroom. Require 1-restroom with standard fixture heights and automated hand dryers, per classroom.
   2.3. Room size minimum 600 sq. ft.
   2.4. Minimum of 6' of countertops with backsplash and side splash, standard height & depth w/ base cabinets and 3' of overhead cabinets.

3. <u>Grades 2-12 Classrooms</u>
   3.1. All grade 2 students shall be located on the first and second floors only, not to be permitted above the 2nd floor per NFPA.
   3.2. Room size minimum 600 sq.ft.
   3.3. Minimum of 6' of countertops, standard height with backsplash/side splash & depth w/ base cabinets and 3' of overhead cabinets.

Exhibit B

CHARTER SCHOOLS USA

**4.** Specialty Classrooms
    4.1. (1-2) Music rooms (next to each other if possible, to be determined by capacity)
        4.1.1. Room size 800-900sqft.
        4.1.2. Music rooms shall always be carpet squares.
        4.1.3. Rooms shall share a storage closet for instruments.
        4.1.4. Rooms shall be positioned so they are isolated from other classrooms where possible, and contain built-in sound panels/ for protection.
        4.1.5. No cabinets/countertops

    4.2. (1-2) Art Rooms
        4.2.1. Room quantity to be determined based on grade levels, student quantity, and layout of facility.
        4.2.2. Room size 850-1000 sq.ft.
        4.2.3. Minimum of 12' of countertops, standard height with backsplash/side splash & depth w/ base cabinets and full-length overhead cabinets.
        4.2.4. 2 sinks (Min. 22" X19.5" and hot/cold water) required in countertop for art procedures.
        4.2.5. Kiln room with 200cfm externally vented exhaust fan and A/C drop required in one of the art rooms
        4.2.6. Special attention shall be paid to sprinkler head in kiln room.
        4.2.7. Art Supply storage closet/room

    4.3. (1-2) Computer Labs
        4.3.1. Room quantity to be determined based on grade levels, student quantity, and layout of facility.
        4.3.2. Room size 800-900 sq.ft.
        4.3.3. Interior room, if available.
        4.3.4. Requires 30 low-voltage data ports w/accompanying electrical, locations specified by RAD.
        4.3.5. No cabinets/countertops.
        4.3.6. No windows, if possible
        4.3.7. All data/electrical outlets to be wall or floor-mounted. No power poles.

    4.4. (1-2) Science Labs
        4.4.1. Room quantity to be determined based on grade levels and student quantity.
        4.4.2. Room size 850-1000 sq. ft.
        4.4.3. Located next to each other with a closet accessible from both rooms.
        4.4.4. Eye wash required for grades 9-12
        4.4.5. Minimum of 12' (wall-to-wall) of countertops, standard height with backsplash/side splash & depth w/ base cabinets and full-length overhead cabinets.
        4.4.6. If Cambridge Program applies, see additional criteria.

**5.** Gymnasium
    5.1. Gym size 12,000 sq ft for full size.
    5.2. Include 4 ceiling-supported basketball hoops and backboards.
    5.3. All windows located within the gym must be impact-resistant glass
    5.4. One hoop on each end & one on each side to be collapsible or raised during games.
    5.5. Wall padding to be installed under main basketball ct. Padding to be wall to wall in length.
    5.6. Presets and striping for High School Volleyball net and posts
    5.7. Telescopic bleachers provided on one side of gymnasium. Two for H.S
    5.8. Wood flooring or equivalent required for K-8. Wood flooring with school logo/colors for H.S.
    5.9. Electronic score board to be provided at one end of gym, pre-wire to be added on adjacent wall for future scoreboard. See RAD for locations. Two school boards for H.S
    5.10. Drinking fountains to be provided.
    5.11. Provide 3 rooms for office and storage.
        5.11.1. Rooms should be 100-200sq.ft each, located next to or accessible to locker rooms.
    5.12. Locker Rooms (1-Girls, 1-Boys)
        5.12.1. Include 30 gym lockers, (minimum 12"Lx12" Wx24" W) with built-in automatic bar and rod release and built-in Automatic Locking Bolts and control key.
        5.12.2. Lockers to be constructed of heavy duty, tamper and vandal-proof materials.
        5.12.3. Include adequate benches in each.
        5.12.4. Include restroom area with partitions.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit B

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

    5.12.5.  Floors in wet areas to be Dura Flex, VCT in all other areas and walls (6'h) in ceramic tile
    5.12.6.  Add plumbing in walls for washer/dryer hookup.

    5.12.7.  Two clocks.
    5.12.8.  All light fixtures, clocks and surface mounted fixtures to be protected from ball impact.
    5.12.9.  PA system required for events

**6.** School Access
  6.1.  All buildings shall be internal corridor designs
  6.2.  All main entrances shall be equipped with an external intercom/camera/speaker access system.
  6.3.  Single front entry door (RAD to designate) shall be equipped with a electronic/mag-lock door release button located at the front administration desk. All doors to be storefront type
  6.4.  Front reception area shall be protected by a second set of entry doors (storefront type), prohibiting access to the rest of the school.
  6.5.  Internal access door shall also be equipped with a second set of electronic/mag-lock door release button at front administration desk.
  6.6.  Front reception area shall have a 42" administration counter for visitors checking in with standard height cabinets below.
  6.7.  All exterior doors, other than the main entrance door and the multi-purpose room doors, should be solid-core, steel-clad, double doors with removable astragal and panic hardware, and shall be equipped with Detex Alarms, keyed alike.
  6.8.  Exterior doors at the multi-purpose room should be storefront design.

**7.** Administration offices
  7.1.  All offices and office areas to receive VCT
  7.2.  All offices doors to contain a vision panel.
  7.3.  One open administration area large enough for 3-4 workstations.
  7.4.  Located at main entrance to building allowing for administrative monitoring of building access.
  7.5.  Include impact-resistant glass at front entrance (reception area only) counter top area with teller type pass-thru with speaking hole. Include built-in admin cabinets at 30" AFF with 4" back splash and a 42" pass-thru top (accommodate for ADA requirements.)
  7.6.  Include copier outlet/data. Specifications provided by RAD.
  7.7.  Include 6-8 offices & file/storage rooms accessed by open administration area, room quantity determined by facility capacity.
  7.8.  One clock in conference room.
  7.9.  Key box to be provided by GC. (keys organized per room #)
  7.10. Unisex admin restroom
     7.10.1.  With hot and cold water
  7.11. Include open Clinic Area with restroom
     7.11.1.  Private restroom (with hot and cold water), sink, and cabinetry with room for under-cabinet refrigerator.
     7.11.2.  Floor to receive VCT.
     7.11.3.  Size based on capacity to accommodate nursing beds and/or seating area.
  7.12. Include one Conference Room near administration offices.
  7.13. Include 5 additional offices and a conference room for grades 9-12 for guidance counselors, located separately from administration area.

**8.** Teacher Workroom
  8.1.  Located on each floor.
  8.2.  Room size 250-400 sqft, (final room quantity and size to be determined by building capacity).
  8.3.  Include unisex adult restroom accessible from corridor only.
  8.4.  Include sink with countertop backsplash/side splash and cabinetry.
  8.5.  Floor to be VCT.
  8.6.  Electrical requirements for:
     8.6.1.  Cabinet mounted microwave
     8.6.2.  Coffee machine
     8.6.3.  Full size refrigerator
     8.6.4.  Vending soda machine
     8.6.5.  Large copier, specifications provided by RAD.
     8.6.6.  Telephone

**9.** Multipurpose Room

Exhibit B

CHARTER SCHOOLS USA

9.1. Designed to accommodate one quarter of the student population. Include one storage closet.
9.2. Include electrical for vending machines.
9.3. **Two clocks at opposite ends.**
9.4. Electrical and data ports needed for lunch checkout. Location by RAD.
9.5. Electrical and data needed for remote screen and projector. Location by RAD
9.6. Independent PA system with cordless microphone for presentations and afternoon dismissal.
9.7. Include Serving Kitchen
    9.7.1.    Serving kitchen to be used for food warming only, no cooking permitted. Designed to meet local/state Department of Health Regulations.
    9.7.2.    Include office/food storage area
    9.7.3.    Kitchen equipment will be provided and installed by vendor.
    9.7.4.    Serving Kitchen electrical specifications provided by RAD (equipment quantities may vary based on facility capacity).
    9.7.5.    Size 400-600 sq ft.
    9.7.6.    Stainless steel serving counter facing multipurpose room.
    9.7.7.    Locking roll-down doors to cover serving windows
    9.7.8.    Walls lined with FRP floor to ceiling.
    9.7.9.    FRP to be installed on walls at serving area.
    9.7.10.    Hand sink (& mop sink near kitchen area).
    9.7.11.    Delivery/ Receiving area for catered food delivery.

**10.** Girls & Boys Student Restrooms
10.1. Dura-Flex flooring (color by RAD) with 4" splash and 12" x 12" Ceramic tile installed on all fixture and partition walls to 6' height.
10.2. Head and Foot-rails double braced to walls, vandal proof partitions and hardware.
10.3. Post form countertop.
10.4. Single level faucets
10.5. Cabinet skirt required to conceal drain and water supply piping, color to match countertop.
10.6. Electric hand blowers only, no paper towel dispensers in student restrooms. Only if required.
10.7. All paper holders, soap dispensers to be installed by Facilities.

**11.** Janitorial Rooms
11.1. Janitors closet to have mop sink with FRP or Tile installed around sink to prevent water damage.
11.2. Requires some storage near delivery zone for books/packages/mail, etc.
11.3. When janitorial closet is located within bathroom, continue Duraflex flooring throughout.

**12.** Server Room/ MDF (Main Distribution Facility)
12.1. (1) MDF room centrally located so all locations within a 320ft. run.
12.2. If distance exceeds 320', create multiple IDF locations, stacked if on separate floors. Connected with 6-strand fiber optic cable in a 2-inch or larger conduit. Fiber strands must be terminated on a rack-mounted patch panel with LC connectors, labeled from 1 to 6, and tested.
12.3. MDF Room design to be provided by RAD Information Technology Dept., to include cable trays and floor-mounted equipment racks.
12.4. Split wall-mounted HVAC system
12.5. Equipment open frame rack system
12.6. Main MDF requires an independent AC system (i.e., not connected to main building system, with a return air design point temperature and relative humidity of 72 degrees F (+/- 2 deg F) and 45% (+/- 5%) respectively, provide environmental monitoring and alerts.
12.7. Main MDF requires quad receptacles at 18 inches above F.F. on 3 walls every 4 feet; each receptacle must be on a dedicated 20AMP circuit. Receptacles must be clearly labeled with panel and breaker number using a P-Touch or similar label.
12.8. Main MDF additionally requires 2 dedicated 20AMP simplex receptacles behind each data rack. Receptacles must be clearly labeled with panel and breaker number using a P-Touch or similar label.
12.9. Provide a ground bar connected to the building ground and ground each data rack.
12.10.    Three walls should have 3/4 fire retardant plywood installed floor to ceiling and painted with fire retardant paint.
12.11.    MDF Room design will be provided by RAD Information Technology Dept., to include cable trays and floor-mounted equipment racks.
12.12.    Two 4-inch conduits to be installed between the MDF and the Utility Room/Building D-Mark for Fiber or other media, as needed.
12.13.    MDF will have one 4-post rack and, at minimum, one 2-post rack

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

- 4-post rack will be a Panduit R4PCN 45 RU, 30inch deep with Cage Nuts and should have clearance of minimum 30inches in the front and 12 inches in the back.
- 2-post rack will be a Panduit R2N 45 RU, #12-24 threaded and should have clearance of minimum 24 inches in the front and 30 inches in the back.
- Each rack should be grounded directly to a ground bar that's connected to building ground.

12.14.  Cable management will be Panduit WMPV45 for vertical and Panduit WMP1E for Horizontal, spec sheet will be provided by RAD IT Dept.

**13.** IDF's

13.1. If distance exceeds 320', create multiple IDF locations, stacked if on separate floors, connected with a minimum 6-strand fiber optic cable ran in a 2-inch or larger conduit.  Fiber strands must be terminated on a rack-mounted patch panel with LC connectors, labeled from 1 to 6 and tested.

13.2. Each IDF will have, at minimum, one 2-post rack (one rack provides 288 data ports)
- 2-post rack will be a Panduit RSN 45 RU, #12-24 threaded and should have clearance of minimum 24 inches in the front and 30 inches in the back.
- Each rack should be grounded to the building ground.

13.3. IDF requires 2 dedicated 20AMP simplex receptacles behind each data rack. Receptacles must be clearly labeled with panel and breaker number using P-touch or similar label.

13.4. Cable management will be Panduit WMPV45 for vertical and Panduit WMP1E for horizontal. Spec sheet will be provided by RAD IT Dept.

Note: Floor plans should be presented to RAD for circulation electronically and in hard copy formats to be considered and approved by RAD team. Once finalized, approved floor plans will be required in CAD format for the purposes of furniture placement, procurement, and space planning by RAD.

(Recommended room sizes are approximations to ultimately be determined by student capacity and space restrictions.)

**Building Systems**

1. **General**
   1.1  All doors for classroom or resource use shall include a vision panel, 96 sq. inches minimum.
   1.2  Interior doors to be pre-finished (clear coat) natural birch solid core.
   1.3  All stairwell doors to include a vison door.
   1.4  Learning Boards/TVs require wall backing placed during construction, RAD to provide specs.
   1.5  All electrical outlets/switches to be white.
   1.6  Exterior electrical outlets to be provided on all four walls.
   1.7  All classroom lighting to be multi- switch, so half the room can be turned off.
   1.8  Exterior weatherproof/tamper proof electrical outlets to be provided on all four walls
   1.9  Elevator doors to be stainless steel and interior finishes to be approved by RAD
   1.10     Acrovyn VA250N (2 1/2 ") wall Corner Guards to be installed from vinyl base to 48' on all corners in hallways, multipurpose room, stairways, and common areas. Colors selected by RAD
   1.11     **Roofing**: Contactor shall provide a 2-year warranty, including material & labor on any and all roofing related issues, including leaks.
   1.12     Building lightning protection system to be installed.

2. **Low Voltage Wiring**
   2.1  Cabling will be non-shielded CAT6 wiring/plenum wiring where needed, as per building code.
   2.2  Each Educational classroom to have CAT 6 single network drop in center of each room and to be terminated with a Biscuit jack or RJ 45 female receptacle, leaving 10' additional cabling. Each network drop should be" Home Run" to the server/MDF room, labeled (both ends), certified and terminated onto a patch panel. All wireless drops to be at a dedicated patch panel

Exhibit B

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

2.3 Standard Keystone wall plates should be used. (ex. Leviton 41080-WP Quickport)
2.4 For hanging phones, stainless steel plates with mounting studs on plate should be used (ex. KWP5EY/KWP6PY CAT5/CAT6 Keystone hanging plates)
2.5 Specifications available upon request. Structured Cabling Installation by Developers Licensed Low Voltage Contractor.
2.6 Labeling to be done using a standard 3-digit numbering scheme starting at 001 and incrementing up to 999 as determined by physical jack count. Port numbers must correspond from the floor to the patch panel and be labeled using a P-touch or similar labels. Black text on white label and font size at 18pt.
2.7 Locations to be reviewed and approved by RAD.
2.8 Every low voltage outlet must be accompanied with a corresponding electrical outlet.
2.9 Documentation
    2.9.1   3-copies of the Low Voltage Systems Documentation Package shall be provided upon completion to RAD.
    2.9.2   To include detailed mapping of the logical design, floor plans, and cable schedules with segment lengths, and numbered, identified, labeled locations, for the stations, MDF, IDF's, and each cable & port with certified test results in hard and electronic formats.
2.10   Numbering scheme to be approved by RAD before start of cabling and all patch panels, outlets, ports, and both cables ends shall be digitally labeled with a unique identifier and cross-referenced for accuracy.

## 3. **Digital PBX Telephone System Equipment**
3.1 Services and equipment will be provided by CSUSA Telephone Vendor.

## 4. **Voice & Data Structured Cabling**
4.1 T1/PRI lines for telephone service, MPLS network infrastructure for Data Service
4.2 Final wall locations to be specified by RAD.
4.3 Two 4-inch conduits to be installed between the MDF and the Utility Room/Building D-Mark for Fiber or other media, as needed.
4.4 Offices
    4.4.1   2-port outlets per room. Principal, AP, BA, and Registrar will have 3-port outlets.
4.5 Administration Area
    4.5.1   2-port outlet per user workstation located next to a110v duplex power outlet.
    4.5.2   2-port outlet per copier/printer/fax station next to an upgraded 20-amp dedicated 110v power outlet in designated areas.
    4.5.3   2-port outlet per postage machine next to a 110v duplex power outlet.
4.6 Mini classrooms, resource rooms, teacher's lounge/workroom.
    4.6.1   3-port outlets per room, 1 hanging for phone and 2 for copier/fax in designated area.
4.7 All Classrooms & Specialty Rooms
    4.7.1   2-ports per room. (Learning Board & Phone)
    4.7.2   32 ports total for each Computer Lab through the use of raceways and/or power-poles for distribution of both low voltage and power
    4.7.3   Cable drops in center of corridors for wireless access points. (Locations to be specified by IT department, no electric needed) cables to be terminated in surface mount boxes.
4.8 Electrical/Data floor outlets to be provided in Conference Room. See RAD for locations.

## 5. **Security System**
5.1 Fire Alarm as required by National/State Fire Prevention Code and State Building Code.

## 6. **Intrusion Detection & Alarm System**
6.1 Include (1) control panel (at main entrance) with keypad and the ability for extended zone modules and the capability to bypass any zone or use time delay operation.
6.2 Provide door contacts on all exterior doors.
6.3 Provide motion detectors on first floor corridors to capture window access.
6.4 Complete Alarm system to be installed by Developer's contractor including training classes and support for school personnel, monitored under monthly contract submitted for approval to RAD.
6.5 DETEX EAX-500 Alarm system to be installed on ALL exterior doors  (Keyed alike) with access to school with the exception of main front doors.
6.6 Door from administration area to school to have electronic release system with release button located in administration area.
6.7 Main exterior door to have camera/speaker/ talk system and electronic release system that allows administration to communicate with and allow access to visitors.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

CHARTER SCHOOLS USA

6.8 Single button Panic Alarm System with battery backup to be installed at main administration office.(N.C Schools ONLY)

7. **Closed Circuit (CCTV) Surveillance System**
   7.1 Avigilon HD video. Complete system with camera hardware, wiring, monitor, and software. Installed, with training classes for school personnel.
   7.2 Camera's
   7.3 Interior : Avigilon 1MP Micro Dome
   7.4 Exterior: Avigilon 2MP Bullet Camera
   7.5 Color, motion-activated cameras throughout with remote viewing capability and a dedicated monitor in the administration area. Provide storage capability for approx. 30 consecutive days with automatic rollover.
   7.6 Cameras to be ceiling-mounted, coverage locations to include:
      7.6.1 All building entrances and exits.
      7.6.2 All stairwells
      7.6.3 All hallways
      7.6.4 Multipurpose room (HD camera)
      7.6.5 Exterior play and gathering areas
      7.6.6 Covered canopy
   7.7 Dedicated Monitor to be provided and located in Administration area, location to be provided by RAD
   7.8 Contractor shall provide equipment specifications and contact information for continued support.
   7.9 All exterior PTZ cameras to be located at second floor height, with location approved by RAD.
   7.10 All closed circuit TV monitors need to placed and viewable from administration area and remote locations.

8. **PA System & Clock/Bell System**
   8.1 **PA System**
      8.1.1 Public Address (PA) system shall connect administration area with all student-occupied areas.
      8.1.2 PA System shall integrate through the school's phone system through "Station Port"
      8.1.3 Systems may comprise of the following, or equivalent:
         8.1.3.1 PA system may be used utilizing a handset and wireless headset.
         8.1.3.2 All classrooms, mini classrooms, teacher rooms, resource rooms, specialty classrooms, multipurpose room, and serving kitchen shall receive PA system communication capability.
         8.1.3.3 All-call paging system may utilize a separate system with individually wired ceiling speakers.
      8.1.4 Speakers shall be located at the following:
         8.1.4.1 All classrooms, group restrooms, hallways, multipurpose room, and exterior play areas, per plan to be provided by RAD.
      8.1.5 PA system shall be multi-zoned.
      8.1.6 Independent PA system (with speakers and cordless microphone)) required for gymnasium & multi-purpose room for presentations and dismissal.
      8.1.7 Speakers are wired to amplifiers in the MDF and to an all-call microphone in the administration area.
      8.1.8 (2) Wireless microphones are required for dismissal operations and must operate in those areas.
   8.2 **Clock and Bell System**
      *8.2.1 Bell system*
         8.2.1.1 Bell system is wired into the ceiling speakers listed above.
         8.2.1.2 Bells shall have at least 6 programmable zones.
      *8.2.2 Clocks*
         8.2.2.1 Clocks are to be provided in every classroom, specialty room, cafeteria gym, administration area, and controlled by a master clock located on the premises.
         8.2.2.2 Individual Clock locations to be identified and/or approved by RAD.
         8.2.2.3 No digital clocks.

9. **Plumbing**
   9.1 All toilets shall be commercial-grade and tankless, with flush valves.
   9.2 Toilet partitions shall be Phenolic, low-maintenance, and resistant to water, mold, and graffiti.
      9.2.1 Mounting of all partitions and accessories shall be reinforced with commercial grade hinges and locks.
      9.2.2 All commercial-grade mechanical hinges and locks.

Exhibit B

CHARTER SCHOOLS USA

9.3   Single lever faucets in K-1, gang baths, teacher planning, clinic
9.4   Classroom bathroom toilets to be standard size.
9.5   Provide sinks and mirrors, soap dispensers, toilet paper holders, and hand dryers at appropriate heights for age group. Hand dryers are to replace paper towel dispensers in all student restrooms.
9.6   Grades 6-12 to receive feminine product dispensers.
9.7   Hot water to be provided in clinic, kitchen, teacher planning, janitors closet, art rooms, science rooms, and/or those required by Health Dept., Building Codes, and local municipalities.
9.8   Chilled drinking fountains shall be provided as required by the local/state Building Code outside of student restrooms.
9.9   Faucets in all baths to be single push with auto shut-off
9.10   Hand dryers in lieu of paper towel dispensers
9.11   Faculty/Staff Restrooms
   9.11.1   Handicap as required and use of paper towel dispensers for faculty areas.
9.12   Complete testing of sewer lines, water pressures, irrigation, running water, and flushing toilets must be conducted by Developer's contractor before turn over of the facility to RAD/school.
9.13   Where required, contractor shall provide lead test of water.
9.14   Exterior hose bibs to be on all four walls and roof..

10.   **HVAC   (ALL ELECTRICAL SYSTEMS ARE TO BE PROTECTED BY SURGE PROTECTION TO MINIMIZE DAMAGE BY LIGHTNING AND POWER SURGES)**
10.1   HVAC temperature control and automation to be Honeywell Webs-AX automated web based solution
10.2   Separate wall mounted unit with 24 hour cooling for technology closet or additional controlled ventilation for reduced temperature.
10.3   All heating, ventilating, mechanical and air conditioning systems and equipment shall undergo complete Test and Balance once it has been completed and is in full working order and copy of results provided to RAD.
10.4   Yearly maintenance contract to be provided and presented by HVAC Contractor to RAD for review and approval.
10.5   **Contractor shall purchase extended warranty for units for years 2 -5. Year 1 & 2 shall be full labor and materials.**

10.6   Completed equipment specifications, and warranty information to be provided to RAD
10.7   Complete service of equipment (including: changing of filters, cleaning vents, and clearing drain lines/coils, of construction debris) must be provided prior to turnover

11. Flooring
11.1   Carpet, ceramic tile, and VCT shall be *commercial grade* "highly recommended for educational/institutional environments" and have a 10-year minimum warranty for wear, manufacturing defects, discoloration, mold, and shall not tear, gouge, peel or separate from substrate.
11.2   VCT/ vinyl base shall be from Armstrong Commercial Flooring, any substitutes must be approved in writing by RAD.
11.3   Color choices and patterns of all flooring and base materials shall be provided by the developer/contractor to RAD for approval.
11.4   Main lobby area (location approved by RAD) to have School name, corporate logo incorporated into VCT flooring.
11.5   Discard and/or replace any broken, cracked, chipped or deformed tiles. Extend tiling into all closets, toe spaces, door reveals, and similar openings without any open cracks, voids, raising, puckering at joints or other surface imperfections.
11.6   Tightly adhere resilient wall base to substrate throughout length of each piece, with base in continuous contact with horizontal and vertical substrates to avoid future indenting of wall base from floor cleaning.
11.7   VCT shall include (5) coats of initial waxing and Burnished, based on manufactures specifications, scheduled and completed before furniture delivery
11.8   Once VCT is waxed and polished, all hallways, multipurpose room, stairwells, and any staging or common areas are to be immediately covered 100% with untreated building roll paper and secured to the floor for protection from contractors and furniture assembly. Areas not protected will require tile replacement and/or re-waxing if damaged at no expense to RAD.
11.9   Additional box, of each type, color, and pattern of flooring installed shall be provided to the school. Additional 20 lineal feet of each type, color, pattern of resilient wall base shall be provided to the school.

Exhibit B

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

12. Painting
    12.1    Interior
        12.1.1        All interior walls shall be slick finish (Level 4).
        12.1.2        All drywall corners in hallways, multipurpose room, columns, etc. shall be protected after painting with an Acrovyn VA250N corner guards to place above vinyl base to 48", in matching wall color.
    12.2    Paint interior and exterior shall be Sherwin Williams (see attached specs).
    12.3    All wet walls in restrooms to be epoxy paint.
    12.4    ALL Paint colors to be reviewed and approved by RAD.
    12.5    Where building is a retrofit, all exterior imperfections to be repaired, patched prior to repainting.
    12.6    Exterior re-painting shall be included and color schemed approved by RAD.

13. Windows
    13.1    All window locations/stairs included will receive window treatments in the form of blinds (fire retardant and without the use of strings to prevent accidental strangulation) installed as part of building completion.

Note: Interior finishes should be presented to RAD for circulation in a board format including but not limited to samples of: carpet, tiles, base, all paint colors, cabinets, countertops, corner guards, lockers, and toilet partitions, any finish requiring a color selection, to be considered and approved by RAD team. (Typical CSUSA Charter Schools utilize variations of primary colors found on logo such as red, blue, green, yellow)

**14. Project Completion**

**14.1. Time is critical in the opening of a School with little or no flexibility for construction delays. The Developer shall notify RAD of the construction progress by a construction schedule, updated on a weekly basis. The Developer acknowledges herein sole responsibility to monitor the progress of construction necessary to coordinate work on the appropriate scheduled dates. The Developer shall be in a position to coordinate Contractor's, Subcontractor's, and Vendor's installations and/or manufacturing processes to ensure construction schedules are maintained at all times. Should the critical path for obtaining the C.O. be compromised, any and all costs associated with corrective actions necessary to maintain the original project schedule shall be the sole responsibility of the Developer.**

    14.1.1.   RAD requires 4-weeks for assembly and installation of all Furniture, Fixtures, and Equipment (FF&E) once C.O. is issued, prior to school opening. Timing of these processes is critical to RAD, school operations, and the opening of the facility. Any costs incurred from the delay of this process due to the delay of a C.O. for the site and facility, resulting in returned equipment, or additional shipping and/or storage costs, will be passed along to the Developer.

14.2. Change Request Procedures
    14.2.1.   Change order requests to expand or reduce the project scope, to modify: costs or budgets, policies, processes, plans, specifications, procedures, or revise schedules must be presented to RAD in written form for review and approval by authorized stakeholders.
    14.2.2.   Only formally documented and approved change order requests will be recognized for payment by RAD on behalf of the school. Verbal notifications and/or approvals will not be accepted as legitimate cost changes.

14.3. Developer/Contractor shall be responsible for obtaining all approvals required by local Building Departments including permits and inspections. The Developer shall meet with plan reviewers or Building Department personnel to clarify plans, Product Control Approval and specifications required to obtain building permits, and inspections if required or requested. The Developer agrees to meet all requirements and qualifications required of any governing entity, including, but not limited to: City, County, and State agencies and school districts, in order to complete the construction and development and construction of the property.

14.4. Developer/Contractor agrees to correct work that is determined by RAD to be deficient in terms of installation or materials within forty-eight hours ( 48) of notification.

14.5. Upon Completion of Building Construction, the Developer will complete the following:
    14.5.1.   Instruction & Training – instruct RAD, School Personnel and/or designated Vendor's via formally scheduled training classes to adjust, operate, and maintain systems, subsystems, and equipment.

CHARTER SCHOOLS USA

    14.5.2.   Provide a list of all applicable Maintenance Company's for HVAC, Plumbing, Electrical, Security, etc. and contact information.

    14.5.3.   Final Cleaning

       14.5.3.1. Provide professional cleaning of school building interior, site, yard, grounds, and landscaping areas.

       14.5.3.2. Remove all rubbish, litter, dirt, stains, and spills, rake grounds, remove all construction debris and surplus construction materials.

       14.5.3.3. Clean all exposed exterior and interior surfaces in their entirety including windows, and HVAC, plumbing, and electrical fixtures, to a dirt-free, film-free, polished condition.

14.6 ALL VCT Flooring will be waxed with 5 coats and burnished to a high shine, based on manufacturer's recommendations.

14.7  Pest Control - Provide a licensed Exterminator to make a final inspection and service call to rid school of all insects, rodents, and pests, provide final report.

14.8      Provide Emergency Exit Drawings in Electronic format and Hard Copy installed in every room per local/state Fire Codes.

14.9      Provide Final Project Binder, which shall include the following required documentation:

    14.9.1       All permitted site and building plans to be provided on CD

    14.9.2       All building systems, warranties, and manuals to be provided in a binder in duplicate format / CD prior to School orientation.

    14.9.3       Building Keys, per RAD specifications

    14.9.4       Key schedule to be approved by RAD

    14.9.5       Key box (as referenced in "Building Design - 7.8") to be provided by GC

    14.9.6       Provide Mailbox, specifications and location provided by local Post Office.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**EXHIBIT "B"**

**BASE RENT**

| | |
|---|---|
| Year 1 | $1,501,643 |
| Year 2 | $1,531,676 |
| Year 3 | $1,562,309 |
| Year 4 | $1,593,556 |
| Year 5 | $1,625,427 |
| Year 6 | $1,657,935 |
| Year 7 | $1,691,094 |
| Year 8 | $1,724,916 |
| Year 9 | $1,759,414 |
| Year 10 | $1,794,602 |
| Year 11 | $1,830,494 |
| Year 12 | $1,867,104 |
| Year 13 | $1,904,446 |
| Year 14 | $1,942,535 |
| Year 15 | $1,981,386 |
| Year 16 | $2,021,014 |
| Year 17 | $2,061,434 |
| Year 18 | $2,102,663 |
| Year 19 | $2,144,716 |
| Year 20 | $2,187,610 |
| Year 21 | $2,231,363 |
| Year 22 | $2,275,990 |
| Year 23 | $2,321,510 |
| Year 24 | $2,367,940 |
| Year 25 | $2,415,299 |
| Year 26 | $2,463,605 |
| Year 27 | $2,512,877 |
| Year 28 | $2,563,134 |
| Year 29 | $2,614,397 |
| Year 30 | $2,666,685 |
| Year 31 | $2,720,018 |
| Year 32 | $2,774,419 |
| Year 33 | $2,829,907 |
| Year 34 | $2,886,505 |
| Year 35 | $2,944,235 |
| Year 36 | $3,003,120 |
| Year 37 | $3,063,183 |
| Year 38 | $3,124,446 |
| Year 39 | $3,186,935 |
| Year 40 | $3,250,674 |

1341322v1 980058.0196

Exhibit B

| | |
|---|---|
| Year 41 | $3,315,687 |
| Year 42 | $3,382,001 |
| Year 43 | $3,449,641 |
| Year 44 | $3,518,634 |
| Year 45 | $3,589,007 |

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1341322v1 980058.0196

Exhibit C

## ADDENDUM TO INTERIM LEASE AGREEMENT

**THIS ADDENDUM TO INTERIM LEASE AGREEMENT** ("Addendum") is made and entered into this _28_ day of February, 2018 by and between **RED APPLE AT LIBERTY, LLC**, a Florida limited liability company ("Landlord"), whose mailing address is 800 Corporate Drive, Suite 124, Fort Lauderdale, Florida 33334 and **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a South Carolina not-for-profit corporation ("**Tenant**"), whose mailing address is _7750 Henry Brown Jr. Blvd, Goose Creek, SC_

Landlord and Tenant hereby agree to the terms set forth in this Addendum, to be added to and in modification of that certain Interim Lease Agreement made and entered into by them on December 16, 2016 ("Interim Lease Agreement"). Capitalized terms herein shall have the same meaning as in the Interim Lease Agreement.

Landlord and Tenant agree to the following modifications to the Interim Lease Agreement:

1.       Landlord is seeking to close loans with BMO Harris Bank and CLI Capital (collectively "the Loan") to refinance the existing debt on the Premises. The parties agree that the Interim Lease Agreement will not be terminated and a Replacement Lease will not be entered into as a result of closing the Loan as provided in Article I, Section 1 of the Interim Lease Agreement. The parties further agree that all of the Tenant's rights under the Interim Lease Agreement are fully reserved and unaffected by the closing of the Loan or any future loan by Landlord, including but not limited to the right to a Replacement Lease in each instance.

2.       Landlord will in good faith seek to obtain tax exempt bond financing for the Premises at the earliest possible time, taking into account the operating history and revenue of Mevers School. Landlord shall in good faith attempt to bring about such tax bond financing in 2020, and, if unsuccessful at that time, then continue to pursue such tax exempt bond financing in every year thereafter.

3.       In the event of any conflict between the terms of the Interim Lease Agreement and this Addendum, the terms of this Addendum shall control. Any references to the term "Agreement", in the Interim Lease Agreement or this Addendum, shall mean the Interim Lease Agreement as modified by this Addendum.

4.       The undersigned have executed and delivered this Addendum effective as of the date set forth above. This Addendum may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

1

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**IN WITNESS WHEREOF,** the undersigned execute and deliver this Addendum to Interim Lease Agreement on the date first set forth above.

**RED APPLE AT LIBERTY, LLC**, a
Florida limited liability company

By:_____

Name:_____

Title:_____


**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a
South Carolina not-for-profit corporation

By: _____

Name: Stewart Weinberg

Title: President

2

#1700480v2

Exhibit D

## DEVELOPMENT AGREEMENT

**THIS DEVELOPMENT AGREEMENT** (this "**Agreement**") is made and entered into effective as of this 5th day of October, 2020, by **RED APPLE DEVELOPMENT, LLC**, a Florida limited liability company, or its authorized assigns ("**Red Apple**") and **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a South Carolina not-for-profit corporation ("**BCEA**").

### RECITALS

**WHEREAS,** BCEA has filed or anticipates filing a charter application(s) (the "**Charter Application**") for a grant of a charter for the operation of a public charter school located in South Carolina (the "**Charter School**");

**WHEREAS,** BCEA has determined that it is in its best interest to contract with Red Apple to assist in the development of the Charter School facility and did previously enter into a Development Agreement with Red Apple dated May 6, 2019 ("Initial Development Agreement"); and

**WHEREAS,** the parties wish to supplement the Initial Development Agreement by entering into this Development Agreement which shall supersede anything that may be in conflict with the Initial Development Agreement; and

**WHEREAS,** BCEA wishes to contract with Red Apple and Red Apple wishes to contract with BCEA, upon the terms and conditions set forth herein.

**NOW, THEREFORE** in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration receipt and sufficiency which is hereby acknowledged and further consideration of the mutual covenants and promises hereinafter set forth, the parties agree as follows:

1.    **Recitals.**  The recitals set forth above are true and correct and are incorporated herein by reference.

2.    **Engagement.**  BCEA hereby engages Red Apple and Red Apple hereby accepts such engagement from BCEA to provide the Services (as defined herein) in accordance with the terms of this Agreement.

3.    **Services.**  In connection with the obligations of BCEA with respect to the Project, Red Apple shall provide certain services, which services include the following (collectively, the "**Services**"):

3.1    BCEA presently owns the project site as described on Exhibit A attached hereto (herein, the 'Property). BCEA will enter into a Ground Lease with Red Apple for a term commensurate with financing at one dollar ($1.00) per year. Red Apple with enter into an Interim Facility Lease ("Interim Lease") with BCEA to run concurrently with the Ground Lease term. Lease payments shall be consistent with the attached payment schedule. Both parties agree and acknowledge that their respective rights may need to subordinated for purposes of financing of the project and may need to be adjusted based upon reasonable financing requirements. The parties agree and acknowledge to fully cooperate and execute needed documents to facilitate financing.

3.2    Red Apple shall advise BCEA in the planning and development of the Charter School facility and in connection therewith shall obtain proposals and engage, or cause to be engaged, professionals (i.e., contractors, architects, consultants, engineers, surveyors, etc.) to perform due

1

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

diligence, entitlement, planning and design work (collectively, the **"Pre-construction Expenses"**) required in connection with the development and construction of the Charter School facility in substantially the scope and quality set forth in the documents attached as Exhibit B (the "Charter School Facility"), together with all of the built infrastructure obligations of BCEA set forth in that certain Development Agreement entered into between BCEA and Wildcat Trail 2, LLC, attached hereto as to form as Exhibit C (the **"WCT2 Requirements"**). The work required to construct the Charter School Facility and fulfill the WCT2 Requirements is hereinafter referred to collectively as "the **Project"**.

     3.3    Red Apple shall assist in obtaining financing for the redevelopment, development, renovation and construction, as applicable, for the execution of the Project, and in connection therewith BCEA shall be required to serve as a borrower or co-borrower on such financing (the **"Financing"**) in the event the debt service for such Financing is less than the aggregate of the Base Rent (as defined in that certain Interim Lease Agreement dated _____, 2020 between Red Apple at Berkeley, LLC, as landlord, and BCEA, as tenant, as may be amended and/or assigned (the **"Interim Lease"**)) payable by BCEA under the Lease.

     3.4    Red Apple shall redevelop, develop, renovate and construct, as applicable or cause to be redeveloped, developed, renovated and constructed, as applicable, the Project. in a scope, configuration, and quality that is at least equivalent to the entire facility and infrastructure identified and described in Exhibit B and the Interim Lease, at a cost basis that is guaranteed not to exceed $13,453,231 ("Cost Basis"). The Cost Basis is a net number calculated based on the sum of the Costs and Fee, as defined in paragraph 4 below, minus a $440,431 credit for the purchase of the Early Learning Center Parcel as described in paragraph 6 below.

     3.5    The cost of the Entry Improvements is approximately $440,431 and will be a credit against the total provided in Section 3.4. It is understood and agreed that there will be $134,575 in water and sewer impact fees required for the Project. Red Apple will also provide BCEA a proposal for the installation of the water line referenced in the WCT2 Development Agreement, for approval by both BCEA and WCT2. Upon approval of the proposal, WCT2 shall make a donation to BCEA to pay for the installation of the water line by Red Apple Development under separate Agreement. BCEA shall pay the same to Red Apple Development, upon which payment the Cost Basis will be credited and further reduced. The parties agree and acknowledge that construction of the water line referenced in the WCT2 Development Agreement is an additional cost and not included in the development costs stated herein ("Water Line Costs"). If the Water Line Costs are not reimbursed upon completion, or if only a portion of the Water Line Costs are reimbursed, the remaining balance owed shall be carried over to, and adjusted in, the Interim Facility Lease Rent Schedule.

     3.6    **Permanent Financing**. Provided it is financially feasible, within eighteen (18) months, Red Apple and BCEA will use their best efforts to cooperate in obtaining Permanent Financing for the Project and Property. Such financing may include Mevers School of Excellence. It is anticipated that the existing Interim Lease and Mevers lease obligations would be reduced with Permanent Financing.

     4.    **Fee**. As and for the performance of its responsibilities hereunder and Services provided, Red Apple shall be paid by BCEA the amount equal to Five Percent (5%) of the actual, out-of-pocket total development costs of the Project (the **"Costs"** and the **"Fee"**). The Costs shall not exceed $12,791,628, which is the sum of $12,682,059 in Construction and Development costs reflected n the RYAN Construction Contract, plus $450,000 in interim financing costs, plus $100,000.00 in soft costs, less $440,431 in credit towards the ELC site. The Fee and Pre-construction Expenses shall be paid by BCEA to Red Apple directly from the Financing or other legally available funds of BCEA, in lump sum, upon substantial completion of the Project. The Fee shall not exceed $661,603.

2

5.    **Option to Purchase.**    It is contemplated under the Permanent Financing, transfer of ownership of the Project and Mevers School of Excellence may be offered to BCEA and may be included within the structure of the Permanent Financing.

6.    **Purchase of Early Learning Center Parcel.**    Red Apple shall purchase the 1.98 acre Early Learning Center Parcel as identified on Exhibit "B" attached hereto for a value equal to the cost of the Entry Improvements under the WCT2 Requirements and have no further obligations to BCEA regarding that Parcel. "Entry Improvements" shall be understood to mean that portion of the WCT2 Requirements comprised of the entry road and all associated infrastructure.

7.    **Termination of Agreement**.    This Agreement shall terminate on the date on which all obligations hereunder have been fully performed and no further obligations can arise hereunder.

8.    **Notices**.    All notices, requests, consents, instructions, and other communications required or permitted under this Agreement shall be in writing and shall be (as elected by the person giving such notice) either hand-delivered by messenger or nationally recognized overnight courier service, sent by facsimile with copy by mail, or mailed (air mail if international) by certified mail (postage prepaid), return receipt requested, and addressed to the parties as follows unless the address or facsimile number is changed by the party by like notice given to the other parties:

If to BCEA:        Berkeley Charter Education Association, Inc.

                   _____
                   _____
                   _____
                   _____
                   Attention: _____
                   Facsimile No.: _____

Copy to:           _____
                   _____
                   Attention: _____
                   Facsimile No.: _____

If to Red Apple:   Red Apple Development, LLC
                   800 Corporate Drive, Suite 124
                   Fort Lauderdale, Florida 33334
                   Attention:  Scott Woodrey
                   Facsimile No.:  954-202-2047

Copy to:           Tripp Scott, P.A.
                   110 Southeast 6th Street
                   Fifteenth Floor
                   Fort Lauderdale, Florida 33301
                   Attention:  Edward J. Pozzuoli, Esq.
                   Facsimile No.:  954-761-8475

Each such notice, request, consent, instruction or other communication shall be considered given and shall be deemed delivered: (a) three (3) days after mailing when mailed certified mail, return receipt

3

1840924v1 980058.0196
HSB 6500370 v.1

Exhibit D

requested, postage prepaid, or upon hand delivery by messenger to the address indicated or (b) one (1) day after acceptance for delivery by Federal Express or other nationally recognized overnight courier service for delivery at the address indicated or (c) when received by telephone facsimile transmission at the number indicated (with confirmation of receipt). Notice sent by counsel for either of the parties shall be deemed to be notice sent by such party.

9.     **No Partnership or Agency**. The relationship between the parties hereto shall be solely as set forth herein and neither party shall be deemed to be an employee, agent, partner, or joint venturer of the other party.

10.     **Assignment**. No party shall assign its rights or obligations hereunder without the prior written consent of the other party to this Agreement, which consent shall not be unreasonably withheld; provided, however, Red Apple shall have the right to assign this Agreement to an affiliate or related entity. For purposes hereof, "affiliate" as applied to any party, means any other person who directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with such party. For purposes hereof, "control" (including "controlling", "controlled by", or "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of management and policies of such party, whether through ownership of voting securities, by agreement or otherwise.

11.     **Outside Business**. Nothing contained in this Agreement shall be construed to restrict or prevent, in any matter, Red Apple, or its representatives or principals from providing services to any third-party similar to the services provided pursuant to this Agreement.

12.     **Survival**. All of the covenants, agreements, representations, warranties, terms and provisions of this Agreement or otherwise made in writing by any party pursuant hereto shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby for a period of one (1) year after the date thereof.

13.     **Waiver of Jury Trial**. EACH OF RED APPLE AND BCEA HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTERS IN ANY WAY ARISING OUT OF OR CONNECTED WITH THIS AGREEMENT, THE RELATIONSHIP OF RED APPLE AND BCEA, THE TRANSACTIONS CONTEMPLATED HEREBY, OR THE ENFORCEMENT OF ANY REMEDY HEREUNDER. THE PARTIES HEREBY SUBMIT TO THE JURISDICTION OF THE STATE OR FEDERAL COURTS IN THE STATE OF SOUTH CAROLINA IN RESPECT OF ANY SUIT OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT.

14.     **Miscellaneous**.

(a)     This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. The provisions of this Agreement may not be amended, supplemented, or waived orally, but only by a writing executed by the parties hereto.

(b)     The failure or delay of any party hereto to enforce any provisions of this Agreement shall not be construed to be a waiver of such or any other provision, nor in any way to affect the validity of all or any part of this Agreement, or the right of such party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

4

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

(c)    In the event that any portion of this Agreement is determined to be unconstitutional, unenforceable or invalid, such portion of this Agreement shall be stricken from and construed for all purposes not to constitute a part of this Agreement, and the remaining portion of this Agreement shall remain in full force and effect and shall, for all purposes, constitute the entire agreement so long as the material provisions of the parties bargain can still be given effect.

(d)    This Agreement shall be governed by South Carolina law.  Venue for any legal proceedings shall be in the state and federal courts of the State of South Carolina.

(e)    In the event of any controversy arising under or relating to the interpretation of this Agreement or any breach thereof, the prevailing party shall be entitled to recover all court costs, expenses, and reasonable attorneys' fees (including, without limitation, all pre-trial, trial and appellate proceedings) incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

(f)    All of the terms and provisions of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective successors and permitted assigns.

(g)    Time is of the essence of this Agreement.

(h)    The headings contained in this Agreement are for convenience of reference only, and shall not limit or otherwise affect in any way the meaning or interpretation of this Agreement.

(i)    This Agreement may be executed in any number of counterparts, each of which shall be considered an original and a complete set of which taken together shall constitute one and the same agreement.  The parties agree and intend that a signature by facsimile machine or other electronic transmission shall bind the party so signing with the same effect as though the signature was an original.

(j)    Each of BCEA and Red Apple has the full right, power and authority to enter into this Agreement and to perform each and all of the terms and provisions hereof, and to execute and deliver this Agreement.  Each of BCEA's and Red Apple's signatory to this Agreement is authorized to sign this Agreement on behalf of such party.

[SIGNATURE PAGE FOLLOWS]

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed effective as of the day and year first above written.

**Witnesses:**

Printed Name: _Cynthia R. O'Toole_

Print Name: _Joseph Armour_

**Witnesses:**

Print Name: _____

Print Name: _____

**BCEA:**

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.,**
a South Carolina not-for-profit corporation

By: _____
Name: _Stewart Weinberg, Ph.D._
Title: _President_

**RED APPLE**:

**RED APPLE DEVELOPMENT, LLC,**
a Florida limited liability company

By: _____
Name:   Jonathan K. Hage
Title:    President

1840924v1 980058.0196
HSB 6500370 v.1

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed effective as of the day and year first above written.

Witnesses:

BCEA:

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.,**
a South Carolina not-for-profit corporation

_____
Printed Name: _____

_____
Print Name: _____

By: _____
Name: _____
Title: _____

Witnesses:

RED APPLE:

**RED APPLE DEVELOPMENT, LLC,**
a Florida limited liability company

_____
Print Name: _____

_____
Print Name: Sharon Gerrard

By: _____
Name: Jonathan K. Hage
Title: President

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1840924v1 980058.0196
HSB 6500370 v.1

Exhibit D

**Berkeley Prep- SC (765 enrollment)**
**Rent Schedule Facility**

| | |
|---|---|
| YEAR 1 | $1,300,000 |
| YEAR 2 | $1,326,000 |
| YEAR 3 | $1,352,520 |
| YEAR 4 | $1,379,570 |
| YEAR 5 | $1,407,161 |
| YEAR 6 | $1,435,304 |
| YEAR 7 | $1,464,010 |
| YEAR 8 | $1,493,290 |
| YEAR 9 | $1,523,156 |
| YEAR 10 | $1,553,619 |
| YEAR 11 | $1,584,691 |
| YEAR 12 | $1,616,385 |
| YEAR 13 | $1,648,713 |
| YEAR 14 | $1,681,687 |
| YEAR 15 | $1,715,321 |
| YEAR 16 | $1,749,627 |
| YEAR 17 | $1,784,620 |
| YEAR 18 | $1,820,312 |
| YEAR 19 | $1,856,718 |
| YEAR 20 | $1,893,852 |
| YEAR 21 | $1,931,729 |
| YEAR 22 | $1,970,364 |
| YEAR 23 | $2,009,771 |
| YEAR 24 | $2,049,966 |
| YEAR 25 | $2,090,965 |

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**EXHIBIT "A"**

**"PROPERTY"**

ALL   that piece, parcel or tract of land situate, lying and being in the County of Berkeley, State of South Carolina, containing 15.67 Acres, more or less, shown as TRACT A-2A on a plat entitled "PLAT OF THE SUBDIVISION OF TRACT A (RESIDUAL 2) CONTAINING 88.72 +/- Ac. TO CREATE TRACT A-2A (15.63 Ac.) NEAR SUMMERVILLE, BERKELEY COUNTY, SOUTH CAROLINA, prepared for and owned by WILDCAT TRAIL 2, LLC" prepared by Phillip P. Gerard, PLS, of Thomas & Hutton Engineering Co., dated November 5, 2019, and recorded on December 27, 2019, in the R.O.D. Office for Berkeley County as Document ID 2019046929.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

EXHIBIT "B"

1.98 ACRE EARLY LEARNING CENTER PARCEL

CHARTER SCHOOL FACILITY (MATERIAL APPENDED)

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1840924v1 980058.0196
HSB 6500370 v.1

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478



**DESIGN/BUILD**

**BASE BUILDING**
**OUTLINE SCOPE DOCUMENT**

# Cane Bay Charter Academy
# Wendell, NC

**One-Story Elementary School**
**6-11-2020**

PROPRIETARY / TRADE SECRET

Exhibit D

# TABLE OF CONTENTS

I.   **GENERAL REQUIREMENTS** ................................................................................. **3**

    A.   INTENT ................................................................................................................ 3

    B.   GENERAL PROJECT PARAMETERS .................................................................... 3

    C.   QUALITY ASSURANCE ....................................................................................... 3

II.  **BASE BUILDING SHELL** .................................................................................... **4**

    A.   SITEWORK ......................................................................................................... 4

    B.   STRUCTURE ....................................................................................................... 6

    C.   EXTERIOR ENCLOSURE .................................................................................... 6

    D.   INTERIOR FINISHES .......................................................................................... 7

    E.   SPECIAL SYSTEMS ........................................................................................... 7

    F.   HVAC GENERAL CRITERIA ............................................................................... 8

    G.   FIRE PROTECTION SYSTEMS DESIGN. ............................................................ 8

    H.   PLUMBING SYSTEM DESIGN ........................................................................... 9

    I.   ELECTRICAL SYSTEMS ..................................................................................... 10

III. **EXCLUSIONS & ALLOWANCES** ........................................................................ **12**

    A.   EXCLUSIONS ..................................................................................................... 12

    B.   ALLOWANCES……………………………………………………………………………………11

PROPRIETARY / TRADE SECRET

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

# GENERAL REQUIREMENTS

### A. INTENT

    1.    This scope document, together with the project drawings, identified in exhibit B, define the general scope of the work for the proposed elementary school building, utilizing the services of Ryan Companies US, Inc. (Design/Builder).

### B. GENERAL PROJECT PARAMETERS

    1.    The general project parameters is listed as follows:

        a.    Building Area

            Gross Square Feet of Classroom Building for phase 1     =    +/- 41,595sq.ft. (Includes complete build out)

    2.    Regulatory Requirements:

        a.    Ryan Companies US, Inc. shall secure site plan approvals, surface water management approvals and complete site construction activities in accordance with exhibit A.

        b.    Ryan Companies US, Inc. will secure Building permits related to the design and construction of the proposed project.

        c.    Impact Fees:  We have included all tap fees, meter fees, connection charges and other similar expenses which are due upon completion of site work. Charter schools are exempt from impact fees. Therefore impact fees are excluded.

        d.    Transportation Concurrency and Proportional Fair Share:  We have not included any allowance for a required payment to Berkeley County or City of Moncks Corner for transportation concurrency as none has been requested and it is understood such fees are exempt for Charter Schools. We have included cost for design, permitting and construction of improvements in accordance with the approved project drawings.

        e.    Building Permits:  Plan review and permit fees associated with the receipt of a building permit from governmental authorities shall be paid by the Design/Builder.  Design/Builder is responsible for securing the building permit for the structure.

### C. QUALITY ASSURANCE

    1.    Design/Builder shall implement their quality assurance program for the design and construction of this project.

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## I.  BASE BUILDING

### A.  SITEWORK

1.  Ryan Companies US, Inc. shall provide the following in accordance with the Site Development Work and is included in this agreement:

    a.  Zoning necessary to operate the school on the Property.

    b.  All site work approvals including storm water management, utilities, and zoning.

    c.  All engineering needed to secure required permits for the Site Development Work and to operate the school.

    d.  All permits required to complete the Site Development work including those items listed above.

    e.  All easements required for cross use of retention, roads, drainage and storm water system.

    f.  Closeout of all permits for Site Development Work.

    g.  Demolition:  demolish all utilities and structures required for the installation of new building, new utilities, parking lots, lights and playfields.

    h.  Grading:  complete all grading work including compaction of soils in compliance with soils report.  If import of off-site fill is required, all soil imported to the site shall be free of hazardous materials and subject to inspection prior to placement.

    i.  We have not included replacement or haul-off of unsuitable soils. Based on the geotechnical report, there are no known unsuitable soils that would require haul off currently found onsite. We have assumed that all topsoil can be lost onsite. If it has to be hauled off, please add $109,000 for 8,000 CY of material.

    j.  Building Pad:  construct the building pad in compliance with soils report. Independent geotechnical engineer shall certify building pad has been properly constructed and compacted prior to acceptance.  Surveyor shall verify building pad elevation prior to acceptance.

    k.  Temporary Staging:  allow contractor a construction staging area adjacent to, but on the Property.

    l.  Water:  supply domestic and fire protection water to within 5' of the building at a location determined by Design/Builder at a pressure and volume required by Buyer and governmental authorities. Install fire hydrants and a fire loop as required by local governmental authorities. Ryan to complete connections prior to Final insp.

    m.  Sanitary Sewer:  provide sanitary sewer piping to the building at a location determined by Design/Builder at a depth and capacity required for the building. Ryan to complete connections prior to final insp.  Lift Station is included per design documents.

Exhibit D

n.  Storm Sewer and Drainage:  provide a complete storm sewer system for drainage of the parking lots and building roof.  Construct parking lot with adequate drainage in accordance with local governmental authorities' requirements.

o.  Electric:  install primary conduits, manholes, transformer pad and secondary electrical conduits in accordance with COT and building's requirements.  Terminate secondary conduits within 5' of the building at a location determined by Buyer.  Design/Builder will enter into an agreement with Duke Energy to provide wiring and transformer.

p.  Communication:  Pay for costs, if any, associated with bringing Buyer's required communication service(s) to the property line at an agreed upon location.  Cost and work associated with getting service from the property line to the building by Buyer.

q.  Natural Gas:  No natural gas shall be provided to the project.

r.  On-site Roads and Parking:  provide the parking lots and interior roads on the Property.  Provide concrete curbs at all asphalt terminations.  Provide striping and signage as required and governmental authorities.  Provide grading and compaction at roads and parking areas.

s.  Sidewalks:  provide all sidewalks shown on the final site plan.

t.  Playground fencing will be provided as shown on the approved site plan.

u.  Site Lighting:  install all site lighting shown on the final site plan including concrete bases, light standards, conduit and wire.

v.  Off-Site Improvements:  Offsite Improvements include work on Black Tom Road directly in front of the school and the construction of the Access Road to tie into the school.

w.  One (1) Monument sign is included.

x.  Dumpster enclosure, pad and gates as required by governmental authorities.

y.  Landscaping including sleeves for irrigation piping, an irrigation system and all code required landscaping.  Irrigation water will be provided by the separate meter from the city water supply or on-site irrigation well.

z.  Exterior scoreboards and lighting of recreational areas are excluded.

aa. Construction testing, by an independent testing agent, shall be paid for by Ryan Companies US, Inc. for all its Site Development Work.

bb. Retaining Walls: Based on current design, no retaining walls are required and are therefore excluded.

PROPRIETARY TRADE SECRET

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**B. STRUCTURE**

1. Concrete

a. Concrete Slab. Building Area Floor - Slab on grade 4" thick 3,000 psi. concrete, reinforced with wire mesh on chairs. Slab will be placed and finished with a laser screed. Per Eng. Dwgs

b. Exterior walls will be constructed of structural concrete tilt-up panels, and will be 4000 psi, with chamfers and reveals per architect.

c. Foundations shall be reinforced 3,000 psi min. concrete. Per Eng. Dwgs.

2. Metals

a. Structural Steel: The structural framing system for the base building shall consist of steel columns, composite beams, composite floor deck, bar joists, and metal roof deck.

b. Floor-to-roof height is 12'-8".

**C. EXTERIOR ENCLOSURE**

1. Roof System

a. Standard roofing system shall be a 60 mil reinforced, white TPO mechanically attached membrane roofing system. The roofing system materials shall be Class "A", non-combustible, guaranteed free from defects for a period of 15 years by the roofing system manufacturer directly to the Owner. Provide maintenance path from roof hatch to equipment.

b. Roof insulation: Polyisocyanate insulation with an average R value of 30 or better.

c. Sheet Metal and Flashing: Pre-finished aluminum parapet cap flashing.

d. Roof Access: One ladder shall be provided for roof access, as part of the base building requirements.

e. Roof overflow scuppers shall be provided on exterior walls as a secondary means of roof drainage. Primary roof drainage shall be via internal roof drains as shown on the drawings.

2. Exterior Window System.

a. Windows shall be in-operable and set in anodized aluminum frames.

b. Glass is insulated, impact resistant, tinted exterior lite, tempered as required by code. PPG, Viracon, Oldcastle or equal.

c. Aluminum Window Systems. YKK, VistaWall, Kawneer or equal.

3. Exterior Doors.

a. Aluminum Entrances.

1) Door frames are 2" X 4 1/2" with insulated glass

2) Doors are 350 IR impact with the hardware per the specifications:

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

     b.    Exterior Hollow Metal Doors.

        1)    Exterior egress doors from service areas shall be 3'-0" x 7'-0", 18 ga. flush face, insulated hollow metal doors. Hardware includes standard mortise locksets, weather stripping, sweep strip, heavy duty ball-bearing hinges, and closer.

**D. INTERIOR FINISHES**

1. General.
   a. Floors - VCT or carpet per project drawings.
   b. Walls – Metal Stud, insulated, gypsum wallboard with level 4 finish and painted per project drawings.
   c. Ceilings - Gypsum wallboard, painted or acoustic panel ceiling tile per project drawings.

2. Gang Restrooms
   a. Restrooms shall be finished with ACT and walls, paint/ceramic wall tile on "wet" walls, and Dur-a-flex or equal epoxy flooring per project drawings. Dura flex on floors with 6" epoxy cove base.
   b. Restrooms will be complete with solid plastic toilet partitions, toilet accessories, and standard wall-hung lavatories with pillar tap metering faucets in lieu of laminated counter tops or solid surface counter tops.

3. Mechanical and Service Areas.
   a. All common area core mechanical areas and service areas will be complete with appropriate finishes per project drawings.

4. Interior Doors
   a. Interior doors to shall be 1-3/4" solid core, wood veneer per project drawings. Prefinished with view window.
   b. Hardware – shall be provided in accordance with the project drawings or approved equal.

5. Millwork
   a. Plastic laminate cabinets and tops shall be provided in accordance with the project drawings. Tops will drilled with 2" diameter holes and plastic grommets for cords.

6. Interior Signage
   a. Code related signs: toilet room/ADA accessibility, stairway identification, evacuation signs shall be provided as required to meet code.

7. Toilet Accessories
   a. Toilet partitions and accessories shall be provided in accordance with the project drawings.

8. Window Blinds
   a. PVC vertical blinds shall be provided on all exterior windows. No cords shall be on blinds

9. PE Space with gymnasium
   a. Gym size +/-4839 sqft
   b. Include 4 ceiling-supported basketball hoops and backboards. All to be retractable.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

    c.    Volleyball court striping is included. One set of volleyball equipment is included and cored holes for 1 court.

    d.    Vinylasa flooring is included for gymnasium.

    e.    One electronic score boards with bar/LED numbers and captions to be provided, see RAD for locations.

    f.    Drinking fountains to be provided.

    g.    Wall padding on four walls is included.

**E.   SPECIAL SYSTEMS**

**F.   HVAC System**

    1.    The HVAC system shall be design and installed in accordance with the project drawings including:

        a.    Three RTUs with VFD for Classroom Area.  One RTU For Gym. All RTU's will utilize Bipolar ION generators. A separate split system shall be provided for the IT room.

        b.    Ductless split system air handling and condensing units to serve the IT room.

        c.    VAV boxes with internal insulation and DDC controls

        d.    Roof mounted exhaust fans

        e.    Ceiling mounted exhaust fans

        f.    Galvanized duct in accordance with latest SMACNA standards

        g.    Medium pressure ductwork will be insulated with 2" fiberglass wrapped insulation

        h.    System to utilize a return air plenum above the drop ceiling

        i.    Manual balancing dampers

        j.    Fire and smoke dampers as required by code

        k.    Complete DDC control system with web based interface by Honeywell System.

**G.   FIRE PROTECTION SYSTEM**

    A.    A properly zoned, supervised, hydraulically designed fire protection system consisting of automatic fire sprinkler system and standpipes will be provided in accordance with NFPA 13 requirements.

    1.    Scope.

        a.    Entire facility shall be 100% sprinklered in accordance with all current NFPA codes. The scope of work for this project shall include providing a complete and operable wet pipe sprinkler system.

        b.    Proposed Sprinkler Head Types:

            1)    Standard upright or pendant in exposed areas;

            2)    Semi-recessed in hard or acoustical ceilings

            3)    Sidewall type where applicable.

    2.    All materials and equipment, including piping and hangers shall be in accordance with NFPA 13.(Schedule 40 black steel in sizes 2 inches and

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

smaller, Schedule 10 in sizes 2-1/2 inches and larger) will be UL listed and FM approved.

3.  Code required upright heads will be included in phase II per code.

4.  Exclusions: Water storage design, storage occupancies, rack storage systems, clean agent / inergen system, preaction system, and dry pipe system.

### H. PLUMBING SYSTEM

Plumbing systems will be in general conformance to the project drawings and include the following:

1.  Plumbing Design Criteria

    a.  The following publications will be used as reference for design of the plumbing systems on this project:

        1)  2018 International Building Code

    b.  Without limiting the generality thereof, the design will include but is not necessarily limited to, the following:

        1)  Domestic water system.

        2)  Sanitary sewer system shall be a gravity system.

        3)  Storm/Roof drainage system shall be a gravity system.

        4)  Condensate drain system shall be a gravity system.

        5)  Multiple wet stack locations shall be provided throughout the shell base building. Each wet stack location shall contain a cold water, sanitary, vent, condensate & possible rainwater stack.

        6)  Plumbing fixtures – faucets will be piller tap operation as approved by RAD

        7)  Mop sinks in Janitor's closets.

2.  Water Distribution

    a.  The domestic water piping system shall be distributed to various pieces of equipment and plumbing fixtures through an adequately sized system of type L copper tubing and fittings or CPVC piping and fittings.

    b.  The mechanical area located on the roof shall have one hose bib located within the screened enclosure.

    c.  Each toilet room located on all floors shall have floor drains with trap primer connections.

    d.  Shut-off valves shall be provided for each toilet room above ceiling or at the fixture.

3.  Sanitary Sewer

    a.  The sanitary sewer drainage system shall be provided to serve all plumbing fixtures and floor drains.

    b.  Underground sanitary sewer system shall be constructed using DWV type, sch. 40, PVC piping

    c.  Cleanout shall be provided as required per code and at the base of all stacks.

4.  Storm/Roof Drainage

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

      a.     The storm drainage system shall be provided to serve all roof drains. All primary roof drain vertical leaders shall be collected into an underground storm drainage collection system. Secondary roof drainage shall utilize scuppers.

      b.     The above ground storm system shall be constructed using service weight cast iron soil pipe and fittings with "hub and spigot" gasketed joints or sch. 40 pvc piping with plenum rated insulation.

      c.     The below ground storm piping will be schedule 40 PVC DWV.

5.     Plumbing Fixtures

      a.     All plumbing fixtures shall be commercial grade. Accessible fixtures shall be provided as specified by the Uniform Federal Accessibility Standards (UFAS).

      b.     Water closets shall be wall mounted with wall hung carriers, or floor mounted, vitreous china with flush valves, designed for 1.6 gallons per flush.

      c.     Urinals shall be wall-hung, vitreous china with flush valves, designed for 1.0 gallon per flush.

      d.     Lavatories shall be vitreous china; countertop, drop-in type and/or wall mounted with ADA approved trim. Faucets will be single lever type with 0.5 gpm discharge.

      e.     Electric water coolers shall be self-contained units with bi-level dispensers meeting ADA mounting requirements.

      f.     Mop sinks shall be floor mounted units with wall mounted splashguards and wall mounted faucet set.

I.  **ELECTRICAL SYSTEMS**

The electrical system will be in general conformance to the project drawings and include toe following:

1.     Basic Design Criteria

      a.     Reference and Codes:

          2017 National Electric CodeNFPA 70
          2006 NFPA

2.     Site Electrical Power

      a.     Electrical service will be provided from Duke Energy via underground primary service to a pad mounted transformer located on the site. Power will be provided at 480/277 volts, 3-phase, 4-wire to the main distribution panel located in the main electrical room. Power will be distributed from the main distribution panel to the various electrical panel(s). Large motor loads such as HVAC equipment will be fed at 480 volts, 3-phase; lighting AT 277 volts, receptacles, and miscellaneous loads will be fed at 120 volts. Design Builder will guarantee above is adequate

      b.     Building metering for energy demand and consumption shall be in accordance with utility company requirements. A single meter will be mounted adjacent to pad mounted transformer.

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

    c.    Site Lighting fixtures. A site lighting system will be designed and installed by Ryan, including poles, fixtures, conduit, and wire to 5' from the building.

3.    Electrical Power

    a.    The main electrical service switchgear for the facility will be arranged with a main and distribution sections. The main breaker for this configuration will be 480/277 volt, 3 phase, 4 wire.  The construction of the switchboard will be compartmentalized individually mounted main and group mounted feeder breakers.  All empty conduits will be provided with a pull wire.

    b.    Minimum size power conduit will be 3/4 inch.

    c.    All conduits and raceways will be provided with a grounding conductor sized per NEC

    d.    The distribution panel will be designed to distribute power to the following items for each level 1and 2:

        1)    Electrical lighting/power panelboards

        2)    Mechanical equipment.

        3)    And other miscellaneous items.

        4)    Life safety items (emergency lighting, fire alarm, etc)

    e.    Conductors shall be minimum THHN #12 AWG conductors. Branch circuit wiring for receptacle power, lighting, and other miscellaneous loads will be routed in EMT conduit in exposed areas and MC Cable in walls and above ceilings.

4.    Lighting

    a.    Lighting will be designed to meet the requirements of the National Electrical Code (NEC)with both lighting power density and control.  A lighting control system will be installed with time clock and relay panel at each sub electrical room and main electrical room.  The lighting control system will control both exterior and interior lighting.

    b.    Corridor areas will be 2'x 4' recessed acrylic with fluorescent or LED lamps.  Exit signs will be standard contractor style.

    c.    Electrical, mechanical, janitor, fire riser, and other back of house type rooms will have industrial strip fixtures.

    d.    Restrooms lighting shall use 2'x 4' recessed acrylic with recessed fluorescent or LED fixtures.

5.    Lightning Protection System

    a.    Lightening protection is included in this scope.

6.    Fire Alarm System

The fire alarm system will be an intelligent addressable system. The fire alarm system will be designed in compliance with NFPA. The fire alarm panel will be located at the main electrical room. A fire alarm annunciator will be located at the main entry with exterior knox box.

    a.    Alarm initiating devices shall include manual pull stations, smoke detectors, duct mounted smoke detectors, heat detectors, and sprinkler flow switches.

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

b. Alarm signaling devices shall include audible horn and visual flashing strobes in compliance with the American Disabilities Act (ADA).

c. Minimum size fire alarm conduits will be ¾".

d. Supervisory functions shall include the monitoring of sprinkler system tamper switch.

e. Interface with other systems will include outputs to the HVAC system for AHU shutdown.

f. The fire alarm system shall be provided with surge protection.

7. Communications

a. Base building conduits will be diverse routing from the first floor communications room to the property edge for utility connections. There will be minimum of (1) 4" conduits for each route. These will be empty conduits with pull string for future respective Verizon and Brighthouse use. Include plywood backboards with fire resistant paint in communication rooms for device connections. Also provided is a ground bar and grounding requirements in the communication room.

b. All general purpose data / voice outlet will be empty conduits with bushings and pull string.

c. Minimum size communications conduit will be 1".

d. We have included all voice and data structured cabling

## II. EXCLUSIONS & ALLOWANCES

### A. EXCLUSIONS

1. The following items are not included in the scope of work proposed herein:

a. Haul off and replacement of unforeseen unsuitable soils outside of amount included as allowance.

b. Water treatment or conditioning.

c. Telephone equipment, telephones or communication equipment.

d. Dedicated electrical circuits or other special computer wiring not specifically shown on the project drawings.

e. Emergency generator or UPS systems.

f. Impact and utility connection fees, unless clarified above.

g. Telecom equipment and Phone systems.

h. Kiln for art room.

i. Food serving equipment and kitchen appliances.

j. Food coolers and vending machines.

k. Office Furniture, student furniture, table, chairs, etc.

l. Appliances – Refrigerators, microwaves, dish washers, ranges, ovens, etc.

m. Restroom paper products and cleaning supplies.

n. White boards, tack boards, chalk boards and cork boards.

o. A/V equipment and brackets, except if noted otherwise.

p. T1 phone/data service.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

q.    All work reference above as by OTHERS.
r.    Offsite Utility Extensions
s.    Classroom Millwork
t.    Roof Screens
u.    Covered drop off/pick up area.
v.    Window Sills at Windows.
w.    Roll up doors at Kitchen

**B.    ALLOWANCES**

a.    Accordion Partitions: $46,765

b.    Monument sign: $10,000
c.    Skylights: $32,445
d.    Landscaping and Irrigation: $175,000

Exhibit D

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## *CSUSA* NEW SCHOOL SPECIFICATIONS

### Planning & Architectural

All design standards shall comply with National, State, and local Building and Fire Prevention Codes.

RAD school building projects shall include a complete school "Turn Key" as defined in RAD (Red Apple Development) New School Specifications. Developer/Contractor shall commence work, proceed diligently, and complete scope of work in accordance with a schedule satisfactory to and as directed by RAD and the State/local municipalities for a new school opening.

School opening dates are fixed, defined by the State, and non-negotiable. Scheduling is critical, and planning and commitment are of the utmost importance to ensure timely project completion.

Developer/Contractor shall designate a representative to meet at a predetermined regular specified date and time with RAD, provide weekly written updates, reports and schedules, shall coordinate delivery and installation activities, and conduct Quality and Safety Inspections of work completed on regular intervals.

### Site Planning

Site design shall optimize the use of the property to accommodate program requirements with a compact footprint and providing the largest possible open areas for use as green space and play areas. Red Apple Development will provide Developer with site criteria required for school operations based on the type, size, and capacity of the proposed facility. To include, but not be limited by, the following:

1.   Bus loading zone requirements:
    1.1.   Separation from parent drop-off. Design to accommodate four two busses. Location will be in drop off area.
    1.2.   Right side of bus will preferably face school when loading/unloading.
    1.3.   Sidewalks to busses required, 6'w min. typ., covered accessibility to facility if possible.

2.1. Drop-off and Pick-up zone requirements
    2.1.1.1.   Two separateOne drop-off and pick-up locations with covered aluminum walkway (max 100'), one of which exiting out of the multipurpose room.
    2.2.1.2.   Minimum of triple stacking. Quadruple stacking preferred, if site plan allows.
    2.3.1.3.   Maximize site for optimum stacking, wrap around parking and/or building before loading.
    2.4.1.4.   All stacking lanes to be individually marked with slash lines and arrows.
    2.5.1.5.   Sidewalk to loading area required, covered accessibility to facility
    2.6.   Covered loading area to span all lanes by a minimum of 60 foot length. Aluminum roof or equivalent.

3.2. Parking
    3.1.2.1.   1-parking space per every 10 students of capacity
    3.2.2.2.   1 parking space for every 50 students for Visitor Parking
    3.3.   High Schools only – 2 additional spaces per every 3 students in 11th & 12th grades, to be separated from faculty parking.
    3.4.2.3.   Handicap parking shall comply with ADA, Chapter 11.
    3.5.2.4.   Provide Mailbox if required by local Post Office. Size and location to be approved by RAD.
    3.6.2.5.   Note: Some local municipalities may have additional parking criteria, determined by location.
    3.7.   If retro-build, existing parking bumpers to be in good shape and painted white.
    3.8.2.6.   All parking areas to be lighted and placed on time clocks.
    3.9.   If retro-build, all paved areas to be repaired and freshly seal-coated.
    3.10. If retro-build, all existing site lights to be in good working order and freshly painted.

4.3. Service Zone
    4.1.3.1.   Create a loading zone location with access to serving kitchen (no loading dock required) with 5-foot wide ramped access.
    4.2.3.2.   Provide dumpster location for waste and recycle bins on concrete pad with hose bib and floor drain, minimum to accommodate two 8 cubic-yard dumpsters with gates.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

CHARTER SCHOOLS USA

~~4.3.~~3.3.    Provide fencing or visual screening as required.  Screening to be Vinyl coated chain link Fencing and PVC Slats.

~~5.~~4.  Play area (Tot lot) for K-3
    ~~5.1.~~4.1.    Minimum 40x75 (3,000 SF) fenced tot lot area. Completely fenced area with black chain link, 6' height, gate, top & bottom rail with steel ties
    ~~5.2.~~4.2.    Sidewalk to be provided from exterior doors to tot lot. Gate to be used as access.
    ~~5.3.~~4.3.    Accessible from or near kinder rooms.
    ~~5.4.~~4.4.    Recreation Equipment designed as modular play system, installed.
        ~~5.4.1.~~4.4.1.    Designed for age 5-12 and 45 student capacity
        ~~5.4.2.~~4.4.2.    ~~Poured rubber~~ Two inch (2") minimum  pad or SBR layered ~~surface~~ under structure.
        ~~5.4.3.~~4.4.3.    Remaining surface within the fenced area to be artificial turf, no sod allowed.
        ~~5.4.4.~~4.4.4.    Equipment pieces and layout to be approved by RAD.
    ~~5.5.~~4.5.    Canopy cover over equipment area.
    ~~5.6.~~4.6.    All awning cover poles to be wrapped with 6' high exterior padding for protection.
    ~~5.7.~~4.7.    Include adequate drinking fountains.

~~6.~~5.  Athletic Area for 4-8
    ~~6.1.~~5.1.    Gymnasium preferred or…
    ~~6.2.5.2.    Combination of soccer field and basketball/volleyball court(s),~~
    ~~6.3.~~5.3.    15,000 SF of artificial turf to be installed ~~at $250,000 allowance~~. RAD to provide manufacturer and model # of turf. If remaining area exist, irrigation and Bahia/ Bermuda to be used.
    ~~6.4.~~5.4.    Exterior play area must have black chain link perimeter fencing, 6' min height. Top & bottom rail, steel ties with 60" gates and a min 10' maintenance/lawn equipment gate at rear of property.
    ~~6.5.~~5.5.    Include adequate drinking fountains.

~~7.    Athletic Area for 9-12~~
    ~~7.1.    Gymnasium and outdoor field suitable for football and soccer, or…~~
    ~~7.2.    Exterior bleachers and scoreboard.~~
    ~~7.3.    Include adequate drinking fountains.~~

~~8.~~6.  Signage
    ~~8.1.~~6.1.    ~~(2)~~(1) School Name~~s~~ with logo on the building, (size and number to be maximized per code) 1 above building entrance ~~and one on building side facing a main street, if feasible.~~
        ~~8.1.1.~~6.1.1.    Constructed ~~of individually mounted letters and CSUSA logo~~ by casting-in-place foam or wood letters and CSUSA logo using a 24"x24"x3/4" scale.
    ~~8.2.~~6.2.    (1) 2-sided sign monument with school name and logo on each side mounted at main entrance to property. Sign must have minimum of 4 lines of changeable copy and be visible from roadway.
    ~~8.3.~~6.3.    All interior signage, with Braille, per code requirements, identifying ~~stairwells~~ exits, room numbers, admin space, etc.

~~9.~~7.  Bike Storage
    ~~9.1.~~7.1.    Permanently affixed bike racks to accommodate a minimum of 20 bikes.
    ~~9.2.~~7.2.    Bicycle parking area to be hard surfaced (asphalt or concrete)

~~10.~~8.  Flag Poles
    ~~10.1.~~8.1.    (3) Commercial-grade flag poles shall be provided in a triangular configuration in front of the school building or in a position approved by RAD. 1-30' height (center), 2-25' height, spaced at least 6' apart and designed to withstand wind velocity as required by ASCE. Flag poles to be displayed on concrete with access walk, not in grass area.

~~11.~~9.  Landscaping
    ~~11.1.~~9.1.    Property to comply with landscaping requirements of the jurisdiction having authority.
    ~~11.2.~~9.2.    Include a complete irrigation and drainage system.
    ~~11.3.~~9.3.    All exterior surfaces assessable to students and staff shall contain sod or solid surfacing. No dirt, rocks, or sand can be allowed to track into the facility.
    ~~11.4.~~9.4.    Recreation fields to be Bahia sod or artificial turf.
    ~~11.5.  Where building is retrofit, clean-up of existing landscaping/trimming of trees, re-mulching of landscape beds to be part of scope.~~
    ~~11.6.~~9.5.    All shrubs, bushes, and trees shall be selected with child safety in mind.
    ~~11.7.~~9.6.    All landscaping to be placed around the perimeter of the athletic field.

Exhibit D

CHARTER SCHOOLS USA

11.8. 9.7.  **No recreation fields should be designed as water storage or retention.**
11.9. Provide "Spirit Rock", natural boulder approx. 6' base by 4' height placed on school grounds (location by RAD). NC schools only.

12. 10. Site Plan Approval Procedures & Permitting
    12.1. 10.1. Developer/Site Engineer to provide Red Apple Development with a preliminary site plan for review and discussion.
    12.2. 10.2. Red Apple Development will make recommendations for any required modifications.
    12.3. 10.3. Revised site plan will be provided to RAD for Final team approval & sign-off, approx. 1 week.
    12.4. 10.4. Final site plan to be provided in electronic form and hard copy to Red Apple Development.
    12.5. 10.5. School Building & Site Rendering required for marketing purposes.
    12.6. 10.6. Permitting application, NTO, and all other submittals required for commencement of job (by January 1st of opening year).


**Building Design**

Building design shall optimize the use of the interior space to accommodate program requirements with a compact footprint, providing the maximum space utilization possible. Red Apple Development will provide Developer/Architect with building and space utilization criteria required for school operations based on the type, size, and capacity of the proposed facility. To include, but not limited to, the following:

1. General
    1.1. Address security through building footprint with built-in resistance to unauthorized intrusions.
    1.2. Quantity of rooms determined by School Worksheet provided by Red Apple Development based on total capacity.
    1.3. All classrooms and corridors to receive VCT (Armstrong) flooring with color-coordinated inlays, unless otherwise specified.
    1.4. Main lobby area (location approved by RAD) to have School name, corporate logo incorporated into VCT flooring.
    1.5. All ceiling tiles throughout school will be 2'x4', manufactured from Armstrong. "Vinylrock" tile manufactured from USG.
    1.6. All music rooms to be carpeted with durable, commercial-grade carpet tiles.
    1.7. All colors for paint, flooring, countertops, etc. to be determined and signed-off on by RAD.
    1.8. All water fountain /hand dryer locations to be outlined in 12"x 12" ceramic tile with floor border strip for water protection.
    1.9. All rooms to be identified by exterior signage with Braille.
    1.10. All rooms to include emergency evacuation signage (acrylic placard) on interior adjacent to door.
    1.11. All interior signage required by code (with Braille) identifying exits, stairwells, admin areas, room numbers, etc. (acrylic placard).
    1.12. All classrooms, specialty classrooms, administrative areas, teacher planning rooms, stairways, and storage rooms to have PVC vertical blinds with no pull strings on windows.
    1.13. Backing is required for all coat racks, cabinets, and all other wall-mounted features. All countertops to have post-form edge.
    1.14. Every classroom, multipurpose room, gymnasium, admin space, conference room, and teacher workroom shall have a programmable analog clock.
    1.15. Where required, contractor shall provide radon testing and certification for site.
    1.16. Where required, contractor shall provide asbestos inspection and certification.
    1.17. Contractor shall provide final survey with flood elevation certificate to Red Apple along with Certificate of Occupancy.

2. K-1 Classrooms
    2.1. All grade K students shall be located on the first floor only, not to be permitted above the first floor per NFPA.
    2.2. Each kindergarten classroom should have direct access to a bathroom within the classroom. Require 1-restroom with standard fixture heights and automated hand dryers, per classroom.
    2.3. Room size minimum 600 283 sq. ft.
    2.4. Minimum of 6' of countertops with backsplash and side splash, standard height & depth w/ base cabinets and 3' of overhead cabinets.

3. Grades 2-12 8 Classrooms

CHARTER SCHOOLS USA

   3.1.  All grade 2 students shall be located on the first ~~and second~~ floors only, not to be permitted above the 2nd floor per NFPA.

   3.2.  Room size minimum ~~600~~ 283 (grades 2-3), 488 (grades 4-6) and 599 (grades 7-8) sq.ft.

   ~~3.3.  Minimum of 6' of countertops, standard height with backsplash/side splash & depth w/ base cabinets and 3' of overhead cabinets.~~

**4.**  Specialty Classrooms

   4.1.  (1-~~2~~) Music ~~rooms~~ Lab (~~next to each other if possible~~, to be determined by capacity)

       4.1.1.   Room size ~~800~~716-900sqft.

       4.1.2.   Music rooms shall always be carpet squares.

       4.1.3.   Rooms shall share a storage closet for instruments.

       4.1.4.   Rooms shall be positioned so they are isolated from other classrooms where possible, and contain built-in sound panels/ for protection.

       4.1.5.   No cabinets/countertops

   4.2.  (1-~~2~~) Art ~~Rooms~~Lab

       4.2.1.   Room quantity to be determined based on grade levels, student quantity, and layout of facility.

       4.2.2.   Room size ~~850~~679-1000 sq.ft.

       4.2.3.   Minimum of 12' of countertops, standard height with backsplash/side splash & depth w/ base cabinets and full-length overhead cabinets.

       4.2.4.   2 sinks (Min. 22" X19.5" and hot/cold water) required in countertop for art procedures.

       4.2.5.   Kiln room with 200cfm externally vented exhaust fan and A/C drop required in one of the art rooms

       4.2.6.   Special attention shall be paid to sprinkler head in kiln room.

       4.2.7.   Art Supply storage closet/room

   ~~4.3.  (1-2) Computer Labs~~

       ~~4.3.1.   Room quantity to be determined based on grade levels, student quantity, and layout of facility.~~

       ~~4.3.2.   Room size 800-900 sq.ft.~~

       ~~4.3.3.   Interior room, if available.~~

       ~~4.3.4.   Requires 30 low voltage data ports w/accompanying electrical, locations specified by RAD.~~

       ~~4.3.5.   No cabinets/countertops.~~

       ~~4.3.6.   No windows, if possible~~

       ~~4.3.7.   All data/electrical outlets to be wall or floor-mounted. No power poles.~~

   ~~4.4.~~4.3.  (1-~~2~~) Science Lab~~s~~

       ~~4.4.1.~~4.3.1.   Room quantity to be determined based on grade levels and student quantity.

       ~~4.4.2.~~4.3.2.   Room size ~~850~~685-1000 sq. ft.

       ~~4.4.3.~~4.3.3.   Located next to each other with a closet accessible from both rooms.

       ~~4.4.4.   Eye wash required for grades 9-12~~

       ~~4.4.5.~~4.3.4.   Minimum of 12' (wall-to-wall) of countertops, standard height with backsplash/side splash & depth w/ base cabinets and full-length overhead cabinets.

       ~~4.4.6.~~4.3.5.   If Cambridge Program applies, see additional criteria.

**5.**  Gymnasium

   5.1.  Gym size ~~12,000~~4,849 sq ft ~~for full size~~

   5.2.  Include 4 ceiling-supported basketball hoops and backboards.

   ~~5.3.  All windows located within the gym must be impact-resistant glass~~

   ~~5.4.~~5.3.  One hoop on each end & one on each side to be collapsible or raised during games.

   ~~5.5.~~5.4.  Wall padding to be installed under main basketball ct. Padding to be wall to wall in length.

   ~~5.6.~~5.5.  Presets and striping for High School Volleyball net and posts

   ~~5.7.  Telescopic bleachers provided on one side of gymnasium. Two for H.S~~

   ~~5.8.~~5.6.  Wood flooring or equivalent required for K-8. ~~Wood flooring with school logo/colors for H.S.~~

   ~~5.9.~~5.7.  Electronic score board to be provided at one end of gym, ~~pre-wire to be added on adjacent wall for future scoreboard. See RAD for locations. Two school boards for H.S~~

   ~~5.10.~~5.8.  Drinking fountains to be provided.

   ~~5.11. Provide 3 rooms for office and storage.~~

       ~~5.11.1.   Rooms should be 100-200sq.ft each, located next to or accessible to locker rooms.~~

   ~~5.12. Locker Rooms (1-Girls, 1-Boys)~~

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

CHARTER SCHOOLS USA

> 5.12.1.  Include 30 gym lockers, (minimum 12"Lx12" Wx24" W) with built-in automatic bar and rod release and built-in Automatic Locking Bolts and control key.
> 5.12.2.  Lockers to be constructed of heavy duty, tamper and vandal-proof materials.
> 5.12.3.  Include adequate benches in each.
> 5.12.4.  Include restroom area with partitions.
> 5.12.5.  Floors in wet areas to be Dura Flex, VCT in all other areas and walls (6'h) in ceramic tile
> 5.12.6. 5.8.1.  Add plumbing in walls for washer/dryer hookup.
>
> 5.12.7. 5.8.2.  Two clocks.
> 5.12.8. 5.8.3.  All light fixtures, clocks and surface mounted fixtures to be protected from ball impact.
> 5.12.9. 5.8.4.  PA system required for events

6.  School Access
    6.1.  All buildings shall be internal corridor designs
    6.2.  All main entrances shall be equipped with an external intercom/camera/speaker access system.
    6.3.  Single front entry door (RAD to designate) shall be equipped with a electronic/mag-lock door release button located at the front administration desk. All doors to be storefront type
    6.4.  Front reception area shall be protected by a second set of entry doors (storefront type), prohibiting access to the rest of the school.
    6.5.  Internal access door shall also be equipped with a second set of electronic/mag-lock door release button at front administration desk.
    6.6.  Front reception area shall have a 42" administration counter for visitors checking in with standard height cabinets below.
    6.7.  All exterior doors, other than the main entrance door and the multi-purpose room doors, should be solid-core, steel-clad, double doors with removable astragal and panic hardware, and shall be equipped with Detex Alarms, keyed alike.
    6.8.  Exterior doors at the multi-purpose room should be storefront design.

7.  Administration offices
    7.1.  All offices and office areas to receive VCT.
    7.2.  All offices doors to contain a vision panel.
    7.3.  One open administration area large enough for 3-4 workstations.
    7.4.  Located at main entrance to building allowing for administrative monitoring of building access.
    7.5.  Include impact-resistant glass at front entrance (reception area only) counter top area with teller type pass-thru with speaking hole. Include built-in admin cabinets at 30" AFF with 4" back splash and a 42" pass-thru top (accommodate for ADA requirements.)
    7.6.  Include copier outlet/data. Specifications provided by RAD.
    7.7.  Include 6-8 offices & file/storage rooms accessed by open administration area, room quantity determined by facility capacity.
    7.8.  One clock in conference room.
    7.9.  Key box to be provided by GC. (keys organized per room #)
    7.10.  Unisex admin restroom
        7.10.1.  With hot and cold water
    7.11.  Include open Clinic Area with restroom
        7.11.1.  Private restroom (with hot and cold water), sink, and cabinetry with room for under-cabinet refrigerator.
        7.11.2.  Floor to receive VCT.
        7.11.3.  Size based on capacity to accommodate nursing beds and/or seating area.
    7.12.  Include one Conference Room near administration offices.
    7.13.  Include 5 additional offices and a conference room for grades 9-12 for guidance counselors, located separately from administration area.

8.  Teacher Workroom
    8.1.  Located on each 1st floor.
    8.2.  Room size 250 301-400 sqft, (final room quantity and size to be determined by building capacity).
    8.3.  Include unisex adult restroom accessible from corridor only.
    8.4.  Include sink with countertop backsplash/side splash and cabinetry.
    8.5.  Floor to be VCT
    8.6.  Electrical requirements for:
        8.6.1.  Cabinet mounted microwave
        8.6.2.  Coffee machine

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

CHARTER SCHOOLS USA

    8.6.3.   Full size refrigerator
    8.6.4.   Vending soda machine
    8.6.5.   Large copier, specifications provided by RAD.
    8.6.6.   Telephone

9.  Multipurpose Room
   9.1.  Designed to accommodate one quarter of the student population. Include one storage closet.
   9.2.  Include electrical for vending machines.
   9.3.  **Two clocks at opposite ends.**
   9.4.  Electrical and data ports needed for lunch checkout. Location by RAD.
   9.5.  Electrical and data needed for remote screen and projector. Location by RAD
   9.6.  Independent PA system with cordless microphone for presentations and afternoon dismissal.re
   9.7.  Include Serving Kitchen
      9.7.1.   Serving kitchen to be used for food warming only, no cooking permitted. Designed to meet local/state Department of Health Regulations.
      9.7.2.   Include office/food storage area
      9.7.3.   Kitchen equipment will be provided and installed by vendor.
      9.7.4.   Serving Kitchen electrical specifications provided by RAD (equipment quantities may vary based on facility capacity).
      9.7.5.   Size 400-600 sq ft.
      9.7.6.   Stainless steel serving counter facing multipurpose room.
      9.7.7.   Locking roll-down doors to cover serving windows
      9.7.8.   Walls lined with FRP floor to ceiling.
      9.7.9.   FRP to be installed on walls at serving area.
      9.7.10.  Hand sink (& mop sink near kitchen area).
      9.7.11.  Delivery/ Receiving area for catered food delivery.

10.  Girls & Boys Student Restrooms
   10.1. Dura-Flex flooring (color by RAD) with 4" splash and 12" x 12" Ceramic tile installed on all fixture and partition walls to 6' height.
   10.2. Head and Foot-rails double braced to walls, vandal proof partitions and hardware.
   ~~10.3.~~ Post form countertop.
   ~~10.4.~~10.3.       Single level faucets – Wall hung lavatory w/ pillar tap metering faucet included.
   ~~10.5.~~ ~~Cabinet skirt required to conceal drain and water supply piping, color to match countertop.~~
   ~~10.6.~~10.4.       Electric hand blowers only, no paper towel dispensers in student restrooms. Only if required.
   ~~10.7.~~10.5.       All paper holders, soap dispensers to be installed by Facilities.

11.  Janitorial Rooms
   11.1. Janitors closet to have mop sink with FRP or Tile installed around sink to prevent water damage.
   11.2. Requires some storage near delivery zone for books/packages/mail, etc.
   11.3. When janitorial closet is located within bathroom, continue ~~Duraflex fluid-applied (epoxy)~~ flooring throughout.

12.  Server Room/ MDF (Main Distribution Facility)
   12.1. (1) MDF room centrally located so all locations within a 320ft. run.
   12.2. If distance exceeds 320', create multiple IDF locations, stacked if on separate floors. Connected with 6-strand fiber optic cable in a 2-inch or larger conduit. Fiber strands must be terminated on a rack-mounted patch panel with LC connectors, labeled from 1 to 6, and tested.
   12.3. MDF Room design to be provided by RAD Information Technology Dept., to include cable trays and floor-mounted equipment racks.
   12.4. Split wall-mounted HVAC system
   12.5. Equipment open frame rack system
   12.6. Main MDF requires an independent AC system (i.e., not connected to main building system, with a return air design point temperature and relative humidity of 72 degrees F (+/- 2 deg F) and 45% (+/- 5%) respectively, provide environmental monitoring and alerts.
   12.7. Main MDF requires quad receptacles at 18 inches above F.F. on 3 walls every 4 feet; each receptacle must be on a dedicated 20AMP circuit. Receptacles must be clearly labeled with panel and breaker number using a P-Touch or similar label.
   12.8. Main MDF additionally requires 2 dedicated 20AMP simplex receptacles behind each data rack. Receptacles must be clearly labeled with panel and breaker number using a P-Touch or similar label.

Exhibit D

CHARTER SCHOOLS USA

12.9. Provide a ground bar connected to the building ground and ground each data rack.
12.10.    Three walls should have 3/4 fire retardant plywood installed floor to ceiling and painted with fire retardant paint.
12.11.    MDF Room design will be provided by RAD Information Technology Dept., to include cable trays and floor-mounted equipment racks.
12.12.    Two 4-inch conduits to be installed between the MDF and the Utility Room/Building D-Mark for Fiber or other media, as needed.
12.13.    MDF will have one 4-post rack and, at minimum, one 2-post rack
- 4-post rack will be a Panduit R4PCN 45 RU, 30inch deep with Cage Nuts and should have clearance of minimum 30inches in the front and 12 inches in the back.
- 2-post rack will be a Panduit R2N 45 RU, #12-24 threaded and should have clearance of minimum 24 inches in the front and 30 inches in the back.
- Each rack should be grounded directly to a ground bar that's connected to building ground.
12.14.    Cable management will be Panduit WMPV45 for vertical and Panduit WMP1E for Horizontal, spec sheet will be provided by RAD IT Dept.

**13.** IDF's
13.1. If distance exceeds 320', create multiple IDF locations, stacked if on separate floors, connected with a minimum 6-strand fiber optic cable ran in a 2-inch or larger conduit. Fiber strands must be terminated on a rack-mounted patch panel with LC connectors, labeled from 1 to 6 and tested.
13.2. Each IDF will have, at minimum, one 2-post rack (one rack provides 288 data ports)
- 2-post rack will be a Panduit RSN 45 RU, #12-24 threaded and should have clearance of minimum 24 inches in the front and 30 inches in the back.
- Each rack should be grounded to the building ground.
13.3. IDF requires 2 dedicated 20AMP simplex receptacles behind each data rack. Receptacles must be clearly labeled with panel and breaker number using P-touch or similar label.
13.4. Cable management will be Panduit WMPV45 for vertical and Panduit WMP1E for horizontal. Spec sheet will be provided by RAD IT Dept.

Note: Floor plans should be presented to RAD for circulation electronically and in hard copy formats to be considered and approved by RAD team. Once finalized, approved floor plans will be required in CAD format for the purposes of furniture placement, procurement, and space planning by RAD.

(Recommended room sizes are approximations to ultimately be determined by student capacity and space restrictions.)

**Building Systems**

1. **General**
    1.1 All doors for classroom or resource use shall include a vision panel, 96 sq. inches minimum.
    1.2 Interior doors to be pre-finished (clear coat) natural birch solid core.
    1.3 All stairwell doors to include a vison panel.
    1.4 Learning Boards/TVs require wall backing placed during construction, RAD to provide specs.
    1.5 All electrical outlets/switches to be white.
    1.6 Exterior electrical outlets to be provided on all four walls.
    1.7 All classroom lighting to be multi- switch, so half the room can be turned off.
    1.8 Exterior weatherproof/tamper proof electrical outlets to be provided on all four walls
    1.9 Elevator doors to be stainless steel and interior finishes to be approved by RAD
    1.101.9    Acrovyn VA250N SM-20AN, mechanically fastened (2 1/2 ") wall Corner Guards to be installed from vinyl base to 48' on all corners in hallways, multipurpose room, stairways, and common areas. Colors selected by RAD.

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1.~~11~~1.10 **Roofing**: Contactor shall provide a 2-year warranty, including material & labor on any and all roofing related issues, including leaks.

1.~~12~~1.11 Building lightning protection system to be installed.

2. **Low Voltage Wiring**
2.1 Cabling will be non-shielded CAT6 wiring/plenum wiring where needed, as per building code.
2.2 Each Educational classroom to have CAT 6 single network drop in center of each room and to be terminated with a Biscuit jack or RJ 45 female receptacle, leaving 10' additional cabling. Each network drop should be" Home Run" to the server/MDF room, labeled (both ends), certified and terminated onto a patch panel. All wireless drops to be at a dedicated patch panel
2.3 Standard Keystone wall plates should be used. (ex. Leviton 41080-WP Quickport)
2.4 For hanging phones, stainless steel plates with mounting studs on plate should be used (ex. KWP5EY/KWP6PY CAT5/CAT6 Keystone hanging plates)
2.5 Specifications available upon request. Structured Cabling Installation by Developers Licensed Low Voltage Contractor.
2.6 Labeling to be done using a standard 3-digit numbering scheme starting at 001 and incrementing up to 999 as determined by physical jack count. Port numbers must correspond from the floor to the patch panel and be labeled using a P-touch or similar labels. Black text on white label and font size at 18pt.
2.7 Locations to be reviewed and approved by RAD.
2.8 Every low voltage outlet must be accompanied with a corresponding electrical outlet.
2.9 Documentation
  2.9.1 3-copies of the Low Voltage Systems Documentation Package shall be provided upon completion to RAD
  2.9.2 To include detailed mapping of the logical design, floor plans, and cable schedules with segment lengths, and numbered, identified, labeled locations, for the stations, MDF, IDF's, and each cable & port with certified test results in hard and electronic formats.
2.10 Numbering scheme to be approved by RAD before start of cabling and all patch panels, outlets, ports, and both cables ends shall be digitally labeled with a unique identifier and cross-referenced for accuracy.

3. **Digital PBX Telephone System Equipment**
3.1 Services and equipment will be provided by CSUSA Telephone Vendor.

4. **Voice & Data Structured Cabling**
4.1 T1/PRI lines for telephone service, MPLS network infrastructure for Data Service
4.2 Final wall locations to be specified by RAD.
4.3 Two 4-inch conduits to be installed between the MDF and the Utility Room/Building D-Mark for Fiber or other media, as needed.
4.4 Offices
  4.4.1 2-port outlets per room. Principal, AP, BA, and Registrar will have 3-port outlets.
4.5 Administration Area
  4.5.1 2-port outlet per user workstation located next to a110v duplex power outlet.
  4.5.2 2-port outlet per copier/printer/fax station next to an upgraded 20-amp dedicated 110v power outlet in designated areas.
  4.5.3 2-port outlet per postage machine next to a 110v duplex power outlet.
4.6 Mini classrooms, resource rooms, teacher's lounge/workroom.
  4.6.1 3-port outlets per room, 1 hanging for phone and 2 for copier/fax in designated area.
4.7 All Classrooms & Specialty Rooms
  4.7.1 2-ports per room. (Learning Board & Phone)
  4.7.2 32 ports total for each Computer Lab through the use of raceways and/or power-poles for distribution of both low voltage and power
  4.7.3 Cable drops in center of corridors for wireless access points. (Locations to be specified by IT department, no electric needed) cables to be terminated in surface mount boxes.
4.8 Electrical/Data floor outlets to be provided in Conference Room. See RAD for locations.

5. **Security System**
5.1 Fire Alarm as required by National/State Fire Prevention Code and State Building Code.

6. **Intrusion Detection & Alarm System**
6.1 Include (1) control panel (at main entrance) with keypad and the ability for extended zone modules and the capability to bypass any zone or use time delay operation.

CHARTER SCHOOLS USA

6.2 Provide door contacts on all exterior doors.
6.3 Provide motion detectors on first floor corridors to capture window access.
6.4 Complete Alarm system to be installed by Developer's contractor including training classes and support for school personnel, monitored under monthly contract submitted for approval to RAD.
6.5 DETEX EAX-500 Alarm system to be installed on ALL exterior doors  (Keyed alike) with access to school with the exception of main front doors.
6.6 Door from administration area to school to have electronic release system with release button located in administration area.
6.7 Main exterior door to have camera/speaker/ talk system and electronic release system that allows administration to communicate with and allow access to visitors.
6.8 Single button Panic Alarm System with battery backup to be installed at main administration office.(N.C Schools ONLY)

### 7. Closed Circuit (CCTV) Surveillance System
7.1  Avigilon HD video. Complete system with camera hardware, wiring, monitor, and software. Installed, with training classes for school personnel.
7.2 Camera's
7.3 Interior :  Avigilon 1-3MP Micro Indoor Dome Camera, 9MP Multisensor Dome Camera, & 12MP Fisheye Camera
7.4 Exterior: Avigilon 2MP 5MP Bullet Camera & 9MP Dome Camera
7.5 Color, motion-activated cameras throughout with remote viewing capability and a dedicated monitor in the administration area. Provide storage capability for approx. 30 consecutive days with automatic rollover.
7.6 Cameras to be ceiling-mounted, coverage locations to include:
 7.6.1  All building entrances and exits.
 7.6.2  All stairwells
 7.6.3 7.6.2   All hallways
 7.6.4 7.6.3   Multipurpose room (HD camera)
 7.6.5 7.6.4   Exterior play and gathering areas
 7.6.6 7.6.5   Covered canopy
7.7 Dedicated Monitor to be provided and located in Administration area, location to be provided by RAD
7.8 Contractor shall provide equipment specifications and contact information for continued support.
7.9 All exterior PTZ cameras to be installed  located at second floor height, with location approved by RAD.
7.10  All closed circuit TV monitors need to placed and viewable from administration area and remote locations.

### 8. PA System & Clock/Bell System
 8.1 PA System
  8.1.1 Public Address (PA) system shall connect administration area with all student-occupied areas.
  8.1.2 PA System shall integrate through the school's phone system through "Station Port"
  8.1.3 Systems may comprise of the following, or equivalent:
   8.1.3.1   PA system may be used utilizing a handset and wireless headset.
   8.1.3.2   All classrooms, mini classrooms, teacher rooms, resource rooms, specialty classrooms, multipurpose room, and serving kitchen shall receive PA system communication capability.
   8.1.3.3   All-call paging system may utilize a separate system with individually wired ceiling speakers.
  8.1.4 Speakers shall be located at the following:
   8.1.4.1   All classrooms, group restrooms, hallways, multipurpose room, and exterior play areas, per plan to be provided by RAD.
  8.1.5 PA system shall be multi-zoned.
  8.1.6 Independent PA system (with speakers and cordless microphone)) required for gymnasium & multi-purpose room for presentations and dismissal.
  8.1.7 Speakers are wired to amplifiers in the MDF and to an all-call microphone in the administration area.
  8.1.8 (2) Wireless microphones are required for dismissal operations and must operate in those areas.
 8.2 **Clock and Bell System**
  *8.2.1 Bell system*
   8.2.1.1   Bell system is wired into the ceiling speakers listed above.
   8.2.1.2   Bells shall have at least 6 programmable zones.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

CHARTER SCHOOLS USA

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

   8.2.2   *Clocks*
- 8.2.2.1   Clocks are to be provided in every classroom, specialty room, cafeteria ~~gym~~, administration area, and controlled by a master clock located on the premises.
- 8.2.2.2   Individual Clock locations to be identified and/or approved by RAD.
- 8.2.2.3   No digital clocks.

9. **Plumbing**
9.1  All toilets shall be commercial-grade and tankless, with flush valves.
9.2  Toilet partitions shall be Phenolic, low-maintenance, and resistant to water, mold, and graffiti.
   9.2.1   Mounting of all partitions and accessories shall be reinforced with commercial grade hinges and locks.
   9.2.2   All commercial-grade mechanical hinges and locks.
9.3  Single lever faucets in K-1, gang baths, teacher planning, clinic
9.4  Classroom bathroom toilets to be standard size.
9.5  Provide sinks and mirrors, soap dispensers, toilet paper holders, and hand dryers at appropriate heights for age group. Hand dryers are to replace paper towel dispensers in all student restrooms.
~~9.6  Grades 6-12 to receive feminine product dispensers.~~
~~9.7~~9.6   Hot water to be provided in clinic, kitchen, teacher planning, janitors closet, art rooms, science rooms, and/or those required by Health Dept., Building Codes, and local municipalities.
~~9.8~~9.7   Chilled drinking fountains shall be provided as required by the local/state Building Code outside of student restrooms.
~~9.9~~9.8   Faucets in all baths to be single push with auto shut-off
~~9.10~~9.9   Hand dryers in lieu of paper towel dispensers
~~9.11~~9.10   Faculty/Staff Restrooms
   ~~9.11.1~~9.10.1   Handicap as required and use of paper towel dispensers for faculty areas.
~~9.12~~9.11   Complete testing of sewer lines, water pressures, irrigation, running water, and flushing toilets must be conducted by Developer's contractor before turn over of the facility to RAD/school.
~~9.13~~9.12   Where required, contractor shall provide lead test of water.
~~9.14~~9.13   Exterior hose bibs to be on all four walls and roof..
~~9.15~~9.14   All underground plumbing to be snaked with a camera to eliminate and potential backups due to construction debris.

10. **HVAC**   **(ALL ELECTRICAL SYSTEMS ARE TO BE PROTECTED BY SURGE PROTECTION TO MINIMIZE DAMAGE BY LIGHTNING AND POWER SURGES)**
10.1   HVAC temperature control and automation to be Honeywell Webs-AX automated web based solution
10.2   Separate wall mounted unit with 24 hour cooling for technology closet or additional controlled ventilation for reduced temperature.
10.3   All heating, ventilating, mechanical and air conditioning systems and equipment shall undergo complete Test and Balance once it has been completed and is in full working order and copy of results provided to RAD.
10.4   Yearly maintenance contract to be provided and presented by HVAC Contractor to RAD for review and approval.
10.5   **Contractor shall purchase extended warranty for units for years 2 -5. Year 1 & 2 shall be full labor and materials.**
10.6   Completed equipment specifications, and warranty information to be provided to RAD
10.7   Complete service of equipment (including: changing of filters, cleaning vents, and clearing drain lines/coils, of construction debris) must be provided prior to turnover

11. Flooring
11.1   Carpet, ceramic tile, and VCT shall be *commercial grade* "highly recommended for educational/institutional environments" and have a 10-year minimum warranty for wear, manufacturing defects, discoloration, mold, and shall not tear, gouge, peel or separate from substrate.
11.2   VCT/ vinyl base shall be from Armstrong Commercial Flooring, any substitutes must be approved in writing by RAD.
11.3   Color choices and patterns of all flooring and base materials shall be provided by the developer/contractor to RAD for approval.
11.4   Main lobby area (location approved by RAD) to have School name, corporate logo incorporated into VCT flooring.
11.5   Discard and/or replace any broken, cracked, chipped or deformed tiles. Extend tiling into all

Exhibit D

CHARTER SCHOOLS USA

closets, toe spaces, door reveals, and similar openings without any open cracks, voids, raising, puckering at joints or other surface imperfections.

11.6   Tightly adhere resilient wall base to substrate throughout length of each piece, with base in continuous contact with horizontal and vertical substrates to avoid future indenting of wall base from floor cleaning.

11.7   VCT shall include (5) coats of initial waxing and Burnished, based on manufactures specifications, scheduled and completed before furniture delivery

11.8   Once VCT is waxed and polished, all hallways, multipurpose room, ~~stairwells~~, and any staging or common areas are to be immediately covered 100% with untreated building roll paper and secured to the floor for protection from contractors and furniture assembly. Areas not protected will require tile replacement and/or re-waxing if damaged at no expense to RAD.

11.9   Additional box, of each type, color, and pattern of flooring installed shall be provided to the school. Additional 20 lineal feet of each type, color, pattern of resilient wall base shall be provided to the school.

12. Painting

12.1   Interior

12.1.1   All interior walls shall be slick finish (Level 4).

12.1.2   All drywall corners in hallways, multipurpose room, columns, etc. shall be protected after painting with an Acrovyn ~~VA250N~~ SM-20AN corner guards to place above

vinyl base to 48", in matching wall color.

12.2   Paint interior and exterior shall be Sherwin Williams (see attached specs).

12.3   All wet walls in restrooms to be epoxy paint.

12.4   ALL Paint colors to be reviewed and approved by RAD.

12.5   Where building is a retrofit, all exterior imperfections to be repaired, patched prior to repainting.

12.6   Exterior re-painting shall be included and color schemed approved by RAD.

13. Windows

13.1   All window locations/~~stairs~~ included will receive window treatments in the form of blinds (fire retardant and without the use of strings to prevent accidental strangulation) installed as part of building completion.

Note: Interior finishes should be presented to RAD for circulation in a board format including but not limited to samples of: carpet, tiles, base, all paint colors, cabinets, countertops, corner guards, ~~lockers~~, and toilet partitions, any finish requiring a color selection, to be considered and approved by RAD team. (Typical CSUSA Charter Schools utilize variations of primary colors found on logo such as red, blue, green, yellow)

14. **Project Completion**

14.1.   **Time is critical in the opening of a School with little or no flexibility for construction delays. The Developer shall notify RAD of the construction progress by a construction schedule, updated on a weekly basis. The Developer acknowledges herein sole responsibility to monitor the progress of construction necessary to coordinate work on the appropriate scheduled dates. The Developer shall be in a position to coordinate Contractor's, Subcontractor's, and Vendor's installations and/or manufacturing processes to ensure construction schedules are maintained at all times. Should the critical path for obtaining the C.O. be compromised, any and all costs associated with corrective actions necessary to maintain the original project schedule shall be the sole responsibility of the Developer.**

14.1.1.   RAD requires 4-weeks for assembly and installation of all Furniture, Fixtures, and Equipment (FF&E) once C.O. is issued, prior to school opening. Timing of these processes is critical to RAD, school operations, and the opening of the facility. Any costs incurred from the delay of this process due to the delay of a C.O. for the site and facility, resulting in returned equipment, or additional shipping and/or storage costs, will be passed along to the Developer.

14.2. Change Request Procedures

14.2.1.   Change order requests to expand or reduce the project scope, to modify: costs or budgets, policies, processes, plans, specifications, procedures, or revise schedules must be presented to RAD in written form for review and approval by authorized stakeholders.

PRELIMINARY - TRADE SECRET

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

CHARTER SCHOOLS USA

    14.2.2.  Only formally documented and approved change order requests will be recognized for payment by RAD on behalf of the school. Verbal notifications and/or approvals will not be accepted as legitimate cost changes.

14.3. Developer/Contractor shall be responsible for obtaining all approvals required by local Building Departments including permits and inspections. The Developer shall meet with plan reviewers or Building Department personnel to clarify plans, Product Control Approval and specifications required to obtain building permits, and inspections if required or requested. The Developer agrees to meet all requirements and qualifications required of any governing entity, including, but not limited to: City, County, and State agencies and school districts, in order to complete the construction and development and construction of the property.

14.4. Developer/Contractor agrees to correct work that is determined by RAD to be deficient in terms of installation or materials within forty-eight hours ( 48) of notification.

14.5. Upon Completion of Building Construction, the Developer will complete the following:

    14.5.1.  Instruction & Training – instruct RAD, School Personnel and/or designated Vendor's via formally scheduled training classes to adjust, operate, and maintain systems, subsystems, and equipment.

    14.5.2.  Provide a list of all applicable Maintenance Company's for HVAC, Plumbing, Electrical, Security, etc. and contact information.

    14.5.3.  Final Cleaning

        14.5.3.1. Provide professional cleaning of school building interior, site, yard, grounds, and landscaping areas.

        14.5.3.2. Remove all rubbish, litter, dirt, stains, and spills, rake grounds, remove all construction debris and surplus construction materials.

        14.5.3.3. Clean all exposed exterior and interior surfaces in their entirety including windows, and HVAC, plumbing, and electrical fixtures, to a dirt-free, film-free, polished condition.

14.6 ALL VCT Flooring will be waxed with 5 coats and burnished to a high shine, based on manufacturer's recommendations.

14.7 Pest Control   Provide a licensed Exterminator to make a final inspection and service call to rid school of all insects, rodents, and pests, provide final report.

14.8     Provide Emergency Exit Drawings in Electronic format and Hard Copy installed in every room per local/state Fire Codes.

14.9     Provide Final Project Binder, which shall include the following required documentation:

    14.9.1       All permitted site and building plans to be provided on CD

    14.9.2       All building systems, warranties, and manuals to be provided in a binder in duplicate format / CD prior to School orientation.

    14.9.3       Building Keys, per RAD specifications

    14.9.4       Key schedule to be approved by RAD

    14.9.5       Key box (as referenced in "Building Design - 7,8") to be provided by GC

    14.9.6       Provide Mailbox, specifications and location provided by local Post Office.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D



ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## EXHIBIT "C"

## WCT2 REQUIREMENTS (AGREEMENT APPENDED)

1840924v1 980058.0196
HSB 6500370 v.1

Exhibit D

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

PLEASE RETURN TO:
Derfner & Altman, LLC
575 King Street Ste. B
Charleston, SC  29403

STATE OF SOUTH CAROLINA

COUNTY OF CHARLESTON

**DEVELOPMENT AGREEMENT**

WHEREAS, Wildcat Trail 2, LLC, a South Carolina Limited Liability Company, ("WCT2") donated a parcel of land located in Berkeley County, South Carolina, to Berkeley Charter Education Association, Inc., a South Carolina Non-Profit Corporation ("**BCEA**") described on Exhibit "A" (the "**Donated Property**") for the purpose of building and operating a charter school (the "**Charter School**") by BCEA; and

WHEREAS, BCEA is a 501(c)(3) Non-Profit Corporation recognized by the Internal Revenue Service;

WHEREAS, WCT2 owns an adjacent parcel of property to the Donated Property, and is the process of negotiating the sale of that property to AMH Development, LLC or another third party ("**Adjoining Property Owner**"), which will utilize the infrastructure to be constructed pursuant to the terms of this Development Agreement ("**Agreement**"); and

WHEREAS, WCT2 and BCEA hereby acknowledge that it is necessary that this Agreement be prepared and executed in order to establish the obligations of each party in order that the infrastructure and the Charter School can be completed in accordance with the Title to Real Estate from WCT2 to BCEA as same contains a reverter clause which requires that the Charter School be constructed and be operational within a two-year period; and

WHEREAS, WCT2 and BCEA have approved a site plan for the development of the Charter School and the location of the infrastructure improvements referenced herein (Exhibit "B").

NOW WHERFORE, the Parties agree as follows:

1. All WHEREAS paragraphs are incorporated herein by reference.

2. BCEA has advises that it will enter into an agreement with Red Apple Development or another developer ("**Developer**") to construct the Charter School and the infrastructure referenced herein on the subject property according to plans that will be submitted and approved by WCT2 and Berkeley County.  Except as provided herein, all costs of construction shall be the responsibility of BCEA and its Developer. Construction of the Charter School and the improvements shall be completed, as evidenced by a certificate of occupancy issued by Berkeley County  within twenty-four (24) months of the full execution of this Development Agreement (the "**Charter School Deadline**").

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

3.  The Charter School and any improvements placed on the real property described herein shall be developed in accord with the Wildcat Master Stormwater Plan, Wildcat Master Sewer Plan and the Wildcat Master Water Plan.

4.  The Developer will install the public road entry improvements and turning lanes necessary to connect Black Tom Road (collectively, the "**Entry Improvements**") with the Charter School site, as generally shown on Exhibit "B". A contract for the Entry Improvements will be obtained and same delivered to WCT2 for approval. Developer will obtain a payment and performance bond in the amount of 110% which shall name WCT2 and the Adjoining Property Owner as beneficiaries (the "**Entry Improvements Bond**"). The Entry Improvements shall be completed and accepted on or before September 1, 2021 (the "**Entry Improvements Deadline**"). Completion of the obligations set forth herein will be evidenced by a Permit to Operate ("**PTO**") issued by Berkeley County. In the event the Entry Improvements are not completed by the Entry Improvements Deadline, WCT2 or the Adjoining Property Owner will provide a thirty (30) notice to the Developer of non-completion. If the Entry Improvements are not completed within that time period, WCT2 or the Adjoining Property Owner shall have the right to call the Entry Improvements Bond and complete the Entry Improvements.

5.  The Developer will install the water line (the "**Water Line Improvements**") from the adjacent Ashton Woods Development to the Charter School site, as shown on Exhibit "B". A contract for the Water Line Improvements will be obtained by the Developer and delivered to WCT2 for its approval. Developer will obtain a payment and performance bond in the amount of 110% of the contract which shall name WCT2 and the Adjoining Property Owner as beneficiaries (the "**Water Line Bond**"). The Water Line Improvements shall be completed and accepted on or before September 1, 2021 (the "**Water Line Improvements Deadline**"). Completion of the obligations set forth herein will be evidenced by a PTO issued by Berkeley County. In the event the Water Line Improvements are not completed and a PTO issued by the Water Line Improvements Deadline, a thirty (30) notice of non-completion will be provided to the Developer. In the event that the Water Line Improvements are not completed within that thirty (30) day period, either beneficiary of the Water Line Bond shall have the right to call the Water Line Bond and complete the Water Line Improvements.

It is acknowledged that Berkeley County is paying to upsize the water line from a 10" to a 16" for future connections. Upon completion of the Water Line Improvements by the Developer, WCT2 or the Adjoining Property Owner, or WCT2's designee will make a contribution to BCEA in the amount equivalent to the cost of the Water Line

Exhibit D

Improvements minus the Berkeley County 16" waterline upsize contribution, if same is accomplished without the need to call the Water Line Bond.

6.  The Developer will construct a sanitary sewer pump station and associated facilities (the "**Pump Station**") to serve the Charter School and the owner of the Adjoining Property Owner.  A contract will be obtained by the Developer for the construction of the said Pump Station which is subject to the written approval of WCT2.  The Developer will obtain a payment and performance bond in the amount of 110% of the contract amount (the "**Pump Station Bond**") with WCT2 and the Adjoining Property Owner being named a beneficiaries.  The Pump Station shall be completed, as evidenced by the issuance of a PTO by Berkeley County on or before September 1, 2021 (the "**Pump Station Deadline**").    In the event that the Pump Station is not completed in accordance with the schedule set forth herein, a thirty (30) notice of non-completion will be provided to the Developer.  If the Pump Station is not completed within that thirty (30) day period, WCT2 or the Adjoining Property Owner will have the right to call the Pump Station Bond and complete the Pump Station. Within thirty (30) days of completion of the Pump Station as evidenced by the issuance of a PTO, WCT2, or the Adjoining Property Owner or WCT2's designee will make a contribution to BCEA amounting to Five Hundred Thousand and no/100 Dollars ($500,000.00) for one hundred sixty-five (165) density units. This contribution may increase in the event that the Adjoining Property Owner acquires additional density units.

7.  WCT2 will grant to the Developer temporary construction easements in order that the Developer can complete the infrastructure improvements specifically described in Paragraphs 4, 5, and 6 herein.  The Developer hereby agrees to hold harmless and indemnify WCT2, its agents, representatives, and employees, from any and all claims, claims of damage caused by the Developer, including attorneys' fees and costs, in its utilization of the temporary construction easements.

8.  In the event that BCEA's Developer does not complete any portion of the work described in Paragraphs 4, 5, or 6, WCT2 or the Adjoining Property Owner shall have the right, but not the obligation to complete the unfinished work by calling the aforementioned bonds, as provided herein.

9.  In the event that the Developer fails to complete its obligations under Paragraphs 4, 5 and 6, BCEA does hereby grant to WCT2 and the Adjoining Property Owner a construction easement over and upon the property described on Exhibit "A" in order that any of the infrastructure work referenced herein can be completed.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

10. The provisions of this Agreement are not intended to create, nor shall they in any way be interpreted to create, a joint venture, a partnership, or any similar relationship between the Parties.

11. This Agreement shall be governed by the Laws of the State of South Carolina.

12. Neither of the Parties may assign its rights or delegate its responsibility under this Agreement without written consent of all signatories to the Agreement, with such consent not to be unreasonably withheld, conditioned or delayed.

IN WITNESS WHEREOF, WCT2 has executed this Agreement under Seal effective as of the _____ 6th _____ day of _____ October _____, 2020.

**WITNESSES:**

_____
1st witness

_____
*Patricia McCurdy*
2nd witness/Notary Public

**WILDCAT TRAIL 2, LLC**
a South Carolina limited liability company
By: Three G. Cousins, LLC
Its: Manager
   By: Wildcatter, LLC
   Its: Manager

By: _____
    BEN M. GRAMLING, III
Its: Authorized Signatory

STATE OF SOUTH CAROLINA      )
                             )      **ACKNOWLEDGMENT**
COUNTY OF CHARLESTON         )

**The foregoing instrument** was acknowledged before me, a Notary Public for the State of South Carolina, by Ben M. Gramling, III the authorized signatory for Wildcatter, LLC, the Manager of Three G. Cousins, LLC, as the Manager of Wildcat Trail 2, LLC, this _16th_ day of _____ October _____, 2020.

_____ (SEAL)
Notary Public for South Carolina

_____
*Patricia McCurdy*
Print Name of Notary Public

My Commission Expires: _8/31/2026_

DA File 282411: dm 6498164-v1 10-2-2020 revised development agmt wct2 - bcea_.docx

4

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

IN WITNESS WHEREOF, the Grantee has executed this Agreement under Seal effective as of the 6th day of *October*, 2020.

WITNESSES:

_Debbie Frickling_
1st witness

_B. Tu____
2nd witness/Notary Public

Berkeley Charter Education Association, Inc.
a South Carolina non-profit corporation

By: _Stewart Weinberg____
       Stewart Weinberg, Ph. D.
Its:    President

STATE OF SOUTH CAROLINA          )
                                 )          **ACKNOWLEDGMENT**
COUNTY OF CHARLESTON             )

**The foregoing instrument** was acknowledged before me, a Notary Public for the State of South Carolina, by Stewart Weinberg, the President of Berkeley Charter Education Association, Inc. a South Carolina non-profit corporation, this 6th day of October _____, 2020.

_B. Tu____ (SEAL)
Notary Public for South Carolina

_Bernadette Tomasuolo_
Print Name of Notary Public

My Commission Expires: 4-12-2027

B TOMASUOLO
NOTARY PUBLIC
SOUTH CAROLINA
MY COMMISSION EXPIRES 4-12-2027

DA File 282411:  development agmt wct2 - bcea (da v.5 cln) (4).docx

5

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D

## AS TO PARAGRAPH 7 HEREIN ONLY:

IN WITNESS WHEREOF, the Developer has executed this Agreement under Seal

effective as of the ___6___ day of ___October___, 2020.

**WITNESSES:**

_____
1st witness

_____
2nd witness/Notary Public

**RED APPLE DEVELOPMENT, LLC,**
a Florida limited liability company

By: _____

Its: _____ (Print)
_____ (Title)

STATE OF ___Florida___          )
COUNTY OF ___Broward___       )          **ACKNOWLEDGMENT**
                                                    )

**The foregoing instrument** was acknowledged before me, a Notary Public for the State

of ___Florida___, by ___Jonathan K Hage___, the ___CEO___

for Red Apple Development, LLC, a Florida limited liability company, this ___6___ day of

___Oct.___, 2020.

Notary Public State of Florida
Fatima Echeverry
My Commission GG 144049
Expires 01/08/2022

_____ (SEAL)
Notary Public for Florida

___Fatima Echeverry___
Print Name of Notary Public

My Commission Expires: ___01/08/2022___

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

## EXHIBIT "A"

### Legal Description of Donated Land

TRACT A-2A

ALL that piece, parcel or tract of land situate, lying and being in the County of Berkeley, State of South Carolina, containing 15.67 Acres, more or less, shown as **TRACT A-2A** on a plat entitled "PLAT OF THE SUBDIVISION OF **TRACT A (RESIDUAL 2) CONTAINING 88.72 +/- Ac.** TO CREATE **TRACT A-2A (15.63 Ac.)** NEAR SUMMERVILLE, BERKELEY COUNTY, SOUTH CAROLINA, prepared for and owned by WILDCAT TRAIL 2, LLC" prepared by Phillip P. Gerard, PLS, of Thomas & Hutton Engineering Co., dated November 5, 2019, and recorded on December 27, 2019, in the R.O.D. Office for Berkeley County as Document ID 2019046929.

Berkeley County TMS _____

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**EXHIBIT "B"**

INFRASTRUCTURE IMPROVEMENTS

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit D



ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**INTERIM LEASE AGREEMENT**

**By and Between**

**RED APPLE AT BERKELEY, LLC**

**as LANDLORD**

**and**

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**

**as TENANT**

**School:**

**Berkeley County Preparatory Academy**

**Property Address:**

**122 Bee Tree Blvd, Summerville, SC 29486**

1852325v1 980058.0196

Exhibit E

**INTERIM LEASE AGREEMENT**

**THIS INTERIM LEASE AGREEMENT** ("**Lease**") is made and entered into this _31st_ day of ___December___, 2020 by and between **RED APPLE AT BERKELEY, LLC**, a Florida limited liability company ("**Landlord**"), whose mailing address is 800 Corporate Drive, Suite 124, Fort Lauderdale, Florida 33334 and **BERKELEY CHARTER EDUCATION ASSOCIATION, INC.**, a South Carolina not-for-profit corporation ("**Tenant**"), whose mailing address is 103B  Howard Mary Drive, Charleston, South Carolina 29412.

**WITNESSETH:**

Tenant is the fee owner of a certain parcel of real property consisting of approximated 15.67 acres (the, "**Land**"). Under that certain Ground Lease between Landlord, as tenant, and Tenant, as landlord, on even date herewith (the "**Ground Lease**"), Landlord has leased from Tenant the Land whereupon Landlord has or will through its developer construct a school facility and related improvements for a 765 student K-8 charter school with gymnasium and recreation field (the building(s) and improvements and surrounding land and all appurtenant easements and rights benefiting or appurtenant to the real property being hereinafter referred to as the "**Premises**"), which Premises is located at 122 Bee Tree Blvd, Summerville, SC 29486, as more particularly described in the attached Exhibit "A".

In consideration of the mutual covenants of the respective parties, as herein provided, Landlord does hereby let, lease and demise, and by these presents has let, leased and demised unto Tenant the Premises.

**ARTICLE I**
**TERM, SURRENDER**

1. **Term.** The term of this Lease ("**Term**") shall commence on July 1, 2021 (the "**Commencement Date**"), for a term of twenty-five (25) years such that the Term would expire on June 30, 2046.

2. **Interim Lease; Financing**. This Lease is entered into by the parties as an interim lease. Landlord and Tenant agree and acknowledge that their respective rights may need to be subordinated and the terms of this Lease may need to be adjusted based upon reasonable financing requirements for purposes of financing the improvements and overall project under that certain Development Agreement between Red Apple Development, LLC and Tenant dated October 5, 2020. Landlord and Tenant agree and acknowledge to fully cooperate and execute needed documents to facilitate any financing, including the permanent Financing (defined below), contemplated in the Development Agreement. Provided it is financially feasible, within eighteen (18) months of the date of this Lease, Landlord and Tenant will use their best efforts to cooperate in obtaining permanent Financing.  Such Financing may include Mevers School of Excellence.  It is anticipated that the obligations of this Lease and the Tenant obligations under the lease for Mevers School of Excellence will be reduced with permanent Financing.  It is contemplated that in conjunction with obtaining permanent Financing, transfer of ownership for the Premises and Mevers School of Excellence may be offered to BCEA and may be included within the structure of the permanent Financing.  Notwithstanding anything herein to the contrary, upon the closing of a loan the proceeds of which are used to finance or refinance, among other things, the acquisition of and/or improvements at the Premises (the "**Financing**"), the parties agree to terminate this Lease and execute and deliver a long-term Lease Agreement for the Premises (the "**Replacement Lease**"), which Replacement Lease shall provide for, among other things, an annual Base Rent in an amount equal to the lesser of (i) the Base Rent (as defined herein) in effect at the time of termination, or (ii) the debt service for such Financing.  The term of the Replacement Lease shall commence as of the date of termination of this Lease and shall run concurrently with term of the Ground Lease.  Subject to the preceding two sentences, the Parties will negotiate the terms of the Replacement Lease in good faith without the requirement that the Replacement Lease be same as the Lease in substance.   Tenant shall

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

be required to serve as a borrower or co-borrower on such Financing in the event the debt service for such Financing is less than the aggregate of the Base Rent payable by Tenant under this Lease. Notwithstanding the intent of Landlord and Tenant to terminate this Interim Lease and enter into a Replacement Lease, if the Interim Lease is in effect at the end of the 6th year, Tenant shall have the power to satisfy its obligations hereunder to the Landlord by paying landlord the *greater* of (a) the fair market value of the Premises or (b) the amount to fully satisfy all indebtedness associated with the Premises, including, without limitation, all loans in which Landlord is a borrower or co-borrower. The fair market value of the Premises shall be established by a full narrative appraisal of the Premises prepared at Tenant's cost by an MAI-certified, Florida-licensed real estate appraiser reasonably acceptable to both Landlord and Tenant. The appraisal shall be performed, and updated if necessary, such that the appraisal date is within thirty (30) days from date Tenant makes payment to Landlord hereunder. Landlord shall apply the funds received from Tenant to pay Landlord's indebtedness encumbering the Premises. Upon payment of such sum to the Landlord and the full satisfaction of indebtedness associated with the Premises, the Landlord shall have no further rights to the Premises under this Lease or under the Ground Lease, such that the Tenant shall have fee simple title to the Premises. In such event, the Tenant shall have a reasonable time to obtain financing for the payment contemplated by this paragraph and such reasonable time shall be a period of not less than six months from any default notice.

3.     **Lease Year.**  For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive period of twelve (12) calendar months, commencing on the first day of the calendar month following the calendar month in which the Rent Commencement Date (as defined herein) occurs and each anniversary of such day, except that the first Lease Year shall also include the period from the Rent Commencement Date until the first day of the following month.

4.     **Holdover Tenant.**  If Tenant shall remain in possession of the Premises following the expiration or the earlier termination of the Term without an agreement in writing between Landlord and Tenant with respect thereto, Tenant shall be deemed to be a tenant at sufferance and the rents and other amounts payable under this Lease during such holdover shall be 150% of the Base Rent in effect immediately prior to the expiration or earlier termination of the Term.  In no event, however, shall such holding over be deemed or construed to be or constitute a renewal or extension of this Lease.

<div align="center">

**ARTICLE II**
**RENT**
</div>

1.     **Base Rent.**  Tenant shall pay a monthly rental ("**Base Rent**") to Landlord, without deduction or setoff commencing on the Rent Commencement Date and continuing each month thereafter for the remainder of the Term, in the amount(s) set forth in Exhibit "B" attached hereto, in the manner herein provided.

As used herein, the term "**Rent Commencement Date**" shall mean July 1, 2021.

No security deposit shall be required for the Term of this Lease.

If the Rent Commencement Date is not the first day of a month, then the monthly Base Rent for the first and last month of the Term shall be prorated accordingly.  All payments shall be made at Landlord's address below and shall be due on the first day of every month and late on the fifth (5th) day of the month in which the payment is due.  If payment is not made before the fifth (5th) day of the month in which the payment is due, then a five percent (5%) late fee will be added to that month against the unpaid amount. In no event may any such late fee exceed the maximum permitted by law.  The annual Base Rent during each Lease Year shall be paid by Tenant in equal monthly payments.

All Rent (as defined below) payable by Tenant under this Lease shall be paid to Landlord without prior notice or demand at 800 Corporate Drive, Suite 124, Fort Lauderdale, Florida 33334.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

**2.     Additional Rent.**  If Tenant shall become obligated to Landlord under this Lease for any sum other than Base Rent, the amount thereof shall be deemed to constitute additional rent ("**Additional Rent**"; and together with Base Rent, "**Rent**") and shall be due and payable by Tenant simultaneously with the next succeeding monthly installment of Base Rent or at such other time as may be expressly provided in this Lease for the payment of the same.

**3.     Taxes and Assessments.**     Commencing on the Rent Commencement Date and continuing throughout the remainder of the Term, Tenant covenants and agrees to pay and discharge, when due and payable, any taxes (ad valorem, sales, excise and otherwise, but excluding income taxes), assessments, and governmental charges now or hereafter levied or assessed upon or against Tenant's or Landlord's interest in the Base Rent and Additional Rent, including, without limitation, assessments imposed by any community development district, private association, or pursuant to any private agreement affecting the Premises.   Should the appropriate taxing authority require that any of the foregoing be collected by Landlord for or on behalf of such taxing authority, then the same shall be paid by Tenant to Landlord as Additional Rent in accordance with the terms of any written notice from Landlord to Tenant to such effect.   Tenant shall pay all such taxes as and when the same become due and shall provide evidence of timely payment upon request from Landlord.

**4.     Operating Charges**.   Commencing on the Rent Commencement Date, Tenant shall directly pay, on behalf of Tenant and Landlord, all charges, costs, expenses, taxes, fees, licenses and permits as may be incurred, required, desired or needed for the operation of the Premises by Tenant, including, without limitation, maintenance of any easements benefitting or appurtenant to the Premises. This Lease is a triple net lease and other than Landlord's debt service, Landlord shall not have any charge, cost, expense for which it is responsible in connection with the Premises during the term of this Lease, Tenant being solely responsible for all costs of operation, maintenance, repair, insurance and taxes, whether or not such costs are specifically described in the Lease or contemplated as of the date hereof.

### ARTICLE III
### USE AND MAINTENANCE OF PREMISES

**1.     Use of Premises.**  The Premises are to be used and occupied solely for such purposes as may be permitted by law.  Tenant shall not use the Premises for any unlawful purpose.  Tenant shall not do or permit any act or thing at the Premises which would constitute a public or private nuisance or waste.

**2.     Maintenance and Repair.**   Except as set forth in this Lease to the contrary, Landlord shall deliver the Premises to Tenant in full and complete compliance with all laws, orders and regulations of federal, state and municipal authorities and with any lawful direction of any public officer (including but not limited to laws, orders and regulations with respect to The Americans with Disabilities Act of 1990). Landlord hereby represents that the HVAC, electrical, mechanical and plumbing systems of the Premises shall be in new and in good working condition as of the Rent Commencement Date.  Except as set forth herein, Landlord shall deliver the Premises to Tenant in its new condition.  Landlord agrees to assign all warranties to the extent such warranties are assignable by Landlord.  Tenant shall maintain and repair the entire Premises, at Tenant's sole expense, in good repair and condition, including but not limited to the building, electrical, plumbing and HVAC systems, and to keep the Premises in a clean and sanitary condition.  Tenant, at its own expense, shall be responsible for maintaining and keeping the building structure, roof, foundation, exterior walls, sidewalks and all utility service pipes and lines outside the exterior of the Premises in good repair and condition, including, to the extent that Tenant has either sole or shared maintenance obligations, all appurtenant easements, but not including easements owned and maintained exclusively by one other than Tenant.  Any maintenance and repairs under this Section shall be made promptly as and when necessary and shall be of a quality and class at least equal to the original

work. Tenant shall not cause any trash or other refuse to accumulate on the Premises, and shall store and remove the same from the Premises at regular intervals, no less often than weekly.

    **3.**    **Landlord's Right of Access.**  Landlord, its agents and representatives, and any mortgagee of Landlord may, at all reasonable times, but with at least one (1) business day advance notice to Tenant except in the case of emergency, enter the Premises to make a walk-through examination or upon notification of termination of this Lease.

    **4.**    **Compliance with Law.**  Tenant agrees, at its own expense, to comply with all Laws (as defined below) which shall impose any duty upon Tenant with respect to its use of the Premises.

    **5.**    **Operation of Business.**  Provided that Tenant is not in default without regard to notice and cure periods under the terms of this Lease, Tenant shall not be required to be open for business or operate at any time during the Term of this Lease.

<div align="center">

**ARTICLE IV**
**ALTERATIONS AND IMPROVEMENTS**

</div>

    **1.**    **Equipment and Furnishings.**  Landlord covenants that Tenant shall be permitted to install personal property such as trade fixtures and equipment on and in the Premises.  Such personal property and equipment shall remain the property of Tenant after expiration of this Lease.

    **2.**    **Improvements.**  Throughout the Term of this Lease and at Tenant's sole cost, Tenant shall be permitted to make alterations, additions or improvements (hereinafter, "**Alterations**") in or to portions of the Premises as Tenant may desire provided that Tenant first obtains the prior written consent of Landlord, which consent may not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, all alterations must be accomplished in a manner that complies with all applicable local, state and federal laws, ordinances, rules and regulations (collectively, "**Laws**").

    **3.**    **Approvals.**  Tenant shall have the right, throughout the Term and at its sole cost, to file and obtain any license or governmental approval (collectively, the "**Approvals**") that Tenant requires in order to conduct its business at the Premises and in connection with any Alterations.  Landlord agrees to cooperate with Tenant in Tenant's efforts to obtain each of the Approvals, at no expense to Landlord. Landlord shall, if required, join in the execution of any applications or other written requests provided that Landlord shall incur no liability or expense when doing so.

    **4.**    **Signs.**  Tenant, throughout the Term and at its sole cost, shall be permitted to affix any sign, advertisement or notice (collectively "**Signs**") on any and every part of the Premises, with the prior written consent of Landlord as to design and installation methods and location, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing all Signs must be accomplished in a manner that complies with all applicable Laws.

    **5.**    **No Liens Created by Tenant.**  Tenant shall not allow the Premises to become subject to any security interest, lien, charge or encumbrance whatsoever except as expressly provided herein.  If any mechanic's lien, materialman's lien or other lien is placed against the Premises, Tenant shall have thirty (30) days after notice thereof to remove same or to cause same to be released and discharged of record by posting a bond with the appropriate court of law in the amount of the lien. Tenant shall indemnify and hold Landlord harmless in the event of any default by Tenant under this provision, which indemnification shall survive the expiration or sooner termination of this Lease.

    **6.**    **Quiet Enjoyment.**  Landlord covenants and warrants that Landlord shall have a ground lease interest and the lawful right and authority to make this Lease as of the Rent Commencement Date, and that Tenant, upon paying the Base Rent and Additional Rent and performing and observing the covenants and conditions herein contained on Tenant's part to be performed and observed, shall and will peacefully and quietly have, hold and enjoy the Premises for the full Term.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

7.     **Destruction of Premises**.  In the event of damage or destruction of fifty percent (50%) or more of the Premises which is not caused by the negligence or willful misconduct of the Tenant, its employees, guests or agents which renders the Premises reasonably and economically unsuitable for Tenant's business, as reasonably determined by Tenant, Tenant shall have the option to (i) terminate this Lease whereupon the Base Rent and Additional Rent shall be apportioned as of the date of such destruction, any prepaid Rents or deposits shall be returned, and the parties shall be released of all further duties and obligations hereunder; or (ii) at its sole expense, rebuild, repair or restore the Premises to a condition substantially similar to their condition at the Rent Commencement Date within 180 days of such damage or destruction and the Base Rent and any Additional Rent shall be abated during such rebuilding, repair and restoration.  Tenant shall notify Landlord in writing within thirty (30) days of the date of such damage or destruction of its election hereunder.  Tenant shall be required, at its sole expense, to rebuild, repair or restore any damage or destruction of less than fifty percent (50%) of the Premises to a condition substantially similar to their condition at the Rent Commencement Date within 180 days of the assessment by the Tenant's insurance carrier of such damage or destruction. The 180 day period provided herein for rebuilding, repairing or restoration shall be subject to reasonable time allowance for the purpose of adjusting the insurance loss, obtaining the necessary building permit or unavoidable delay and shall be enlarged by delays caused, without fault or neglect on the part of Tenant, by acts of God, epidemic or pandemic disease and any effects arising therefrom, strikes, lock-outs or other conditions, including, without limitation, adjusting the insurance loss and not obtaining building permits, beyond the control of Tenant.  In the event Tenant elects to terminate this Lease as aforesaid, (a) the Base Rent and Additional Rent shall be apportioned as of such date, any prepaid Rents or deposits shall be returned, and Tenant shall be released of all further duties and obligations hereunder; and (b) the proceeds collected under any policy or policies of casualty insurance for damage to the Premises shall be paid to Landlord; provided, however, Tenant shall be entitled to all insurance proceeds, if any, recovered as a result of such casualty for its trade fixtures, equipment, personalty and inventory, which shall be separately insured.

8.     **Eminent Domain.** In the event of condemnation or other similar taking or transfer due to governmental order, of a material portion of the buildings or land, which renders the land or buildings reasonably and economically unsuitable for Tenant's business, as reasonably determined by Tenant, this Lease, at Tenant's sole discretion, shall (i) terminate, in which case the Base Rent and Additional Rent shall be apportioned as of the date of termination, but not later than the date that the condemning authority actually takes possession of the part so condemned or purchased, any prepaid Rents or deposits shall be returned, and Tenant shall be released of all further duties and obligations hereunder; (ii) continue in full force and effect except that the Base Rent and Additional Rent shall be reduced by a percentage which is equivalent to the percentage of the Premises so taken.

If there is a partial taking of the buildings or land, or access thereto, such that the governmental taking results in an incomplete architectural unit, and this Lease is not thereupon terminated under the provisions of this Article but remains in full force and effect with a reduced Base Rent and Additional Rent as described above, then the Landlord shall, within a reasonable time thereafter and at Landlord's sole cost and expense, repair or reconstruct the remaining portion of the Premises or access to it  to the extent necessary to make the same a complete architectural unit; provided that in complying with its obligations, Landlord shall not be required to expend more than the net proceeds of the condemnation award, which are paid to Landlord, and provided further that there shall be an abatement of the Rent and all other charges reserved hereunder during any period in which the Premises shall be rendered untenantable as a result of such partial taking.

Landlord shall be entitled to the entire proceeds of any condemnation award.  Tenant shall have no claim against Landlord or against the condemning authority for the value of any leasehold estate or for the value of the unexpired Lease Term.  Nothing, however, shall be construed to preclude Tenant from prosecuting any claim directly against the condemning authority for loss of business, for damage to, and cost of removal of, trade fixtures, furniture and other personal property belonging to Tenant, and for the

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

unamortized cost of leasehold improvements to the extent same were installed at Tenant's expense, provided, however, that no such claim shall diminish or adversely affect Landlord's award.

## ARTICLE V
## UTILITIES

Tenant shall place in its name and shall pay or cause to be paid all charges for gas, electricity, light, heat, power, water, sewer, telephone, cable, trash collection and all other utility services used, rendered or supplied to or in connection with the Premises during the Term of this Lease and any renewals thereof.  The cost of such utilities shall include the cost incurred in connection with any easements or declarations providing for the use of off-site drainage facilities, lift stations, and the like, including, without limitation, the maintenance thereof.

## ARTICLE VI
## INSURANCE

1.    **Liability Insurance.**  Throughout the Term, Tenant shall obtain and maintain, at Tenant's sole cost, commercial general liability insurance against claims for bodily injury, death and property damage occurring in or about the Premises with a combined single limit per occurrence of $3,000,000, and a $5,000,000 annual aggregate, plus excess liability coverage with a limit of $5,000,000.  Landlord and Landlord's lender shall be named as additional insureds.

2.    **All-Risk Property Insurance.**  Throughout the Term, Tenant shall obtain and maintain at Tenant's sole cost, all-risk property insurance in the amount equal to the full replacement value of all buildings, improvements and contents of the Premises, insuring Tenant, Landlord, and lender as their interests may appear.

3.    **Worker's Compensation Insurance.**   Throughout the Term, Tenant shall obtain worker's compensation insurance in minimum limits as required by law of the jurisdiction in which the Premises is located.

4.    **Requirements.**  All policies of insurance required of Tenant hereunder shall (1) contain a severability of interest clause, a cross-liability clause, shall be primary and shall not call into contribution any other insurance available to Landlord, (2) contain an endorsement prohibiting cancellation or reduction of coverage without first giving Landlord, and if applicable, Landlord's first mortgagee, thirty (30) days prior written notice of such proposed action (by certified mail if permitted by the insurance carrier), (3) be issued by a company or companies licensed to do business in the jurisdiction in which the Premises is located and that has a rating equal to or exceeding A:XI form Best's Insurance Guide, and (4) upon request by Landlord, cause Landlord's first mortgagee to be added as an additional insured to the same extent as the Landlord.  The limit of said insurance shall not, however, limit the liability of Tenant hereunder.  Tenant shall furnish to Landlord a certificate of all required insurance and receipts evidencing payment therefor to Landlord on or before the Commencement Date and thereafter prior to the expiration of the policy then in effect.  Tenant is obligated to pay for deductibles associated with a loss.

5.    **Waiver of Subrogation**.   Anything in this Lease to the contrary notwithstanding, Landlord and Tenant each hereby waives any and all rights of recovery, claim, action or cause of action, against the other, and their affiliates and each of their partners, members, governors, directors, shareholders, officers and employees for any loss or damage that may occur to the Premises, or any improvements thereto, or any personal property of any such party therein, by reason of fire, the elements, or any other cause which could be insured against under the terms of the all risk property insurance policies referred to in Article VI hereof (whether or not actually insured), or which is actually insured against by the party in question, regardless of cause or origin, including negligence of the other party hereto or its affiliates or any of their partners, members, governors, directors, shareholders, officers or

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

employees, and covenants that to the extent of such waiver no insurer shall hold any right of subrogation against the other party hereto.

## ARTICLE VII
## ATTORNMENT AND SUBORDINATION; TENANT ESTOPPEL CERTIFICATE

1.  **Attornment.**  Tenant shall, if requested by a mortgagee of the Premises at any time, or in the event any proceedings are brought for the foreclosure of or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease.  Tenant shall, if requested by a mortgagee of the Premises, provide to such mortgagee Tenant's financial statement, as and when requested.  In all events, Tenant will provide internally generated quarterly financial statements within 45 days after quarter end, and will provide unqualified audited financial statements within 180 days after fiscal year end.  As and when requested by any mortgagee of the Premises, Tenant shall deliver a copy of the certified enrollment.

2.  **Subordination.**  This Lease is hereby agreed by Tenant to be and is hereby made junior, subordinate and subject in right, priority and all other respects to any mortgage now or hereafter in force and effect upon or encumbering the Premises, and to all future modifications, extensions, and replacements of any such mortgage, and upon recording any of such mortgage, the same shall be deemed to be prior in dignity, lien and encumbrance of this Lease irrespective of the dates of execution, delivery or recordation of any such mortgage or mortgages.  The foregoing subordination provisions of this Section shall be automatic and self-operative without the necessity of the execution of any further instrument or agreement of subordination on the part of Tenant; provided, however, that Tenant shall execute a subordination, non-disturbance and attornment agreement reasonably acceptable to Tenant within ten (10) days after request therefor from Landlord.  Notwithstanding the foregoing, so long as Tenant shall not be in default in the performance of its obligations under this Lease, neither this Lease nor any of Tenant's rights hereunder, including but not limited to Tenant's right to remain in exclusive possession of the Premises, shall be affected or disturbed by reason of any default under such mortgage and if such mortgage shall be foreclosed or if such mortgagee shall exercise any of its remedies under such mortgage, this Lease and all of Tenant's rights and obligations hereunder shall survive such foreclosure and continue in full force and effect.

3.  **Tenant Estoppel Certificate.**  Tenant agrees at any time and from time to time, within ten (10) business days after receipt of a written request from Landlord, to execute, acknowledge and deliver to Landlord or a party designated by Landlord a statement in writing (i) certifying that this Lease is unmodified and in full force and effect, or if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications, (ii) stating the Commencement Date and the expiration date of the Term of this Lease, (iii) stating the dates to which the Rent and other charges hereunder have been paid by Tenant, (iv) stating whether or not Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if Landlord is in default, specifying each such default, (v) agreeing that Tenant and Landlord will not thereafter modify the Lease without the approval of any mortgagee identified by Landlord, (vi) agreeing that Tenant shall not prepay any Rent more than one month in advance (other than to the extent that any payment of an installment of Tenant's Additional Rent when due constitutes such prepayment), and (vii) including such other matters relating to this Lease as may be reasonably requested, all in form and substance reasonably acceptable to Tenant. Any such statement delivered pursuant hereto may be relied upon by any owner of the Premises, any prospective purchaser of the Premises, any present or prospective mortgagee of the Premises or of Landlord's interest, or any prospective assignee of any such mortgagee.

## ARTICLE VIII
## DEFAULT

1.  **Tenant Events of Default.**  The occurrence of any one or more of the following shall constitute an "**Event of Default**" hereunder:  (a) Tenant's failure to pay any amount required hereunder

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

within five (5) days after the date when due; (b) Tenant's failure to perform any other covenant, condition, agreement or provision contained herein within thirty (30) days after receipt of written notice of such failure (unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature reasonably be performed, done, or removed, as the case may be, within such thirty (30) day period, in which case no default shall be deemed to exist so long as Tenant shall have commenced doing the same within such thirty (30) day or other such period required in this Lease and shall diligently and continuously prosecute the same to completion); or (c) commencement of bankruptcy, insolvency, assignment for the benefit of creditors or receivership proceedings in respect of Tenant and the same is not dismissed within ninety (90) days from the date of commencement.

**Landlord Remedies.**  Upon the occurrence and continuance for more than thirty (30) days of an Event of Default, Landlord may, at its option and without any obligation to do so, elect any one or more of the following remedies:  terminate and cancel this Lease; cure such Event of Default and recover the costs thereof from Tenant, plus interest at the maximum legal rate permitted by applicable law; or pursue any other remedy now or hereafter available under the laws or judicial decisions of the state in which the Premises is situated, together with interest thereon, at the maximum legal rate permitted by applicable law. Additionally, Landlord may at its option exercise any one or more of the following remedies upon the occurrence and continuance of an Event of Default by Tenant: (a) Landlord may declare as immediately due and payable the whole Rent remaining unpaid for the entire Term and the same shall thereupon become immediately due and payable, anything to the contrary notwithstanding; (b) Landlord may terminate this Lease in which event Tenant shall immediately surrender the Premises to Landlord and if Tenant fails to do so, Landlord may without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying said Premises or any part thereof; (c) Landlord may re-enter and take possession of all property hereby leased and in good faith sublet the same for the account of Tenant, applying all rental received by Landlord as the result of such subletting to the credit of Tenant on all Rents accruing but such re-entry and subletting by Landlord shall not relieve Tenant of Tenant's obligation to pay the Rents herein provided for, but Tenant shall remain liable therefore and shall pay to Landlord, as and when the installments of Rent herein provided for shall become due, the difference, if any, herein agreed to be paid by Tenant and the rent received by Landlord as a result of such subletting for each month of the period that otherwise would have constituted the balance of the Term hereunder; Tenant shall be liable for Landlord's reasonable expenses in restoring the Premises and all reasonable costs incident to such re-letting, including broker's commissions; and Tenant further agrees that Landlord shall not be liable for any damages resulting to Tenant from such reasonable action, whether caused by negligence of Landlord or otherwise, unless caused by the gross negligence or willful wanton misconduct of Landlord; or (d) effect a cure of such Event of Default and offset the amount due or necessary to effect a cure against any amounts owing to Tenant by Landlord, whether pursuant to this Lease or pursuant to a separate agreement.  Notwithstanding the foregoing or anything in this Lease to the contrary, property of Tenant, including, without limitation, any of such property deemed by law to be the property of the sponsoring school district, that is purchased by or reimbursed to Tenant with federal or state grant funds shall not be subject to seizure or removal from the Premises by Landlord or become the property of Landlord in the event such property is not removed by Tenant prior to the expiration or termination of this Lease.  Notwithstanding the previously mentioned, if Landlord shall have declared the whole Rent due or taken steps to evict Tenant pursuant to an Event of Default after the end of the sixth (6th) year, Tenant shall be given the opportunity to exercise the option to satisfy its obligations as more fully described in Article I, Paragraph 2, provided that in the case of such exercise by Tenant, Tenant will be required to pay all rents then currently due within ninety (90) days of such action by Landlord, and in any event to cure all outstanding defaults in conjunction with the purchase contemplated by Article I, Paragraph 2.

2.     **Landlord Default.**  In the event Landlord fails to perform its obligations hereunder, or if any representation or warranty of Landlord contained herein proves to be false, and such breach of this Lease continues for thirty (30) days beyond notice from Tenant, then in addition to all rights, powers or remedies provided by law or in equity, Tenant may cure such default and charge the cost thereof plus

interest at the rate of eighteen percent (18%) to Landlord, or sue for specific performance, or sue for damages. In no event shall Tenant have the right to terminate this Lease or offset any amount against Rent.

    **3.**     **No Recourse.** Tenant shall look solely to the interest of Landlord in the Premises for satisfaction of any remedy it may have hereunder or in connection herewith and shall not look to any other assets of Landlord or of any other person, firm or corporation. If Landlord is a partnership, there shall be absolutely no personal liability on the part of any present or future partner, or any of its successors or assigns, with respect to any obligation hereunder or in connection herewith.

    **4.**     **Indemnification.** Tenant hereby agrees to indemnify and hold harmless Landlord, its officers, directors, agents and employees, against any and all liability, loss, cost, damage or expense (including all reasonable attorneys' fees at hourly rates customarily charged and other reasonable expenses incurred by the Landlord in defense of any claim) in connection with the Premises and involving damage or injury to Landlord or Landlord's successors or assigns, the Premises, or any other party or parties, person or persons, if due to the negligence or willful misconduct of the Tenant, or any of its officers, directors, employees, servants, agents or representatives, or otherwise occurring in connection with any default of the Tenant hereunder. The provisions of this Article shall survive any termination of this Lease. Landlord hereby agrees to indemnify and hold harmless Tenant, its officers, directors, agents and employees against any and all liability, loss, cost, damage or expense (including all reasonable attorneys' fees at hourly rates customarily charged and other reasonable expenses incurred by the Tenant in defense of any claim) in connection with the Premises and involving damage or injury to Tenant or Tenant's successors or assigns, the Premises, or any other party or parties, person or persons, if due to the negligence or willful misconduct of the Landlord, or any of its officers, directors, employees, servants, agents or representatives, or otherwise occurring in connection with any default of the Landlord hereunder. The provisions of this Article shall survive any termination of this Lease.

    **5.**     **Waiver.** The waiver by either party of any breach of any term, covenant or condition in this Lease shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of Base Rent or Additional Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No covenant, term or condition of this Lease shall be deemed to have been waived by either unless such waiver be in writing by that party.

    **6.**     **Force Majeure.** Except as expressly provided herein, in the event of restrictive governmental laws or regulations, strike, lockout, labor trouble, civil commotion, Act of God, riots, insurrection, war, epidemic or pandemic disease and any effects arising therefrom, or any other cause beyond a party's control (collectively "**force majeure**") resulting in Landlord's inability to supply the services or perform the other obligations required of Landlord hereunder, this Lease shall not terminate and Tenant's obligation to pay Rent and all other charges and sums due and payable by Tenant shall not be affected or excused as otherwise provided in this Lease and Landlord shall not be considered to be in default under this Lease. If, as a result of force majeure, Tenant is delayed in performing any of its obligations under this Lease, other than Tenant's obligation to pay Rent and all other charges and sums payable by Tenant hereunder, Tenant's performance shall be excused for a period equal to such delay and Tenant shall not during such period be considered to be in default under this Lease with respect to the obligation, performance of which has thus been delayed. In no event shall force majeure be deemed to excuse the timely payment of any sums due under this Lease.

<div align="center">

**ARTICLE IX**
**ENVIRONMENTAL**

</div>

    **1.**     **Maintenance of Premises.** Tenant, at Tenant's expense, shall maintain the Premises in compliance with, and shall not cause or permit the Premises, through the acts of Tenant, to be in violation

of any federal, state, county and municipal laws, ordinances, or regulations including, without limitation, those relating to Hazardous Materials (as defined herein), air and water quality, waste disposal, zoning, building, occupational safety and health, industrial hygiene, or to the environmental conditions on, under, or about the Premises, including, but not limited to, soil and groundwater conditions ("**Environmental Laws**").

2.     **Use of Hazardous Materials.**  Tenant shall not, in violation of any Environmental Laws, use, generate, manufacture, store, or dispose of, on, under, or about the Premises or transport to or from the Premises any flammable explosives, radioactive materials, including, without limitation, any substances defined as, or included in the definition of, "hazardous substances", "hazardous wastes", or "hazardous materials" under any applicable Environmental Laws ("**Hazardous Materials**").

3.     **Environmental Liens.**  Tenant shall not create or suffer to exist with respect to the Premises, or permit any of its agents to create or suffer to exist any lien, security interest or other charge or encumbrance of any kind, including without limitation, any lien imposed pursuant to section 107(f) of the Superfund Amendments and Reauthorization Act of 1986 (42 U.S.C. section 9607(l)) or any similar Environmental Law.

4.     **Responsibility.**  Tenant shall be solely responsible for, and shall indemnify and hold harmless Landlord, its partners, employees, agents, successors, and assigns from and against any loss, damage, cost, expense, or liability directly or indirectly arising out of or attributable to Tenant's use, generation, storage, release, threatened release, discharge, disposal of Hazardous Materials on, under, or about the Premises.  The foregoing indemnity shall survive the termination or expiration of this Lease.

### ARTICLE X
### MISCELLANEOUS

1.     **Brokers.**  Landlord represents and warrants that it has not dealt with any broker(s) in connection with the execution of this Lease and Tenant represents and warrants that it has not dealt with any broker(s) in connection with the execution of this Lease.  Each of the parties represents and warrants there are no claims for brokerage commissions or finders' fees in connection with the execution of this Lease.  Each of the parties agrees to indemnify and hold harmless the other from any and all liabilities, costs and expenses (including attorneys' fees) arising from a breach of the foregoing.

2.     **Assignment and Subletting.**  Tenant shall have the right to assign, transfer, sublease, mortgage or otherwise encumber this Lease or its interest in the Premises provided that Tenant first obtains the prior written consent of Landlord.  Any assignment or subletting shall not be construed either as waiving or releasing Tenant from any of its liabilities or obligations under this Lease.

3.     **Applicable Law.**  The laws of the State and County in which the Premises is located shall govern the validity, performance and enforcement of this Lease and jurisdiction shall be in same.

4.     **Captions.**  The captions and article numbers appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such articles or this Lease, nor in any way affect this Lease.

5.     **Entire Agreement.**  This Lease and the exhibits and riders, if any, attached hereto and forming a part hereof, represent the entire understanding and agreement between the parties with respect to the subject matter hereof, and supersede all other negotiations, understandings and representations (if any) made by and between the parties.  Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

6.     **Interpretations.**  This Lease shall not be construed more strictly against one party than against the other merely because it may have been prepared by counsel for one of the parties, it being recognized that both parties have contributed substantially and materially to its preparation.

7.     **Notices.**  All notices, demands and communications hereunder and copies of notices, demands, and communications, to Tenant or Landlord shall be served or given by hand-delivery or certified United States Mail, return receipt requested, or reputable overnight courier to the addresses first above appearing or to such other addresses as are hereinafter designated by either party, or their successors in interest, by notice in writing, sent by certified United States Mail, return receipt requested, or reputable overnight courier to such designated addresses. Notice shall be deemed effective upon delivery or refusal to accept delivery.

8.     **Relationship of Parties.**  The relationship between the parties hereto shall be solely as set forth herein, and neither party shall be deemed the employee, agent, partner or joint venturer of the other and that the relationship of the parties hereto is strictly that of Tenant and Landlord.

9.     **Severability.**  Each and every covenant and agreement contained in this Lease shall for all purposes be construed to be a separate and independent covenant and agreement, and the breach of any covenant or agreement contained herein by either party shall in no way or manner discharge or relieve the other party from its obligation to perform each and every covenant and agreement herein.  The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

10.     **Costs and Attorneys' Fees.**  If either party shall bring an action to recover any sum due hereunder, or for any breach hereunder, the court may award to the prevailing party its reasonable costs and reasonable attorneys' fees, specifically including reasonable attorneys' fees incurred in connection with any appeals, whether or not taxable as such by law.

11.     **Reasonable Consent.**  Any consent or approval of either party required hereunder shall not and may not be unreasonably withheld unless this Lease provides that such consent or approval is within the sole discretion of such party.

12.     **Successors and Assigns.**  This Lease shall be binding upon and enure to the benefit of the successors and assigns of the parties hereto.

13.     **No Representations or Warranties by Landlord.**  Neither Landlord nor any agent or employee of Landlord has made any representations or promises with respect to the Premises except as herein expressly set forth, and no rights, privileges, easements or licenses are acquired by Tenant except as herein expressly set forth.  Tenant has no right to light or air over any premises adjoining the Premises.  This Lease constitutes the entire agreement of the parties with respect to the subject matter hereof and Tenant's leasehold interest.  All prior and contemporaneous written and oral agreements are merged herein.

14.     This Lease shall be strictly construed against neither Landlord or Tenant; each provision hereof shall be deemed both a covenant and a condition running with the land; except as otherwise expressly provided in this Lease, the singular includes the plural and the plural includes the singular; "or" is not exclusive; a reference to an agreement or other contract includes supplements and amendments thereto to the extent permitted by this Lease; a reference to any laws includes any amendment or supplement to such laws; a reference to a person or entity includes its permitted successors and assigns; accounting provisions have the meanings assigned to them by generally accepted accounting principles applied on a consistent basis; the words "such as", "include", "includes" and "including" are not limiting; except as specifically agreed upon in this Lease, any right may be exercised at any time and from time to time, and all obligations are continuing obligations throughout the Term of this Lease, and in calculating any time period, the first day shall be excluded and the last day shall be included, and all days are calendar days unless otherwise specified.

Exhibit E

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

15.    Time is of the essence with respect to this Lease and each and every provision hereof.

16.    The provisions of this Lease that relate to periods subsequent to the expiration of the Term shall survive the expiration of the Term.

[Signatures on following page]

Exhibit E

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the date first above written.

Landlord:

**RED APPLE AT BERKELEY, LLC,**
a Florida limited liability company

By: _____
Name: Jonathan K. Hage
Title:    President

Witness:

_____
Print Name: _____

_____
Print Name: _____

Tenant:

**BERKELEY CHARTER EDUCATION ASSOCIATION, INC.,**
a South Carolina not-for-profit corporation

By: _____
Name:  Stewart Weinberg, Ph.D.
Title:    President

Witness:

_____
Print Name: MARGARET K. WEINBERG

_____
Print Name: Martha E. Herchek

1876709v4 980058.0372

13

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit E

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the date first above written.

Landlord:                                          Tenant:

**RED APPLE AT BERKELEY, LLC,**                    **BERKELEY CHARTER EDUCATION**
a Florida limited liability company                **ASSOCIATION, INC.,**
                                                   a South Carolina not-for-profit corporation


By:_____                  By:_____
Name:  Jonathan K. Hage                            Name:
Title:    President                                Title:


**Witness:**                                       **Witness:**

_____                     _____
Print Name: _____                   Print Name: _____


_____                     _____
Print Name: _____                   Print Name: _____

**EXHIBIT "A"**

**DESCRIPTION OF PREMISES**

ALL that piece, parcel or tract of land situate, lying and being in the County of Berkeley, State of South Carolina, containing 15.67 Acres, more or less, shown as **TRACT A-2A** on a plat entitled "PLAT OF THE SUBDIVISION OF **TRACT A (RESIDUAL 2) CONTAINING 88.72 +/- Ac.** TO CREATE **TRACT A-2A (15.63 Ac.)** NEAR SUMMERVILLE, BERKELEY COUNTY, SOUTH CAROLINA, prepared for and owned by WILDCAT TRAIL 2, LLC" prepared by Phillip P. Gerard, PLS, of Thomas & Hutton Engineering Co., dated November 5, 2019, and recorded on December 27, 2019, in the R.O.D. Office for Berkeley County as Document ID 2019046929.

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

Exhibit E

**EXHIBIT "B"**

**BASE RENT**

| | |
|---|---|
| YEAR 1 | $1,300,000 |
| YEAR 2 | $1,326,000 |
| YEAR 3 | $1,352,520 |
| YEAR 4 | $1,379,570 |
| YEAR 5 | $1,407,161 |
| YEAR 6 | $1,435,304 |
| YEAR 7 | $1,464,010 |
| YEAR 8 | $1,493,290 |
| YEAR 9 | $1,523,156 |
| YEAR 10 | $1,553,619 |
| YEAR 11 | $1,584,691 |
| YEAR 12 | $1,616,385 |
| YEAR 13 | $1,648,713 |
| YEAR 14 | $1,681,687 |
| YEAR 15 | $1,715,321 |
| YEAR 16 | $1,749,627 |
| YEAR 17 | $1,784,620 |
| YEAR 18 | $1,820,312 |
| YEAR 19 | $1,856,718 |
| YEAR 20 | $1,893,852 |
| YEAR 21 | $1,931,729 |
| YEAR 22 | $1,970,364 |
| YEAR 23 | $2,009,771 |
| YEAR 24 | $2,049,966 |
| YEAR 25 | $2,090,965 |

ELECTRONICALLY FILED - 2025 Feb 11 3:09 PM - BERKELEY - COMMON PLEAS - CASE#2025CP0800478

1876709v4 980058.0372